# EXHIBIT   B - PART 1 OF 4

REC'D CLS DOCKETING

GLORIA

MC-275

| Name | Robert J. Linn |
|------|----------------|
| Address | P. O. Box 705, WA-326L |
| | Soledad, CA 93960-0705 |

CDC or ID Number C-82285

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF RIVERSIDE

(Court)

Robert J. Linn
Petitioner

vs.

Board of Parole Hearings, et. al
Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No. _____

*(To be supplied by the Clerk of the Court)*

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

- [ ] A conviction
- [X] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other (specify): _____

1. Your name    Robert J. Linn

2. Where are you incarcerated?    Correctional Training Facility, Soledad, CA

3. Why are you in custody?    [X] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Murder, First Degree

   b. Penal or other code sections:  187

   c. Name and location of sentencing or committing court:  Superior Court of California, County of Riverside

   d. Case number:  CR 18380

   e. Date convicted or committed:  April 19, 1983

   f. Date sentenced:  February 22, 1984

   g. Length of sentence:  25 years to life

   h. When do you expect to be released?  unknown

   i. Were you represented by counsel in the trial court?    [X] Yes.    [ ] No.  If yes, state the attorney's name and address:

      Ronald G. Lorden, Attorney At Law, 4275 Lemon St. Suite 250, Riverside, CA 92501

4. What was the LAST plea you entered? *(check one)*

   [ ] Not guilty    [X] Guilty    [ ] Nolo Contendere    [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury    [ ] Judge without a jury    [ ] Submitted on transcript    [ ] Awaiting trial

---

MC-275 [Rev. January 1 1999]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page two of six

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

_____

_____

_____

_____

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

_____

_____

_____

_____

7. **Ground 2 or Ground** _____ _(if applicable):_

See attached petition

_____

_____

_____

_____

  a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

  b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment?   ☐ Yes.  ☒ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

     _____

   b. Result _____  c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

             (2) _____

             (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

     _____

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☒ No.  If yes, give the following information:

   a. Result _____  b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

             (2) _____

             (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    N/A _____

    _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    N/A _____

    _____

    _____

    _____

    _____

    _____

    _____

   b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

12  Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13.  a.  (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result *(Attach order or explain why unavailable):* _____

(5) Date of decision: _____

b.  (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result *(Attach order or explain why unavailable):* _____

(5) Date of decision: _____

c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14.  If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15.  Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

N/A

_____

16.  Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

17.  Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

18.  If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

N/A

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: *April 29, 2007*

_____
(SIGNATURE OF PETITIONER)

1 | Robert J. Linn, C-82285
P. O. Box 705, WA-326L
2 | Soledad, CA 93960-0705

3 | Petitioner, In Pro Per

4

5

6

7

8

9

10 |                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11 |                       **COUNTY OF RIVERSIDE**

12

13

14

15 | Robert J. Linn,                    )
                                       )    Case No.
16 |              Petitioner,           )
                                       )
17 |         v.                         )    **PETITION FOR WRIT OF**
                                       )    **HABEAS CORPUS**
18 | Board of Parole Hearings, et al.,  )
                                       )
19 |              Respondent.           )

20

21 |        **TO THE HONORABLE JUDGE OF THE SUPERIOR COURT OF**
            **CALIFORNIA, IN AND FOR THE COUNTY OF RIVERSIDE**
22

23 |     Petitioner hereby petitions for a Writ of Habeas Corpus and

24 | by this verified petition states as follows:

25 |                               I

26 |                          **INTRODUCTION**

27 |    1.  The Board of Parole Hearings [hereinafter Board] failed

28 | to make its suitability determination in a manner consistent

                                    1

1  with its obligation under the California Penal Code, California

2  Code of Regulations and settled California law.  The Board's

3  decision failed to follow or apply controlling legal principles

4  and its own regulations in finding petitioner unsuitable for

5  parole, the decision was devoid of the "some evidence" required

6  by law, and was arbitrary and capricious resulting in a due

7  process violation of Article 1, § 7 of the California

8  Constitution and the Fifth and Fourteenth Amendments to the

9  United States Constitution.  The Board violated the Due Process

10  Clause of the Fifth Amendment and the notice and jury trial

11  guarantees of the Sixth Amendment of the United States

12  Constitution.  For these reasons the Board's finding that

13  petitioner is unsuitable for parole should be reversed.

14                              II

15                           **PARTIES**

16      2.  Petitioner Robert J. Linn is a prisoner of the State of

17  California and is currently incarcerated at the Correctional

18  Training Facility in Soledad, California.

19      3.  Respondent Ben Curry is the Acting Warden of the

20  Correctional Training Facility, Soledad, California.

21      4.  Respondent J. Dovey is the Director of the California

22  Department of Corrections and Rehabilitations.

23      5.  Respondent James Davis is the Chairperson of the Board

24  of Parole Hearings and is responsible for its operations.

25  (Penal Code § 5075.)

26      6.  Respondent Arnold Schwarzenegger is the Governor of the

27  State of California and is responsible for the Board's

28  operation.  (Penal Code §§ 5075, 3041.1 and 3041.2.)

                              2

III

### STATEMENT OF FACTS

7.  Petitioner plead guilty to first degree murder on April 19, 1983, and was sentenced to 25 years-to-life on February 22, 1984.

8.  On December 19, 2006, Petitioner's seventh Subsequent Parole Consideration Hearing was held before the Board. Petitioner was found unsuitable and denied parole for a period of one year.

9.  Petitioner has no other plain or adequate remedy in the ordinary course of the law. This petition is addressed to this courts original habeas corpus jurisdiction because the issues raised are of constitutional dimension, questioning the legality of petitioner's confinement. A petition for a Writ of Habeas Corpus based upon factual allegations to be determined by reviewing court is generally first brought in the Superior Court. (*In re Hillery* (1972) 202 Cal.App.2nd 293.) Petitioner alleges that the Board violated his due process rights by failing to find him suitable for parole, thus depriving him of a liberty interest. The Fifth and Fourteenth Amendments of the United States Constitution and the California Constitution, Article I, section 7, subdivision (a), prohibit the government from depriving an inmate of life, liberty, or property without due process of law. Petitioner has been denied due process of law in violation of not only the United States Constitution but also the Constitution of the State of California, the California Penal Code, the California Code of Regulations, and established law. This is petitioner's first request for habeas relief, and

3

1 | thus is properly filed in this court.

2 |     10.   The accompanying Memorandum of Points and Authorities

3 | and factual allegations contained herein, as well as the exhibits

4 | appended to this petition are incorporated herein by reference.

5 |     WHEREFORE, petitioner respectfully prays that this Court:

6 |     A.   Issue a Writ of Habeas Corpus directing the Direct of

7 | the Department of Corrections and Rehabilitation to inquire into

8 | the legality of petitioner's incarceration;

9 |     B.   Order the immediate release of the petitioner; or

10 |     C.   Order the Board to schedule and commence a new term-

11 | fixing hearing within thirty days, and to render a new

12 | determination in strict accordance with both the letter and

13 | spirit of the regulations and law;

14 |     D.   Conduct an evidentiary hearing;

15 |     E.   Appoint counsel;

16 |     F.   Declare the rights of the parties; and

17 |     G.   Grant any and all relief the court deems appropriate.

18 |

19 | DATED:  April 29, 2007                 Respectfully submitted,

20 |

21 |

22 |                                        Robert J. Linn

23 | ///                                    Petitioner, In Pro Per

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

**VERIFICATION**

I, Robert J. Linn, state:

I am the petitioner in this action.  I have read the foregoing petition for writ of habeas corpus and the attached memorandum of points of authority, and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on April 29, 2007.

Robert J. Linn

5

1    **MEMORANDUM AND POINTS OF AUTHORITY**

2    **INTRODUCTION**

3    "The Board of Prison Terms is authorized by statute to

4    determine parole suitability, and to exercise its discretion in

5    deciding whether to grant or deny parole." (*In re Rosenkrantz*

6    (2000) 80 Cal.App.4th 409, 423; Penal Code, § 3040.)

7    Penal Code section 3041 sets forth criteria the Board must

8    consider in determining parole.

9    The California Code of Regulations (hereinafter CCR), title

10   15, division 2, chapter 3, article 11, section 2400 et seq. set

11   forth additional criteria for determining parole suitability for

12   persons found guilty of murders committed after November 7,

13   1978.

14   Subdivision (c) of section 2402 sets forth the circumstances

15   tending to show unsuitability for parole, which include: (1)

16   Commitment Offense; (2) Previous Record of Violence; (3)

17   Unstable Social History; (4) Sadistic Sexual Offenses; (5)

18   Psychological Factors; and (6) Institutional Behavior.

19   Subdivision (d) of section 2402 sets forth the circumstances

20   tending to show suitability for parole, which include: (1) No

21   Juvenile Record; (2) Stable Social History; (3) Signs of

22   Remorse; (4) Motivation for Crime; ... (6) Lack of Criminal

23   History; (7) Age; (8) Understanding and Plans for Future; and

24   (9) Institutional Behavior.

25   In *Rosenkrantz*, our Supreme Court held "that the judicial

26   branch is authorized to review the factual basis of a decision

27   of the Board denying parole in order to ensure that the decision

28   comports with the requirements of due process of law, but that

6

1  in conducting such a review, the court may inquire only whether

2  *some evidence* in the record before the Board supports the

3  decision to deny parole, based upon *the factors specified by*

4  *statute and regulation.*  If the decision's consideration of the

5  specified factors is not supported by some evidence in the record

6  and thus is devoid of a factual basis, the court should grant

7  the prisoner's petition for writ of habeas corpus and should

8  order the Board to vacate its decision denying parole and.

9  therefore to proceed in accordance with due process of law."

10  (*In re Rosenkrantz (2002)* 29 Cal.4th 616, 658, emphasis added.)

11     In *Dannenberg* the Supreme Court held "In that regard, we

12  noted that 'the nature of the prisoner's offense, alone, can

13  constitute a sufficient basis for denying parole.  [Citations.]'

14  (*Rosenkrantz, supra*, 29 Cal.4th 616, 682.)  While neither the

15  board nor the Governor may adopt a blanket no-parole policy for

16  particular offenses, we said, 'the [parole] authority properly

17  may weigh heavily the degree of violence used and the amount of

18  viciousness shown by a defendant.'  (*Id.*, at p. 683.) [¶]

19  However, we cautioned, sole reliance on the commitment offense

20  might, in particular cases, violate section 3041, subdivision

21  (a)'s provision that a parole date 'shall normally be set' under

22  'uniform term' principles, and might thus also contravene the

23  inmate's constitutionally protected expectation of parole.  We

24  explained that such a violation could occur, 'for example[,]

25  where no circumstances of the offense reasonable could be

26  considered more aggravated or violent than the minimum necessary

27  to sustain a conviction for that offense.'  (*Rosenkrantz, supra*,

28  29 Cal.4th 616, 683.)  Quoting *Ramirez, supra*, 94 Cal.App.4th

7

1   549, 570, we suggested that, in order to prevent the parole

2   authority's case-by-case suitability determinations from

3   swallowing the rule that parole should 'normally' be granted, an

4   offense must be *particularly egregious'* to justify the denial

5   of parole. (*Rosenkrantz, supra*, at 683.)" (*In re Dannenberg*,

6   (2005) 34 Cal.4th 1061, 1094-1095.)

7       The Supreme Court then held "As we have explained, however,

8   the Board must apply detailed standards when evaluating whether

9   an individual inmate is unsuitable for parole on public safety

10  grounds. (See § 3041, subd. (b); CCR § 2402.) When the Board

11  bases unsuitability on the circumstances of the commitment

12  offense, it must cite 'some evidence' of aggravating facts

13  *beyond the minimum elements of that offense.* (*Rosenkrantz,*

14  *supra*, 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg, supra*, 34

15  Cal.4th 1061, 1095.)

16      Therefore, according to our Supreme Court, the Board must

17  follow and apply the factors specified by statue and regulation

18  in determining that the circumstances of the commitment offense

19  was "particularly egregious" and cite aggravating facts that

20  were beyond the minimum elements of that offense and support

21  these determinations with "some evidence" in the record. The

22  Board must also cite "some evidence" that reliably and

23  rationally indicates a prisoner's release would unreasonably

24  endanger public safety. As will be shown below the Board failed

25  to meet these requirements resulting in a violation of

26  petitioner's due process rights and other state and federal

27  constitutional rights.

28                          I

                           8

1    *Claim*:   The Board failed to follow or apply the controlling

2    legal principles, the decision was devoid of the "some evidence"

3    required by law and was arbitrary and capricious, resulting in a

4    due process violation of Article I, § 7 of the California

5    Constitution and the Fifth and Fourteenth Amendment to the

6    United States Constitution.

7        *Argument*:   Before addressing the specific unsuitability

8    factors the Board relied on, petitioner will address the Board's

9    misplaced confusion on what they claim is the existence of

10   different versions of the commitment offense.

11       The Board stated, "First of all, as in every parole hearing

12   in the Decision, we have to talk about the commitment offense.

13   And one of the areas that we struggle with is with regards to

14   the commitment offense and is the fact that there's a couple of

15   different versions of how – what you actually did during the

16   offense.   Versus what your companion did during the offense."

17   (Exhibit 1, Subsequent Parole Consideration Hearing Transcript,

18   December 19, 2006 [hereinafter HT]; p. 113, L 20-26, to p. 114,

19   L 1.)   The position of the Board that there exist conflicting

20   versions of the circumstances surrounding the events of the

21   crime is perplexing.   The actual circumstances of the offense

22   have been previously address on numerous prior occasions.

23   (Exhibit 1, HT, p. 4, L 8-11; see also Exhibits 19, 20, 21, 22,

24   23, 24, 25, and 26.)   In fact petitioner provided the Board, at

25   the beginning of the hearing, with uncontrovertible evidence in

26   support of his version of the events.   (Exhibit 28, Exception to

27   the Statement of Facts.)   The Board's refusal to accept the

28   actual court transcripts and reliance on the mischaracterization

9

1  contained in the Probation Officer's Report is unfathomable.

2  Not only is this an abuse of the Board's authority but is both

3  arbitrary and capricious.

4      In finding petitioner unsuitable for parole the Board

5  seemed to rely on CCR, § 2402, subdivisions (c)(1)(A),

6  (c)(1)(D), (c)(1)(E), and (c)(5), as "some evidence" that

7  petitioner's crime was "particularly egregious," making him

8  unsuitable for parole, and that he *currently* poses a threat to

9  public safety if released at this time.

10  A.   The Board's reliance on the gravity of the commitment
        offense failed to meet the "some evidence" standard
11      required by law, was arbitrary and capricious, and resulted
        in a due process violation.

12

13     CCR, § 2402 (c)(1) states, "Commitment Offense.  The

14  prisoner committed the offense in an especially heinous,

15  atrocious or cruel manner."  The regulations then list five

16  subfactors that must be considered.

17     As will be demonstrated below, the Board's reliance on

18  three of these factors to show that petitioner is unsuitable for

19  parole is flawed.

20     First, a cursory review of the record in this case

21  demonstrates that the Board's decision was unreasonable under

22  the applicable "some evidence" rule.  The record simply does not

23  contain *any* evidence that petitioner's first degree murder was

24  *particularly* egregious.  Nor does the record contain *any*

25  evidence that petitioner is currently a threat to society.

26  Given that both findings are required by California law, there

27  is *zero* evidence in the record to support the Board's decision.

28     Second, the nature of the offense may justify a denial of

10

1   parole if the crime was committed in an "especially heinous,

2   atrocious or cruel manner."  An offense that was "no more

3   aggravated or violent than the minimum necessary to sustain a

4   conviction" for first degree murder does not justify a finding

5   of unsuitability for parole.  (*Rosenkrantz* at p. 682.)

6       To guide this determination, CCR, § 2402, subd. (c)(1)(A)-

7   (E) establishes the specified criteria the Board must rely on to

8   demonstrate that a prisoner committed his offense in an

9   "especially heinous, atrocious or cruel manner."  It is

10  axiomatic that absent the required "some evidence" supporting

11  any of the specified factors that decision would be arbitrary

12  and capricious and result in a due process violation.

13      Petitioner will demonstrate that each of the Board's

14  unsuitability findings failed to meet the specified legal and

15  regulatory requirements.

16  1.   The Board's finding that petitioner attacked multiple
         victims is not supported by the record.
17

18       CCR, § 2402 (c)(1)(A) states, "Multiple victims were

19  attacked, injured or killed in the same or separate incidents."

20      The Board stated, "[T]here were more than one victim and

21  you acknowledged that.  There was one murder victim and two

22  brothers, who had to watch their brother die and carry that with

23  them." (Exhibit 1, HT, p. 116, L 12-15.)

24      According to the record, and the Board's own statement,

25  only one person was killed.  Petitioner robbed two individuals

26  and shot and/or killed no one.  It is apparent that the Board is

27  relying on the fact that multiple individuals were robbed to

28  satisfy the "multiple victims were attacked" requirement of this

                                11

1  unsuitability factor.  The American Heritage Dictionary, 1985
2  ed., defines attack as: "1.  To set upon with violent force."
3  Neither of the two brothers were physically assaulted or injured
4  as a result of this incident.  Petitioner would content that the
5  intent of this factor is to recognize the dangerousness of
6  serial killers, violent perpetrators on a crime spree or
7  individuals who shoot, stab or injury more then one victim
8  during the commission of a crime.  As this clearly does not fit
9  the case record of petitioner's commitment offense, the misuse
10  of this factor by the Board is arbitrary and capricious.

11       The Board's mischaracterization of this factor as evidence
12  that petitioner's offense was "especially egregious" cannot be
13  allowed to stand.

14  2.   The Board's finding that petitioner demonstrated an
        exceptionally callous disregard for human suffering is not
15      supports by any evidence.

16       CCR, § 2402 (c)(1)(D) states, "The offense was carried out
17  in a manner which demonstrates an exceptionally callous
18  disregard for human suffering."

19       The Board stated, "The offense was carried out in a cruel
20  and callous manner[.]"  (Exhibit 1, HT, p. 116, L 11-12.)

21       "All first degree murders by definition involve some
22  callousness – i.e., lack of emotion or sympathy, emotional
23  insensitivity, indifference to the feelings and suffering of
24  others.  As noted, however, parole is the rule, rather than the
25  exception, and a conviction for first degree murder does not
26  automatically render one unsuitable."  (*In re Smith* (2003) 114
27  Cal.App.4th 343, 366.)  In *In re Ramirez* (2001) 94 Cal.App.4th
28  549, as in this case, the Board denied a parole release date on

                                  12

1  the basis of a finding that the nature of the inmate's offense

2  displayed a "callous disregard for human suffering." (*Id.* at pp.

3  558, 568.)  Setting aside that determination, the court agreed

4  that "the gravity of the commitment offense or offenses alone

5  *may* be a sufficient basis for denying a parole application, so

6  long as the board does not fail to consider all other relevant

7  factors," *Id.* at p. 569, but attached an important caveat.  As

8  the court explained, "[a]ll violent crime demonstrates the

9  perpetrator's potential for posing a grave risk to public

10 safety, yet parole is mandatory for violent felons serving

11 determinate sentences.  (Pen. Code, § 3000, subd. (b)(1).)  And

12 the Legislature has clearly expressed its intent that when

13 murderers - who are the great majority of inmates serving

14 indeterminate sentences - approach their minimum eligible parole

15 date, the Board 'shall normally set a parole release date.'

16 (Pen. Code, § 3041, subd. (a).)  The Board's authority to make

17 an exception based on the gravity of a life term inmate's

18 current or past offenses should not operate so as to swallow the

19 rule that parole is 'normally' to be granted.  Otherwise, the

20 Board's case-by-case rulings would destroy the proportionality

21 contemplated by Penal Code section 3041, subdivision (a), and

22 also the murder statutes, which provide distinct terms of life

23 without possibility of parole, 25 years to life, and 15 years to

24 life for various degrees and kinds of murder.  (Pen. Code, § 190

25 et seq.)." (*Ramirez*, at p. 570.)  Therefore, to demonstrate "an

26 exceptionally callous disregard for human suffering" (§ 2402,

27 subd. (c)(1)(D)) the offense in question must have been

28 committed in a more aggravated or violent manner than that

13

1  ordinarily shown in the commission of first degree murder.

2      *In re Van Houten* (2004) 116 Cal.App.4th 339 illustrates the

3  sort of gratuitous cruelty required.  The prisoner in that case

4  was involved in multiple stabbings of a woman with a knife and

5  bayonet.  While she was dying, the victim was made aware her

6  husband was suffering a similarly gruesome fate.  As stated by

7  the court, "[t]hese acts of cruelty far exceeded the minimum

8  necessary to stab a victim to death." (*Id.* at p. 351.)  Other

9  examples of aggravated conduct reflecting an "exceptionally

10 callous disregard for human suffering," are set forth in Board

11 regulations relating to the matrix used to set base terms for

12 life prisoners (§ 2282, subd. (b)); namely, "torture," as where

13 the "[v]ictim was subjected to the prolonged infliction of

14 physical pain through the use of non-deadly force prior to act

15 resulting in death," and "severe trauma," as where "[d]eath

16 resulted from severe trauma inflicted with deadly intensity;

17 e.g., beating, clubbing, stabbing, strangulation, suffocation,

18 burning, multiple wounds inflicted with a weapon not resulting

19 in immediate death or actions calculated to induce terror in the

20 victim." (*Ibid.*)  No such facts or anything remotely similar

21 are present in this case.  As in *In re Smith*, *supra*, 114

22 Cal.App.4th 343, there is no evidence petitioner "tormented,

23 terrorized, or injured the victim before his crime partner shot

24 the victim, or that he gratuitously increased or unnecessarily

25 prolonged the victim's pain and suffering.  As the *Scott* court

26 stated, "Was the crime callous? Yes.  However, are the facts of

27 the crime some evidence that [he] acted with exceptionally

28 callous disregard for [the victim's] suffering; or do the facts

14

1  distinguished this crime from other [first] degree murders as
2  exceptionally callous?  No.  (*Id.* at p. 367.)" (*In re Scott*,
3  (2004) 119 Cal.App.4th 871, 891-892.)

4      Because the relevant evidence shows no more callous
5  disregard for human suffering than is shown by most first degree
6  murder offenses, the Board's use of this factor to conclude that
7  petitioner committed his offense "in an especially cruel and
8  callous manner" was arbitrary and capricious.

9  3.   The Board's finding that petitioner's motive for the crime
        was trivial lacks evidentiary support.
10

11     CCR, § 2402 (c)(1)(E) states, "The motive for the crime is
12  inexplicable or very trivial in relation to the offense."

13     The Board stated, "In all - - and you know, and with
14  regards to the motive, the motive of the crime was very trivial.
15  You were looking for a way to support your drug habit at that
16  point." (Exhibit 1, HT, p. 116, L 23 -26 to p. 117, L 1.)

17     "The epistemological and ethical problems involved in the
18  ascertainment and evaluation of motive are among the reasons the
19  law has sought to avoid the subject.  As one authority has
20  stated, '[h]ardly any part of penal law is more definitely
21  settled than that motive is irrelevant.'  (Hall, General
22  Principles of Criminal Law (2d ed. 1960) at p. 88; see also
23  Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.
24  Justice Ethics 3.)... The offense committed by most prisoners
25  serving life terms is, of course, murder.  Given the high value
26  our society places upon life, there is no motive for unlawfully
27  taking the life of another human being that could not reasonably
28  be deemed 'trivial.'  The Legislature has foreclosed that

                                15

1  approach, however, by declaring that murderers with life

2  sentences must 'normally' be given release dates when they

3  approach their minimum eligible parole date.  (Pen. Code, §

4  3041, subd. (a).)  The governing statue also states the Board

5  shall set a release date 'unless it determines that the gravity

6  of current convicted offense or offenses, or the timing and

7  gravity of the current or past convicted offense or offenses, is

8  such that consideration of the public safety requires a more

9  lengthy period of incarceration for this individual, and that a

10 parole date, therefore cannot be fixed at this meeting.'  (Pen.

11 Code, § 3041, subd. (b).)  This language means a 'more lengthy

12 period of incarceration' is called for where the gravity of the

13 offense or offenses of the prisoner in question is more

14 indicative of a danger to the public if the prisoner is released

15 than would ordinarily be the case.  The reference in Board

16 regulations to motives that are 'very trivial in relationship to

17 the offense' therefore requires comparisons; to fit the

18 regulatory description, the motive must be materially less

19 significant (or more 'trivial') than those which conventionally

20 drive people to commit the offense in question, and therefore

21 more indicative of a risk of danger to society if the prisoner

22 is released than is ordinarily presented."  (*In re Scott* (2004)

23 119 Cal.App.4th 871, 893.)

24     The "evidence" articulated by the Board in support of their

25 finding that the "motive" was "very trivial" was that petitioner

26 had committed the robbery to obtain money to purchase drugs.

27 (Exhibit 1, HT, p. 116, L 25-26, to p. 117, L 1.)  Although this

28 "fact" is reliably documented, it fails to make the required

16

1   comparison of how the "motive" was "very trivial" in relation to
2   other robberies or how it was indicative of a risk of danger to
3   society.
4       "[I]n the parole context, the requirements of due process
5   are met if some evidence support the decision." (Biggs v.
6   Terhune, 334 F.3d 910, 915 (9th Cir. 2003.) "Some evidence,"
7   however does not mean literally "any" evidence.  If it did, the
8   protection afforded by due process would be meaningless.  In
9   addition, the evidence underlying the decision must possess some
10  indicia of reliability." (Biggs at 914 [internal quotations
11  omitted]; Caswell, 363 F.3d at 839; see Hill at 455-456.)
12  Evidence that lack any real probative value cannot constitute
13  "some evidence." (See Cato, 924 F.2d at 705.) Otherwise, the
14  requirement of "some evidence" could be satisfied by baseless
15  speculation, superstition, or stereotyping.  That too would
16  reduce the requirement of "some evidence" to a sham or a
17  mockery.
18      The circumstances surrounding the crime or the manner in
19  which it was committed must show not only that the first degree
20  murder at issue was more cruel or vicious than the ordinary
21  first degree murder, but also that petitioner would likely pose
22  a current risk to public safety if released.  The reliance on a
23  "very trivial motive" factor fails to rise to the required
24  level.
25      Therefore, the Board's reliance on this factor to deem
26  petitioner a risk to public safety and a danger to society was
27  arbitrary and capricious and should be reversed.
28

B.     The Boards finding that due to psychological factors
        prisoner was unsuitable for parole and a threat to society
        if released is not supported by the evidence, regulations,
        or statute.

    CCR, §2402 (c)(5) states, "Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense."

    For this unsuitability factor to apply to petitioner the Board is required to demonstrate that there is or was a "lengthy history of severe mental problems related to the offense." (CCR, § 2402 (c)(5).) The Board has failed to meet this regulatory requirement.

    The Board stated "There's three specific areas that we are going to have looked at for you on a new psychological evaluation. One reason being that this is a 2005 Psyche. [sic] It's not an old psyche [sic] for you but it doesn't answer the questions that we have and there's a couple of other issues." (Exhibit 1, HT, p. 113, L 13-18.) "There's always -- there's been a question of your addiction and I want to tell you what I wrote on the psyche [sic] request was, is your addiction real or was it exaggerated?" (Exhibit 1, HT, p. 114, L 8-11) "Where would you have gone if you hadn't been caught for this one? Would there have been future victims down the road? How long would your addiction have carried on. [sic]" (Exhibit 1, HT, p. 115, L 3-6.) "The other thing that I want the psychologist to explore is your mental health issues. What they said about you way back when, when you first were evaluated and to rule out any questions that there might be an ongoing problem there." (Exhibit 1, HT, p. 115, L 22-26, to p. 116, L 1.)

18

1    A review of all the Psychological Evaluations (Exhibits 11-

2   18), spanning more than 24 years of petitioner incarceration,

3   will not only prove to be informative but instructive as well.

4    1.  "Should he be placed on probation, and in absence of

5   antisocial individuals who can influence him, he has potential

6   for conducting himself well within the community in which he

7   resides."  E. Rivlin, Ph.D., Senior Psychologist, 7-21-83.

8   (Exhibit 11, Psychological Evaluation [hereinafter PE].)

9    2.  "I have no recommendation at this time for him."

10   Charles D. Willis, M.D., 4-14-86.  (Exhibit 12, PE.)

11    3.  "There is no essential change so that the prior consult

12   applies to his current situation."  Charles D. Willis, M.D., 1-

13   29-87.  (Exhibit 13, PE.)

14    4.  "A review of the inmate's medical records and central

15   file revealed no psychiatric history in his past."  "In point of

16   facts, Mr. Linn appeared to be a well-adjusted, focused and

17   coherent 31-year-old male."  "It is concluded, therefore, that

18   if the inmate were to [sic] placed in a less restricted

19   environment, such as would be the case where he to return to

20   life outside of prison, he would not constitute any greater

21   danger to the general public than would the average inmate."

22   "In conclusion then, there appears to be no basis for positing

23   psychological considerations as impediments to releasing the

24   inmate on parole."  Paul Rodriquez, Ph.D., Staff Psychologist,

25   2-16-90.  (Exhibit 14, PE.)

26    5.  "He does not have a psychiatric condition which would

27   benefit from mental health treatment following his release."

28   "If he is considered for parole, his level of dangerousness is

19

1  likely to be less than the average inmate."  Bruce M. Bakeman,

2  Ph.D., Clinical Psychologist, 5-15-96.  (Exhibit 15, PE.)

3      6.  "If released to the community, his violence potential

4  is considered to be no more than average, and perhaps even

5  somewhat below average, relative to the average citizen in the

6  community."  "This inmate does not have a mental health disorder

7  which would necessitate treatment either during his

8  incarceration period or following parole."  Steven J. Terrini,

9  Ph.D., Staff Psychologist, 10-13-98.  (Exhibit 16, PE.)

10      7.  "His prognosis is positive for being able to maintain

11  his present gains in the community upon parole."  "It is

12  estimated that his violence potential, if released to the

13  community, would be no more than the average citizen."  "This

14  inmate does not have a mental health disorder which would

15  necessitate treatment either during his incarceration period or

16  following parole."  Jeff Howlin, Ed.D., Staff Psychologist, 11-

17  26-02.  (Exhibit 17, PE.)

18      8.  "In considering his potential for dangerous behavior if

19  released to the community at this point, I agree with the prior

20  evaluators, who stated that his violence potential in the

21  community would be no greater than the average citizen in the

22  community.  There are several facts that support this

23  conclusion.  Inmate Linn is not a criminally-oriented person.

24  He does not have antisocial thinking or values.  He does not

25  have a personality disorder that would contribute towards

26  violence.  He definitely knows the difference between right and

27  wrong, and he has a well developed conscience and strong

28  abhorrence against wrong activities. ... He has changed

20

1  considerable since he was 21 years of age and was involved in
2  the commitment offense." "Other evaluators have noted that a
3  risk factor for inmate Linn for potential violence would be if
4  he were to return to the abuse of alcohol or drugs.  The fact
5  that this raises the issue about potential future drug use is
6  what has concerned the Board of Prison Terms in the past.  In
7  this writer's opinion, this is no longer an issue in this man's
8  life." "There is no indication of any mental or emotional
9  problems that would interfere with this inmate being granted
10 parole.  The prognosis for successful adjustment in the
11 community in this case is excellent. ... Compared to other
12 inmates, and even compared to other lifers, his work skills and
13 work history are above average.  These factors support the
14 conclusion that he will do very well in the community." "His
15 prognosis for success   is excellent."  M. Macomber, Ph.D.,
16 Clinical Psychologist, 09-06-05.  (Exhibit 18. PE.)

17     The Board considered Dr. Macomber's evaluation.  (Exhibit
18 1, HT, p. 54, L 17-27, pp. 55, 56, 57, to p. 58, L 1-16.)  And,
19 as it appears in the record, the Board dismissed Dr. Macomber's
20 evaluation and failed to consider any of the past mental health
21 evaluations.

22     In point of fact the Board is requiring a psychologist to
23 speculate about hypothetical events that may or may not ever
24 occur.

25     It is beyond understanding how a psychologist can now
26 determine if petitioner's 25 year ago addiction was real or
27 exaggerated.  Or what would have become of petitioner if he had
28 not been arrested.  Or if there would have been more victims in

21

1  the future if petitioner had not been arrested.

2      It is also unclear how this speculation can rise to the

3  level of "some evidence" that petitioner now posses and

4  unreasonable risk of danger to society if released on parole.

5      The last issue the Board raised, on-going mental health

6  issues, has been more that adequately addressed in the current

7  and past psychological evaluations.

8      The record in this case is replete with evidence

9  demonstrating that petitioner does not have a mental health

10 disorder, does not pose a threat or danger to society if

11 released on parole, and, in the opinion of psychological

12 professionals, will be able to successfully make the transition

13 from prisoner to law abiding citizen.

14      Absent some, or any, evidence to support this finding, the

15 Board's decision is arbitrary and capricious and cannot stand.

16      As it was required to do, the Board considered whether

17 petitioner was suitable for parole – that is, whether he

18 presented an unreasonable risk of danger to society if released.

19 (See Penal Code § 3041 (b); CCR, § 2402.)  It decided that

20 petitioner posed an unreasonable risk of danger (and, therefore,

21 was unsuitable for parole) because his crime was especially

22 heinous.  While relying upon the nature of petitioner's crime as

23 an indicator of his dangerousness -- after over two and a half

24 decades of incarceration -- violates due process because

25 petitioner's commitment offense has become such an unreliable

26 predictor of his present and future dangerousness that it does

27 not satisfy the "some evidence" standard.  After over twenty-

28 five years of rehabilitation, the ability to predict a

22

1   prisoner's future dangerousness based simply on the

2   circumstances of his or her crime is nil. (See *Irons v. Warden*

3   *of California State Prison - Solano*, 358 F.Supp.2d 936, 947 n1

4   ["To a point, it is true, the circumstances of the crime and

5   motivation for it may indicate a petitioner's instability,

6   cruelty, impulsiveness, violent tendencies and the like.

7   However, after fifteen or so years in the caldron of prison

8   life, not exactly an ideal therapeutic environment to say the

9   least, and after repeated demonstrations that despite the

10  recognized hardships of prison, this petitioner does not possess

11  those attributes, the predictive ability of the circumstances of

12  the crime is near zero."] Even California courts have said as

13  much. (*In re Scott* (2005) 133 Cal.App.4th 573, 595 ["The

14  commitment offense can negate suitability only if circumstances

15  of the crime reliably established by evidence in the record

16  rationally indicate that the offender will present an

17  unreasonable public safety risk if released from prison. Yet,

18  the predictive value of the commitment offense may be very

19  questionable after a long period of time."].)

20      Regardless of whether the Board ever was entitled to rely

21  upon the commitment offense to find that petitioner posed an

22  unreasonable risk of danger and was unsuitable for parole, in

23  the exceptional circumstances presented by this case, the

24  Board's reliance on the commitment offense violates due process

25  because it resulted in an arbitrary decision and because the

26  facts surrounding the offense do not now constitute "some

27  evidence" possessing "some indicia of reliability" that

28  petitioner poses a danger to the community.

23

1    Because there is no reliable evidence supporting the

2   Board's conclusion that petitioner is unsuitable for parole,

3   that determination violates due process.

4                              II

5        *Claim*:  The Board's continued reliance on unchanging

6   factors resulted in a due process violation.

7        *Argument*:  In finding petitioner unsuitable at his eighth

8   parole suitability hearing, the panel relied exclusively on an

9   unchanging factor: the commitment offense.  In Biggs, the Ninth

10  Circuit stated that the Board was *"initially* justified" in

11  finding Mr. Biggs unsuitable based on the circumstances of the

12  offense and his conduct prior to imprisonment.  The Ninth

13  Circuit added that "[a] continued reliance in the future on an

14  unchanging factor, the circumstance of the offense and conduct

15  prior to imprisonment, runs contrary to the rehabilitative goals

16  espoused by the prison system and could result in a due process

17  violation."  (*Biggs*, *supra*, 334 F.3d at 917.)

18       One district court has explained the rationale underlying

19  this aspect of Biggs as follow:

20           "Whether the facts of the crime of conviction, or other
             unchanging criteria, affect the parole eligibility decision
21           can only be predicated on the "predictive value" of the
             unchanged circumstance.  Otherwise, if the unchanged
22           circumstance per se can be used to deny parole eligibility,
             sentencing is taken out of the hands of the judge and
23           totally reposited in the hands of the BPT.  That is, parole
             eligibility could be indefinitely and forever delayed based
24           on the nature of the crime even though the sentence given
             set forth the possibility of parole - a sentence given with
25           the facts of the crime fresh in the mind of the judge.
             While it would not be a constitutional violation to forego
26           parole altogether for certain crimes, what the state cannot
             constitutionally do is have a sham system where the judge
27           promises the possibility of parole, but because of the
             nature of the crime, the BPT effectively deletes such from
28           the system.  Nor can a parole system, where parole is

                               24

1
mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanging circumstance must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events."

(*Bair v. Folsom State Prison,* 2005 WL 2219220 (E.D.Cal. 2005),

report and recommendation adopted by 2005 WL 3081634 (E.D.Cal.

2005)

Another district court explained:

"More important ... in assessing any due process violation is the fact that continued reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetorically – what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crime will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrary hold that the circumstances were not that serious or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point on non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility." n2

n2 "To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, the predictive ability of the circumstances of the crime in near zero."

(*Irons v. Warden of California State Prison – Solano,* 358

F.Supp.2d 936, 949.)

25

1      In the circumstances of this case, the Board's continued

2   reliance upon the nature of petitioner's crime to deny him

3   parole in 2006 violates due process.  Continued reliance upon

4   the unchanging facts of petitioner's crime makes a sham of

5   California's parole system and amounts to an arbitrary denial of

6   petitioner's liberty interest.  Petitioner has been granted

7   parole on one occasion and denied parole on six occasions prior

8   to the determination he now challenges.  (See Exhibits 4, 5, 6,

9   7, 8, 9, and 10.)   [It should be noted that at the December 4,

10  2002 hearing petitioner was found suitable for parole.  (Exhibit

11  8, Subsequent Parole Consideration Hearing Decision Transcript.)

12  This grant of parole was reversed by the Governor on May 2, 2003

13  on the same issues that petitioner now challenges.  (Exhibit 27,

14  Indeterminate Sentence Parole Release Review.)  It is amazing,

15  instructive, and bewildering that the Board flip-flops on the

16  facts.  At past hearings the Board uses facts to "prove"

17  petitioner is unsuitable for parole, at another hearing they use

18  the same facts to "prove" that petitioner is suitable, and then

19  at another hearing the same facts "prove" he is unsuitable

20  again.  The only factual difference is that petitioner has

21  served more time incarcerated.]  Continued reliance upon the

22  unchanging characterization of petitioner's offense amounts to

23  converting petitioner's sentence of 25 years to life to a term

24  of life without the possibility of parole.

25      The Board's continued reliance on the commitment offense

26  violates due process because it resulted in an arbitrary

27  decision and because the facts surrounding the offense do not

28  now constitute "some evidence" possessing "some indicia of

26

1   reliability" that petitioner pose a danger to the community.

2   (See *Hill*, 472, U.S. at 455;  *Biggs*, 344 F.3d at 917;  *Irons*,

3   358 F.Supp.2d at 947;  *Masoner v. State*, 2004 WL 1080177 at *1-2

4   (C.D.Cal. 2004) ["Although the gravity of the commitment offense

5   and other pre-conviction factors alone may be sufficient to

6   justify the denial of a parole date at a prisoner's initial

7   hearing, subsequent BPT decisions to deny a parole date must be

8   supported by some post-conviction evidence that the release of

9   an inmate is against the interest of public safety].)

10      Beside not being especially atrocious, heinous or callous,

11  petitioner's crimes have little, if any, predictive value for

12  future criminality.  Simply from the passing of time,

13  petitioner's crime 25 years ago have lost much of the usefulness

14  in foreseeing the likelihood of future offenses than if he had

15  committed them five or ten years ago.  (*In re Scott*, 133

16  Cal.App.4th at 573 [past crime's value for predicting future

17  crime diminishes over time].)

18      The Ninth Circuit Court of Appeals has articulated when the

19  reliance on unchanging factors, i.e. the reliance on the

20  commitment offense to deny parole, trigger a violation of the

21  Due Process Clause of the Fifth Amendment of the United States

22  Constitution.  The Ninth Circuit held, "We note that in all the

23  cases in which we have held that a parole Board's decision to

24  deem a prisoner unsuitable for parole solely on the basis of his

25  commitment offense comports with due process, the decision was

26  made before the inmate had served the minimum number of years to

27  which they had been sentenced at the time of the challenged

28  parole denial by the Board.  *Biggs, Sass,* and here, the

27

1  petitioners had not served the minimum numbers of years to which
2  they had been sentenced at the time of the challenged parole
3  denial by the Board. *Biggs*, 334 F.3d at 912; *Sass*, 461 F.3d
4  1125. All we held in those cases and all we hold today,
5  therefore, is that, given the particular circumstances of the
6  offenses in these cases, due process was not violated when these
7  prisoners were deemed unsuitable for parole prior to the
8  expiration of their minimum terms." (*Irons v. Carey*, ___ F. ___
9  (9th Cir. 2007)

10      Petitioner was sentenced to a term of 25 years to life. At
11  the time of the 2006 parole hearing, petitioner had served a
12  total of 25 years 11 months (excluded 8 years 7 months of earned
13  good time and work time credits). Petitioner has exceeded the
14  minimum number of years threshold articulated in *Irons*. Based
15  on the holding of the Ninth Circuit Court in *Irons*, the Board
16  violated petitioner's due process rights by deeming him
17  unsuitable for parole based on the commitment offense.

18      Because there is no reliable evidence supporting the
19  Board's conclusion that petitioner is unsuitable for parole, and
20  the Ninth Circuit Court's holding in *Irons*, that determination
21  violates due process. (*Hill*, 472, U.S. a5 455.)

22                              CONCLUSION
23      The California rules governing parole in murder cases, for
24  which parole eligibility is provided by statute, [See CCR §
25  2402] are as follows: "[P]arole eligibility is the rule, rather
26  than the exception." (*In re Scott*, *supra*, 119 Cal.App.4th at p.
27  891.) "[P]arole is 'normally' to be granted." (*Id.* [quoting
28  Penal Code § 3041 (a)].) The murder giving rise to the

                                28

1  prisoner's incarceration must be "particularly egregious" for

2  parole to be denied. (*In re Rosenkrantz, supra*, 29 Cal.4th at p.

3  683.)  Indeed, a murder must be "heinous, atrocious or cruel"

4  if, as here, the offense is to serve as the basis for parole

5  denial.  (CCR, § 2402 (c)(1).)  In addition, in such cases, the

6  prisoner must *presently* present a danger to society.  (Penal

7  Code § 3401 (b).)  In short, in petitioner's case, the

8  circumstances surrounding the crime or the manner in which it

9  was committed must show not only that the first degree murder at

10 issue was more cruel or vicious than the ordinary first degree

11 murder, but also that petitioner would likely pose a current

12 risk to public safety if released.  The record in this case

13 contains absolutely *no* evidence that would meet *either* of the

14 two requirements.  Thus, there can be little doubt that the

15 Board violated the applicable rules when it denied petitioner

16 parole solely on the basis of his commitment offense.

17      All murders represent the basest form of human behavior.

18 Our laws, however, provide for mechanisms by which even

19 murderers, in limited circumstances, are entitled to be paroled.

20 The judiciary has an obligation to execute those laws.  The

21 record establishes that petitioner does not pose an unreasonable

22 risk to public safety.  Any contrary conclusion lacks any

23 evidentiary support.  Therefore, petitioner prays that this

24 court will grant the petition for habeas corpus.

25

26 DATED: April 29, 2007                    Respectfully submitted,

27

28                                          Robert J. Linn
                                            Petitioner, In Pro Per

**TABLE OF EXHIBITS**

**EXHIBIT 1**
Subsequent Parole Consideration Hearing Transcript
December 19, 2006

**EXHIBIT 2**
Probation Officer's Report
May 11, 1983

**EXHIBIT 3**
Abstract of Judgment
March 1, 1984

**EXHIBIT 4**
Initial Parole Consideration Hearing Decision Transcript
December 4, 1996

**EXHIBIT 5**
Subsequent Parole Consideration Hearing Decision Transcript
December 16, 1998

**EXHIBIT 6**
Subsequent Parole Consideration Hearing Decision Transcript
July 18, 2000

**EXHIBIT 7**
Subsequent Parole Consideration Hearing Decision Transcript
December 5, 2001

**EXHIBIT 8**
Subsequent Parole Consideration Hearing Decision Transcript
December 4, 2002

**EXHIBIT 9**
Subsequent Parole Consideration Hearing Decision Transcript
April 21, 2004

**EXHIBIT 10**
Subsequent Parole Consideration Hearing Decision Transcript
September 30, 2005

**TABLE OF EXHIBITS**
(Continued)

**EXHIBIT 11**
Psychological Evaluation
July 21, 1983


**EXHIBIT 12**
Psychological Evaluation
April 14, 1986


**EXHIBIT 13**
Psychological Evaluation
January 29, 1987


**EXHIBIT 14**
Psychological Evaluation
February 16, 1990


**EXHIBIT 15**
Psychological Evaluation
May 15, 1996


**EXHIBIT 16**
Psychological Evaluation
October 13, 1998


**EXHIBIT 17**
Psychological Evaluation
November 26, 2002


**EXHIBIT 18**
Psychological Evaluation
September 6, 2005


**EXHIBIT 19**
Life Prisoner Evaluation
August 1996 Calendar


**EXHIBIT 20**
Life Prisoner Evaluation
December 1998 Calendar

**TABLE OF EXHIBITS**
(Continued)

**EXHIBIT 21**
    Life Prisoner Evaluation
    December 1999 Calendar

**EXHIBIT 22**
    Life Prisoner Evaluation
    July 2001 Calendar

**EXHIBIT 23**
    Life Prisoner Evaluation
    December 2002 Calendar

**EXHIBIT 24**
    Life Prisoner Evaluation
    December 2003 Calendar

**EXHIBIT 25**
    Life Prisoner Evaluation
    April 2005 Calendar

**EXHIBIT 26**
    Life Prisoner Evaluation
    September 2006 Calendar

**EXHIBIT 27**
    Indeterminate Sentence Parole Release Review
    May 2, 2003

**EXHIBIT 28**
    Exception To The Statement of Facts

**EXHIBIT 29**
    Petitioner's Response To Unsuitability and Suitability Facts
    (CCR § 2402 (c) and (d))

**E X H I B I T**

**1**

Subsequent Parole Consideration Hearing Transcript
December 19, 2006

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )     CDC Number C-82285
                           )
ROBERT LINN                )
                           )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 19, 2006

9:30 A.M.


PANEL PRESENT:

LINDA SHELTON, Presiding Commissioner
WILLIAM KEENAN, Deputy Commissioner


OTHERS PRESENT:

ROBERT LINN, Inmate
PAT FOX, Attorney for Inmate
JOHN RUIZ, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum


Anna E. McGaughy                    House of Scribes

ii

<u>INDEX</u>

                                                    <u>PAGE</u>

Proceedings . . . . . . . . . . . . . . . . . .   1

Case Factors. . . . . . . . . . . . . . . . .   8

Pre-Commitment Factors. . . . . . . . . . . . . 17

Post-Commitment Factors . . . . . . . . . . . . 28

Parole Plans. . . . . . . . . . . . . . . . . . 64

Closing Statements. . . . . . . . . . . . . . . 99

Recess. . . . . . . . . . . . . . . . . . . . .111

Decision. . . . . . . . . . . . . . . . . . . .112

Adjournment . . . . . . . . . . . . . . . . . .122

Transcriber Certification . . . . . . . . . . .123

1

<pre>
 1                    P R O C E E D I N G S

 2            DEPUTY COMMISSIONER KEENAN:  Okay, we're on

 3    record.

 4            PRESIDING COMMISSIONER SHELTON:  All right.

 5    Good morning, everyone.  We are here for a Subsequent

 6    Parole Consideration for Robert Linn, L-I-N-N, CDC

 7    Number C-82285.  Today's date is December 19, 2006 and

 8    the time is 9:30 a.m.  We are located at CTF Soledad.

 9    Let's see.  Mr. Linn was received from Riverside

10    County on March 8, 1984.  His life term began that

11    same date; March 8, 1984 and he has a minimum eligible

12    parole date of October 23, 1997.  Controlling offense

13    for which Mr. Linn has been committed is 187-PC,

14    Murder, First, Case Number CR-18380.  Also non-

15    controlling offenses; Count Two, 211-PC, Robbery;

16    Count Three, 211-PC, Robbery.  Mr. Linn received a

17    term of 25 years to life.  All right.  Sir, this

18    hearing is being tape-recorded for voice

19    identification purposes so we will go around the room

20    and introduce ourselves.  Say our first name, our last

21    name, spell our last name and when we get to you,

22    please add your CDC number.

23            INMATE LINN:  All right.

24            PRESIDING COMMISSIONER SHELTON:  My name is

25    Linda Shelton, S-H-E-L-T-O-N, Commissioner.

26            DEPUTY COMMISSIONER KEENAN:  Bill Keenan,

27    K-E-E-N-A-N, Deputy Commissioner.
</pre>

2

1            DEPUTY DISTRICT ATTORNEY RUIZ:  John Ruiz,

2    Deputy District Attorney, R-U-I-Z.

3            ATTORNEY FOX:  Pat Fox, F-O-X, Attorney for

4    Mr. Linn.

5            INMATE LINN:  Robert Linn, L-I-N-N, C-82285.

6            PRESIDING COMMISSIONER SHELTON:  Thank you.

7    And for the record, we have two officers in the room

8    for security purposes, who will not be participating

9    in today's hearing.  All right.  Sir, before we get

10   started I want to go over some ADA issues with you.

11   You signed BPT Form 1073 on May 3, 2006, indicating

12   that you had no disabilities that needed

13   accommodation.  Is that true?

14           INMATE LINN:  Yes.

15           PRESIDING COMMISSIONER SHELTON:  Counsel,

16   did you have a chance to go over the form I gave you

17   today with him?

18           ATTORNEY FOX:  Yes, I do and I have the

19   executed document right here.

20           PRESIDING COMMISSIONER SHELTON:  Thank you.

21           ATTORNEY FOX:  The only comment I have,

22   Mr. Linn does not suffer from any maladies that would

23   require ADA accommodation.  And regarding the

24   statement on that form regarding confidential

25   material, I would object at this state -- at this

26   stage to any use of confidential material because I've

27   been denied access to it.  And of course, I wouldn't

3

1  be able to defend any allegations that may or may not

2  be contained in there.

3           PRESIDING COMMISSIONER SHELTON:  Well, we

4  don't know if we have any or if we're going to use any

5  so we'll get to that at that time, okay?

6           ATTORNEY FOX:  Okay, thank you.

7           PRESIDING COMMISSIONER SHELTON:  Um-hum.

8  Just a couple questions for the record.  Mr. Linn, do

9  you wear glasses?

10           INMATE LINN:  No.

11           PRESIDING COMMISSIONER SHELTON:  Okay.  And

12  so you don't need glasses; right?

13           INMATE LINN:  No.

14           PRESIDING COMMISSIONER SHELTON:  Your

15  hearing is okay?  You can hear me fine?

16           INMATE LINN:  My hearing is fine.

17           PRESIDING COMMISSIONER SHELTON:  Are you on

18  any medication, sir?

19           INMATE LINN:  No.

20           PRESIDING COMMISSIONER SHELTON:  Okay.  Your

21  mobility is okay?  You're comfortable sitting,

22  standing, walking?

23           INMATE LINN:  Yes.

24           PRESIDING COMMISSIONER SHELTON:  Okay.  Than

25  I think we're ready to go.  What do you think?

26           INMATE LINN:  Yes.

27           PRESIDING COMMISSIONER SHELTON:  All right.

4

1   I want to remind you of a couple of things, even

2   though I know you've been here before.  You have

3   certain rights and those rights include the right to a

4   timely notice of this hearing, the right to review

5   your central file.  And it looks to me that you

6   reviewed your central file on June 2, 2006?

7           INMATE LINN:  Yes.

8           PRESIDING COMMISSIONER SHELTON:  Okay, good.

9   And the right to present relevant documents.  And I

10  know your attorney handed us some documents and we'll

11  review those as we go along.  Counsel, have we met

12  your client's rights so far?

13          ATTORNEY FOX:  Yes, as to this hearing.

14          PRESIDING COMMISSIONER SHELTON:  Okay,

15  great.  Mr. Linn, you also have an additional right to

16  be heard by an impartial Panel.  And today, your Panel

17  would be Commissioner Keenan and myself.  Is that all

18  right with you?

19          INMATE LINN:  Yes, it is.

20          PRESIDING COMMISSIONER SHELTON:  Okay, thank

21  you.  A couple of years ago the regulations changed

22  with regards to your right to appeal.  So if you have

23  any questions about that, consult with your attorney

24  or go to the prison law library.  I'll give you a

25  postscript to that.  Evidently, there's going to be

26  some future changes made to that, as well.  So if you

27  need that information, kind of try to keep abreast of

5

1    it.  I just -- I don't have all the particulars right
2    now to tell you.  Now, sir, you are not required to
3    admit to or discuss your offense, however, this Panel
4    does accept as true the findings of the Court.  Tell
5    me what that means.
6              INMATE LINN:  It means that the evidence
7    that was -- that was -- that I'm convicted of, you
8    know, the crime that I'm convicted of.  It means that
9    I am convicted of First Degree Murder and that's what
10   the Court found and Robbery.
11             PRESIDING COMMISSIONER SHELTON:  Very good.
12   It also means that we're not here to retry your case.
13   We're here to discuss issues of suitability for you,
14   okay?
15             INMATE LINN:  Yes.
16             PRESIDING COMMISSIONER SHELTON:  Now,
17   Commissioner, do we have any confidential information?
18             DEPUTY COMMISSIONER KEENAN:  We do.  And it
19   will not be used unless otherwise specified during the
20   course of this hearing.
21             PRESIDING COMMISSIONER SHELTON:  I already
22   passed the Hearing Checklist to both Mr. Ruiz and
23   Ms. Fox and both have signed and indicated that they
24   have all the necessary materials to move forward.
25   Counsel, as there any additional documents to submit
26   other than, I know you submitted to us a parole
27   hearing -- parole plan package.  As well as a letter

6

1   with regards to housing at Anonymity Recovery House.

2   And you also a circumstances tending to show

3   unsuitability format.

4           ATTORNEY FOX:  That's the title of the first

5   page but it does include --

6           PRESIDING COMMISSIONER SHELTON:  Also --

7           ATTORNEY FOX:  --. factors tending to support

8   suitability.

9           PRESIDING COMMISSIONER SHELTON:  And

10  circumstances tending to show suitability.

11          ATTORNEY FOX:  So that's it for now.  In the

12  event --

13          PRESIDING COMMISSIONER SHELTON:  You are

14  welcome to submit anything all during the course of

15  the hearing.

16          ATTORNEY FOX:  Great.  Thank you, because

17  sometimes --

18          PRESIDING COMMISSIONER SHELTON:  Until we

19  recess.

20          ATTORNEY FOX:  -- chronos don't get into the

21  file.

22          PRESIDING COMMISSIONER SHELTON:  Right.  And

23  I appreciate it as we go through each section.  It

24  just makes it easier to review that.  And Mr. Linn,

25  we'll review this last suitability/unsuitability

26  package during that recess.

27          INMATE LINN:  All right.

7

1    PRESIDING COMMISSIONER SHELTON:   Okay?
2    Thank you.  And we will review the others during yours
3    and my discussion about parole plans.  Are there any
4    preliminary objections?
5    ATTORNEY FOX:  No, ma'am.
6    PRESIDING COMMISSIONER SHELTON:  And will
7    your client be speaking with us today?
8    ATTORNEY FOX:  Yes, he will, as to all
9    aspects.
10    INMATE LINN:  Yes.
11    PRESIDING COMMISSIONER SHELTON:  Okay.  Then
12    sir, please raise your right hand.  Do you solemnly
13    swear or affirm that the testimony you give at this
14    hearing will be the truth, the whole truth and nothing
15    but the truth?
16    INMATE LINN:  I do.
17    PRESIDING COMMISSIONER SHELTON:  Okay.  Then
18    let's do this, just to get things opened up since
19    you're going to speak with us about the offense, as
20    well.  Then what I would like to do is refer to the
21    September 2006 Board Report.  It's a brief summary and
22    an adequate one and I will go ahead and enter that
23    into the record as a way to jump into this, okay?
24    ATTORNEY FOX:  Normally, I object to using
25    the Probation Officer's Report because it's based on
26    hearsay.  And if any evidence would be reliable, it
27    would be testimony received under oath.  There was a

8

1   preliminary examination in this case.  However, having

2   said that, to use that as a jumping off point I think

3   would be all right.

4                PRESIDING COMMISSIONER SHELTON:  Thank you.

5                ATTORNEY FOX:  You're welcome.

6                PRESIDING COMMISSIONER SHELTON:  I like to

7   use Appellate Rulings but I have none in my file so,

8   all right.

9                "On December 28, 1980 at approximately

10                4:30 p.m., the Riverside County Sheriff's

11                Deputies responded to a report of robbery

12                and a homicide in an avocado grove on

13                Kamerlin (phonetic) Road near Rancho,

14                California.  Once at the scene, the officers

15                took statements from Jose and Abel Zelgado

16                (phonetic), victims of the robbery.  The

17                Zelgado brothers stated that they and their

18                brother, Guadalupe (phonetic) Zelgado, had

19                been working at the edge of the avocado

20                grove when two white men robbed them at

21                gunpoint.  Guadalupe attempted to run away

22                but was shot and killed by the two robbers.

23                A subsequent investigation revealed Linn's

24                crime partner, John Crawley (phonetic), had

25                left Linn's house armed with a rifle.

26                Investigators received a statement from

27                Ronald Crawley, indicating that John had a

9

1          history of robbing illegal aliens and had

2          left Linn's house armed with a rifle on the

3          day of the homicide.  Linn was arrested for

4          murder shortly afterwards."

5    Mr. Linn, would you like to tell us in your own words

6    what was going on then; what happened?

7          INMATE LINN:  You want me to explain to you

8    the day of the crime?

9          PRESIDING COMMISSIONER SHELTON:  Sure, if

10    you're comfortable doing that.

11          INMATE LINN:  Yes, I can do that.

12          PRESIDING COMMISSIONER SHELTON:  Okay.

13          INMATE LINN:  I submitted a prisoner's

14    version of the crime and it's fairly brief but it's

15    pretty concise.  I'll go ahead and elaborate

16    (indiscernible).  What I've been saying all along to

17    the Board; we would do armed robberies and as we

18    pulled up to the three people that were working off to

19    the side of the road, just as we stepped from the

20    vehicle, one of the victims fled into the avocado

21    grove.  And as I stepped from the vehicle, I

22    approached Abel Zelgado and Jose Zelgado.  Jose and

23    Abel did not run.  Guadalupe ran and as we stepped

24    from the vehicle my co-Defendant, John Crawley, went

25    in running pursuit of him.  And at this -- at the

26    moment that John fired his shot, actually what he did,

27    he ran to the location where Guadalupe was standing

10

1    when he was -- before he took off running.  And John

2    basically got to that location and by doing that, he

3    was in line of sight of where Guadalupe was running.

4    Because it is an avocado grove and the aisle of the

5    trees was blocking peripheral view.  So at that time,

6    I had my -- I was approaching Abel and Jose.  Jose

7    took off running to Guadalupe's right -- I mean,

8    Abel's -- Jose took off from Abel's right, okay?  He

9    went to the right.  He ran to the right and Guadalupe

10   ran to the left but he was already to the left so he

11   more or less just ran straight up into the avocado

12   grove.  And Abel Zelgado yelled for his brothers to

13   stop running.  He was running for Jose to stop running

14   because Guadalupe was already long gone.  He was gone.

15   He was pretty much up in the grove when our feet hit

16   the ground out of the car.  So because Jose didn't run

17   right away, he didn't get very far.  He stopped

18   somewhere down the hill a little ways because his

19   brother yelled for him to stop running.  At that

20   point, he came back but I have a -- basically it was a

21   motion of approaching Abel Zelgado when I heard a shot

22   fired.  I was probably a distance of maybe ten feet

23   from him, maybe eight feet at the time that the shot

24   was fired.  And at -- back then when the crime took

25   place, I wasn't sure if there was two shots or one

26   shot.  I got -- I thought it over and through and I

27   know that the terrain was hilly.  It was like a

11

1    ravine.  There was avocado groves on both sides of the

2    road.  And the evidence that was found in court

3    actually more indicated there was one round, one shot

4    fired, okay?  But at the time, there was a lot of

5    statements saying two shots and I believe that that

6    was actually a echo of the terrain that made it sound

7    like two shots.  Because we really weren't paying

8    attention to that shot.  I know there was a shot fired

9    and at that point, that's when I looked at

10    John Crawley.  When I heard a shot, I looked for

11    John Crawley, which he was to my right and to Abel

12    Zelgado's left.  And like I said, I was pointing the

13    gun at him at this time.

14            PRESIDING COMMISSIONER SHELTON:  So you were

15    armed?

16            INMATE LINN:  I was armed with a .22 rifle

17    and it was loaded.  And at this point, like I say, I

18    looked towards John Crawley, my co-Defendant, and at

19    the same moment, Abel looked that direction.  We both

20    looked that direction.  Well, I knew I'm doing an

21    armed robbery so I didn't just -- you know, I kept --

22    I was still careful what I was doing.  I still had my

23    gun on Abel Zelgado.  And at this point, Abel -- Jose

24    was still coming back.  He did run oh, maybe 40 feet,

25    maybe 50 feet down a hill a little ways but he came

26    back.  He didn't come running back.  He walked back.

27    John took off up in the avocado grove.  At that point,

12

1    while John was gone up in the -- while he took off in

2    the avocado grove, I was doing a robbery.  I was

3    robbing Abel Zelgado and Jose Zelgado.  I robbed

4    Abel Zelgado first because Jose Zelgado was just still

5    coming back.  But I told Abel Zelgado to give me his

6    money, okay?  At that point, I told him to give me his

7    money and he did give me his money.  When Jose came

8    back, now I'm not real clear, I'm not real clear

9    exactly what I said to Jose about his money but I know

10   I was trying to get his money from him because there

11   was a robbery.  I was doing this robbery.  And at that

12   point, keep in mind I already did take the money from

13   Abel Zelgado and this is happening fairly quick, okay?

14   These people were running and I wasn't that far.  When

15   we pulled up to the crime scene, I was approximately

16   maybe 50 or 60 feet away from Abel Zelgado.  So when I

17   approached him, it wasn't too -- it was within seconds

18   that I was already on -- within range of where I told

19   you I was.  The location was eight to ten feet from

20   him.  Now, of course I moved in closer to get the

21   money and actually do the robbery.  I stepped right up

22   to him within maybe three or four feet to do that

23   robbery, okay?  But then after all that robbery taking

24   place, John came back before I took money from Jose.

25   Before I had a chance to take money from Jose, I

26   should say.  John came back from the avocado grove and

27   he came running out of the avocado grove and ran right

13

1   up to me and got to my left side.  He came around

2   behind me, got to my left side and then he told me in

3   my ear, he goes, "I think I killed this guy."  Well,

4   at that point, I didn't know what to think, you know.

5   Whether he knew what he was talking about.  I realized

6   right then and there that he did shoot someone.  There

7   was no doubt about that.  I can't sit here and say

8   well, I thought he was kidding or something like that.

9   I may have said something about that in the past, that

10  I was kidding or he was kidding, I thought he was

11  kidding.  I didn't even mean -- my interpretation was

12  misconstrued because the fact is, that's not what I

13  intended.  My intentions were of saying that I didn't

14  know if he actually knew he killed someone, you know.

15  He told me he thought he killed someone but I thought

16  maybe, it wasn't an actual killing.  But besides all

17  that, it's irrelevant, okay?  He did come back and

18  tell me that he shot this guy and possibly killed him.

19  And at that point, Jose was holding his money out and

20  John Crawley grabbed it out of his hand and at that

21  point, we told them to lay down on the ground.  We

22  told them to lay down on the ground because we didn't

23  know what we were doing.  We told them, "Get down, get

24  down, get down."  We both basically gestured for them

25  to get down.  I speak English, they speak Spanish and

26  I don't think they -- the only communication was

27  gesture and we knew how to say money and stop.  That's

14

1    all -- the only Spanish words I knew.  But the point

2    is, is that we got them to lay down on the ground and

3    no sooner than they laid down, I would say within

4    about three -- two or three seconds, we told them,

5    "Get up.  Go.  Run."  We started yelling at them, "Get

6    out of here.  Get out of here."  And then they jumped

7    up and ran at that point.  We got in the car and we

8    fled the scene of the crime and we went back downtown

9    and on the way home we stopped at a store.  And then

10   by the time we got home, there was already an

11   investigator at his house so we knew they were onto

12   us.  Basically, we knew we were suspects and the

13   reason why is because he had a green Pinto and there

14   was only a couple of green Pintos in that town.  And

15   the sheriff's kind of narrowed it down to who had

16   three Pintos and that led the investigation to us.

17   And me and John was basically -- we came up with an

18   alibi and it didn't fly and ten days later, we were

19   arrested and that's basically the crime.

20              PRESIDING COMMISSIONER SHELTON:  Question

21   for you, sir.  Were you under the influence of

22   anything during the commission of that crime?

23              INMATE LINN:  During the crime?  I was

24   drinking that day.  I drank -- I believe I drank about

25   six beers that day.  It may have been more because it

26   was the day of a football game and we -- I was at my

27   house and we were drinking beer.  And about three-

15

1   quarters of the way through the game, the game -- it

2   was the Super Bowl, as a matter of fact.   Three-

3   quarters of a way through that game, it was a blowout

4   in the game and we just decided we were going to go

5   out and do our deed, you know, what we did.

6          PRESIDING COMMISSIONER SHELTON:   Had you

7   committed robberies before with your partner?

8          INMATE LINN:   Yes, I did.

9          PRESIDING COMMISSIONER SHELTON:   Had you

10  been caught for them before?

11         INMATE LINN:   No.   The one that I did before

12  I did the crime, one robbery before that and we didn't

13  get arrested for it.

14         PRESIDING COMMISSIONER SHELTON:   How did you

15  know him?

16         INMATE LINN:   When I moved out to Elsinore

17  from Orange County -- actually, I was living in Orange

18  County in San Juan Capistrano and the company that I

19  used to work for moved out to Riverside County and

20  they were building -- breaking ground on a bunch of

21  new homes.   So I went ahead and moved out there and

22  went back to work for the same company that basically,

23  there were kind of -- they kind of let me down before.

24  So I went ahead and found a new job at the time but

25  I'll get to the point here.   I moved out to Riverside

26  County and because I didn't really -- I was young, you

27  know.   I was 20 years old at the time and I just

16

1   turned 20 and I was looking for, you know, friendship,

2   you know.  And that town, basically there wasn't a

3   whole lot going on.  It was -- you know, it was a

4   roll-up town.  It rolls up at 7:00 when the light --

5   when it gets dark.  The only thing in town is bars.

6   And I know I'm kind of making up excuses but I was

7   basically just looking for people to associate with

8   and I saw some people framing houses, you know.  While

9   I was on my day -- a day off, I saw some guys framing

10  a house and I went over and I started talking to them.

11  And that was John Crawley, his brother and they were

12  doing construction work.  So that's how I met them.

13  That's how I met John, basically and we started

14  hanging out together and we did a little bit of -- we

15  did some good things.  You know, we went out and we

16  did some -- just stuff that normal people would do,

17  like boating and fishing and stuff like that.  But

18  then there was the drinking and there was the drugs.

19  You know, some drugs; marijuana and maybe -- no, I

20  never -- I never shot up any kind of dope or anything

21  like that but I used -- I might snort some crank once

22  in a while or a little cocaine.  But it wasn't that

23  often that I would do that but you know, I was known

24  to.  You know, if it was there, I would get involved

25  it, you know.

26              PRESIDING COMMISSIONER SHELTON:  Where is

27  your crime partner today?

17

1           INMATE LINN:   I believe he's at Old Folsom.

2    That's the last I heard.

3           PRESIDING COMMISSIONER SHELTON:   Did he also

4    get a charge or a conviction of Murder One?

5           INMATE LINN:   Huh?

6           PRESIDING COMMISSIONER SHELTON:   Did he get

7    a conviction for Murder One?

8           INMATE LINN:   Yes, he did.  Excuse me.  He

9    took a plea bargain.  We both took plea bargains.

10          PRESIDING COMMISSIONER SHELTON:   All right.

11   Commissioner, do you have any questions with regards

12   to the offense right now?

13          DEPUTY COMMISSIONER KEENAN:   Nothing.  Thank

14   you.

15          PRESIDING COMMISSIONER SHELTON:   Okay.

16   Mr. Linn, we'll be returning to this most likely.  We

17   can ask questions during the course of the hearing.

18   And what I'd like to do is move forward into your

19   prior record and your social history.  According to

20   what I have here and I appreciate your honesty.  Here

21   is says -- according to your Board Report, it said

22   that you had no juvenile record.  But you indicate

23   that that is wrong because you were placed on

24   probation for a burglary when you were about 12 or so?

25          INMATE LINN:   That's right.

26          PRESIDING COMMISSIONER SHELTON:   A

27   commercial burglary?

18

1        INMATE LINN:  Yes.

2        PRESIDING COMMISSIONER SHELTON:  What did

3   you -- where did you go, into a department store or a

4   business or something?

5        INMATE LINN:  The elementary school.  I was

6   in junior high school at the time and me and three

7   other people broke into a cafeteria or an auditorium.

8   You know, where they keep stuff and we took the band

9   equipment.

10       PRESIDING COMMISSIONER SHELTON:  Band

11  equipment?

12       INMATE LINN:  Yes.

13       PRESIDING COMMISSIONER SHELTON:  Did you

14  want to be a musician?

15       INMATE LINN:  No.  I don't know why I was

16  doing that.  We'd play against them.

17       PRESIDING COMMISSIONER SHELTON:  At 12 years

18  old, yeah, it probably just looked good.

19       INMATE LINN:  We had gone back real soon

20  after and we got caught.

21       PRESIDING COMMISSIONER SHELTON:  It also

22  indicates here that you have no prior record as an

23  adult?

24       INMATE LINN:  No, I don't.

25       PRESIDING COMMISSIONER SHELTON:  And I

26  couldn't -- I reviewed your CI&I file and it didn't

27  show anything there either.  Well, that's good.  All

19

1  right.  Let's talk about your social history a little

2  bit, okay?

3          INMATE LINN:  Okay.

4          PRESIDING COMMISSIONER SHELTON:  I want to

5  verify that your birthday is January 5, 1958?

6          INMATE LINN:  Yes.

7          PRESIDING COMMISSIONER SHELTON:  And you

8  were born in West Covina.  Your dad's name was

9  Robert Linn and your mom was Betty Ayers (phonetic)?

10          INMATE LINN:  Yes.

11          PRESIDING COMMISSIONER SHELTON:  You're the

12  third of five children.  Tell me about where your four

13  brothers and sisters are, briefly.

14          INMATE LINN:  I have a younger brother and

15  younger sister in Orange County right now.  My older

16  -- two older sisters -- well, actually all three of my

17  older sisters.  Two of them live in Tennessee and the

18  other one is in Boondocks, Alabama and they all

19  recently just moved out there, oh, the last four

20  years.  They've all kind of started heading out that

21  way.

22          PRESIDING COMMISSIONER SHELTON:  You have

23  five siblings or six all together in your family?

24          INMATE LINN:  Actually, six.

25          PRESIDING COMMISSIONER SHELTON:  Okay.  So

26  that's wrong.

27          INMATE LINN:  My older brother, I don't know

20

20

1  where he's at.  That's the thing is he -- he's having

2  serious -- you know, some issues and -- but he's not

3  connected to the family real well.  And everybody's

4  still trying to --

5           PRESIDING COMMISSIONER SHELTON:  Do you have

6  contact?

7           INMATE LINN: -- care -- you know, do what

8  they can for him but he just doesn't respond.  He

9  doesn't want to face the issues that he has and come

10 clean with the family.

11          PRESIDING COMMISSIONER SHELTON:  So he

12 doesn't want to be found right now?

13          INMATE LINN:  Evidently not.

14          PRESIDING COMMISSIONER SHELTON:  Okay.

15          INMATE LINN:  I really worry about him,

16 though, you know.  I'd like to be able to help him in

17 some way, you know, if I can.

18          PRESIDING COMMISSIONER SHELTON:  Well, I

19 know just briefly reviewing your parole plan that you

20 have contact with your siblings, most of them.

21          INMATE LINN:  Yes, I do.

22          PRESIDING COMMISSIONER SHELTON:  Mom and dad

23 are no longer alive?

24          INMATE LINN:  My mother is.  Yeah, she's in

25 Tennessee, too.

26          PRESIDING COMMISSIONER SHELTON:  Oh, is she?

27 Okay.  Growing up in school, it says you were a poor

21

1    student and dropped out of school in the ninth grade?

2            INMATE LINN:  Yes.

3            PRESIDING COMMISSIONER SHELTON:  And got into

4    construction work?

5            INMATE LINN:  Yes, I did.

6            PRESIDING COMMISSIONER SHELTON:  And I'm

7    assuming that you went back to school and got a GED or

8    a high school diploma some time in prison?

9            INMATE LINN:  Yes, I have.

10           PRESIDING COMMISSIONER SHELTON:  Okay, good.

11   And Commissioner Keenan will be going over that with

12   you in just a moment.  You were employed as a

13   construction foreman at the time of this arrest;

14   correct?

15           INMATE LINN:  Um-hum.  Yes.

16           PRESIDING COMMISSIONER SHELTON:  I guess

17   that leads me to a quick question of why were you

18   robbing people when you had, it sounds to me, like a

19   fairly reasonable job?  And construction pays pretty

20   well.

21           INMATE LINN:  I was making -- I was taking

22   home $350, $400 a week for a full week's pay.  At that

23   time, I was -- I had a drug addiction of cocaine and

24   I'd say it was just three to four months prior to the

25   crime, I started intravenously using cocaine.  And the

26   habit eventually progressed to a point where I was

27   going to the guy that was supplying cocaine and he

22

1   would give me an "X" amount of cocaine up front.

2   Either between $500 or it would be close to $1,000

3   worth.  It depends, you know, what -- how much I would

4   owe him.  First it started off as just $500, I'd get

5   and I didn't have no problem paying it.  I had money,

6   my paycheck and every -- and like I say, the $500

7   worth of cocaine would last me -- I would -- I wasn't

8   so addicted to it at that point to where I had to go

9   running back to the dealer and say I need more.  I

10  want more.  So at that point, I would pay for that

11  cocaine out of my paycheck.  And then say a couple

12  weeks go by and I would have placed an order again to

13  where I could go to him again.  I would pay him his

14  money and then he would give me another issue, okay?

15  So it became to where I would get cocaine before I'd

16  pay the money.  But now --

17          PRESIDING COMMISSIONER SHELTON:  So you

18  always owed him.

19          INMATE LINN:  For me to go get the cocaine,

20  I had to come up with some money and I had my regular

21  bills.  I was buying a truck and I was living in a

22  home and I was paying some bills.  I had gasoline and

23  food bills and stuff like that.  So my $300 to $400

24  paycheck was working okay for a while.  But I started

25  getting behind on bills that I had to pay or else I'd

26  lose -- have no place to live and this and that.  So

27  my money was kind of split between bills and trying to

23

1  support my habit.  And I tell you right now, that
2  habit was -- it got the best of me because it was --
3  every time that I was -- I'd find my pockets empty and
4  no cocaine or down to my last little pile of cocaine,
5  I'd be telling myself, what am I doing?  I kept
6  questioning myself.  What am I doing here?  I gotta
7  stop doing this.  I got -- this is it.  I'm not doing
8  this no more.  I'm not gonna do it no more.  And you
9  know what?  As soon as that was gone, the next day I
10  would be trying to conjure up a pile of money to get
11  some more cocaine.  I could not -- I could not control
12  that urge for cocaine.  Even as bad as I wanted to
13  stop, I could not control it.  So the point is, is I
14  had property, I had tools I had accumulated over the
15  years.  I bought tools and I had a motorcycle, fishing
16  boat.  I had fishing poles, I had guns.  I had a TV.
17  I had material things in my life that I had bought and
18  paid for from working before I had this problem.  I
19  began to sell those things off.  So it wasn't that I
20  had to go do a crime to support my habit.  It was more
21  of an issue of taking my paycheck, buying cocaine and
22  then start selling my personal possessions to keep up
23  with my bills and my cocaine habit.  And as I ran down
24  to zero property except for the truck and -- my very
25  truck and the clothes on my back and the few items
26  that I had, and I even was looking at my truck, to
27  sell my truck.  And I said no, I'm not touching my

24

1   truck.  You know, I had already convinced myself I'm

2   not going to sell my truck.  You know, that's where I

3   had to draw a line, not to sell my truck.  And I guess

4   maybe I'd have been better off selling my truck than

5   going and doing robberies but that -- I would have

6   continued right on the same path.  So that's what led

7   me to go do the robberies, is because of the fact that

8   I was out of control.  I lost control of my -- I lost

9   control of myself.

10          PRESIDING COMMISSIONER SHELTON:   I

11  appreciate your sharing that and being honest about

12  it.  And this also indicates that you're dyslexic.  Is

13  that true or not?

14          INMATE LINN:  I don't believe that's

15  actually the case.  You know, a lot of people --

16  growing up as a kid, I was told that a couple times by

17  grownup people, you know, and I -- so I took it for

18  face value that that must be my issue, you know?

19          PRESIDING COMMISSIONER SHELTON:   For

20  learning in school?

21          INMATE LINN:  Yeah.  And the thing is, is

22  the more I learned about what dyslexia was, I realized

23  that that really wasn't my problem.  My problem was I

24  didn't really pay attention in class, you know.  I

25  mean, I did well but I think somebody -- I'm not going

26  to -- I can't blame anyone for what happened to me in

27  school.  But I look back now and I just wish someone

25

1    would have said hey, kid, come here.  Pay attention,

2    you know.

3              PRESIDING COMMISSIONER SHELTON:  Put you up

4    (indiscernible), huh?

5              INMATE LINN:  Because I actually, I read

6    well and I like math and I like to learn and I didn't

7    feel good about being behind in class, behind in

8    school.  And the more I got behind, the harder it was

9    to keep up.  And the fact is, it seemed like there was

10   no catching up after a certain point and --

11             PRESIDING COMMISSIONER SHELTON:  Sure.  All

12   right.  So we've discussed so far in your social

13   history, we have discussed your family. We have

14   discussed your substance use.  We have discussed your

15   education.  It says here, you married a lady named

16   Marion Snyder after you got arrested?

17             INMATE LINN:  Yes.

18             PRESIDING COMMISSIONER SHELTON:  Did you

19   have any children?

20             INMATE LINN:  No.

21             PRESIDING COMMISSIONER SHELTON:  You're not

22   married to Marion anymore?  Or are you?  You're

23   legally married?

24             INMATE LINN:  We're married, yes.

25             PRESIDING COMMISSIONER SHELTON:  But no

26   relationship?

27             INMATE LINN:  No, separated.  I actually

26

1    talked to her about divorce and she told me that I

2    have to do it if I wanted to get it done.  So I went

3    ahead and I filed papers and I lost the -- I couldn't

4    find her.  She would disappear where I couldn't locate

5    her.

6          PRESIDING COMMISSIONER SHELTON:  Okay.

7          INMATE LINN:  So I said well, you know what?

8    The time will come.  I'll catch up with her eventually

9    and get it squared away.  And at this point, you know,

10    I've actually been in touch with her family for the

11    last five years or six years now and I just felt that,

12    you know, that that issue right there is probably

13    better left to deal with at another time.  I mean, I

14    don't want to -- you know, just because I got back in

15    contact with her family, hey, where's your sister, you

16    know?  I want to get this divorce and stuff.  I think

17    that's something that I'm going to have to get with

18    her at another time when it's more --

19          PRESIDING COMMISSIONER SHELTON:  Okay.  Who

20    comes and visits you here?

21          INMATE LINN:  Well, I actually get visits

22    from -- everyone in my family has visited me but they

23    don't get to get up here that frequent because of

24    distance.

25          PRESIDING COMMISSIONER SHELTON:  Besides

26    family, do you have any visitors?

27          INMATE LINN:  The friends that -- my sister-

27

1    in-law, she came up recently.  And she'd like to come

2    up more often but she's -- like I say, it's a thing of

3    it's real inconvenient and I don't -- I don't, you

4    know, ask them to come up.  Actually, I tell them, you

5    know, hold on because something might happen.  I --

6    maybe I'll get down south and then you don't have to

7    go through all this trouble.  But she's been up to

8    visit me and now she's married and she's a Christian

9    lady and she's real nice.  And you know, the funny

10   thing is she's -- there's something I need to explain

11   to her one day, too, you know, and actually in some --

12   in a certain way I have in letters, you know.  Kind of

13   let her know that everything's okay with me and that

14   she is not to blame for anything.  You know what I'm

15   saying?  Because she was going out with the guy --

16   actually, I think they were married.  She was married

17   to the guy that was giving me the cocaine.  So I think

18   she knew -- she saw what was going on.  I think she

19   got wind of what was going on because my wife, that's

20   her sister, they discussed my problem.  So maybe she

21   feels that, you know --

22             PRESIDING COMMISSIONER SHELTON:  A little

23   responsible.

24             INMATE LINN:  Yeah.  But I wrote her and let

25   her know that it was my choices that I made to do

26   things in my life that caused myself to go down that

27   lifestyle, you know.  The path of destruction.

28

1              PRESIDING COMMISSIONER SHELTON:   I

2   appreciate that, too.  We're going to go to

3   Commissioner Keenan now and review post-conviction

4   factors and I'll turn it over to him.

5              INMATE LINN:  All right.

6              DEPUTY COMMISSIONER KEENAN:  Okay, Mr. Linn.

7   Your last hearing was 9/30/05 and we recommended you

8   participate in self-help if available, you remain

9   disciplinary free, earn positive chronos.  You have a

10  placement score of 19.  Classification score was zero,

11  going back to 3/10/99.  The GED that was mentioned,

12  you got that in '98.  Does that sound right?

13             INMATE LINN:  Yes.

14             DEPUTY COMMISSIONER KEENAN:  You have a

15  total of three 115's.  The last one was 8/4/98 and I

16  think they were all for failure to report to work;

17  weren't they?

18             INMATE LINN:  Yes, they were.  I think one

19  was for being late and the other was for being late

20  and leaving my assignment.  And one was for not

21  showing up or something like that.

22             DEPUTY COMMISSIONER KEENAN:  Um-hum.

23             INMATE LINN:  They were basically all work-

24  related, attendance.

25             DEPUTY COMMISSIONER KEENAN:  Yeah.  I see

26  them listed as failure to report.  Oh, I think I -- oh

27  yeah.  Here it is, okay.  Yeah, 8/4/98, reporting

29

1    late, leaving work assignment without authorization.

2    5/8/98, reporting late for work.  12/22/84, home brew

3    found in cell.  And then you had three 128-A's;

4    6/22/00 was the last one, failure to report.  Also

5    7/19/99 and 3/7/98, both failure to report.

6            INMATE LINN:  Yes.

7            DEPUTY COMMISSIONER KEENAN:  All right.  And

8    you've been working as a kitchen sanitation worker

9    since your last hearing?

10           INMATE LINN:  Yes, I am.

11           DEPUTY COMMISSIONER KEENAN:  Okay.

12   Satisfactory to above average reports?

13           INMATE LINN:  Yes.  I have a chrono from my

14   boss, if you --

15           DEPUTY COMMISSIONER KEENAN:  Sure.  I'd like

16   to see that.

17           INMATE LINN:  It's the most recent one.

18   That's it right there.  Yeah, I'm -- they put me in

19   that position, you know.  They assign you to a job and

20   I take it upon myself -- you know, I'm not a quitter,

21   you know.  So I went in there, I did a good job and I

22   stuck to it and I've been -- I work hard and I try to

23   do everything the way it's supposed to be done, you

24   know.

25           DEPUTY COMMISSIONER KEENAN:  All right.  The

26   chrono's 10/19/06 from C. Sylvania, Correctional

27   Sergeant.

30

1       "Inmate Linn was initially assigned to CTF

2       north culinary A.M. sanitation crew on

3       8/24/04.  He is currently assigned to a

4       position from (indiscernible) and was

5       promoted to lead man position on 1/7/06.

6       Since being assigned to A.M. sanitation

7       crew, Linn has done an exemplary job

8       handling all duties assigned to him and

9       requires minimal supervision to perform.

10      Linn has served the position exceptionally

11      well and has been integral in the operation

12      of culinary sanitation.  He is a motivation

13      to the inmates following his leadership and

14      is very cooperative with assisting during

15      institutional lockdowns when he was at times

16      called upon to work during his regular days

17      off.  Linn has also volunteered to work for

18      other crews within the culinary when inmate

19      workers were needed.  Linn consistently

20      displays a mature attitude, gets along well

21      with staff and inmates alike and performs

22      his assignments with exceptional quality.

23      Inmate Linn is an asset to the north

24      culinary and can always be depended upon to

25      perform well."

26          **INMATE LINN:**  Yeah.  You know, if you

27  noticed it mentioned I worked on my days off?