# EXHIBIT   B – PART 2 OF 4

31

1          DEPUTY COMMISSIONER KEENAN:  Right.

2          INMATE LINN:  Okay.  I'm not making any

3    excuses.  I did miss those days of work.  You know,

4    what, here and there my attendance was kind of

5    sporadic for a minute there.  But I do put a lot of

6    extra time in, volunteer time for work and I've been

7    doing that throughout my prison sentence.  And my --

8    before in the county jail, you know.  I'm just always

9    following upgrade to work.  You know what I'm saying?

10   I don't sit back and play cards or lay around and let

11   something be undone.  I see something that needs to be

12   taken care of and I take care of it, regardless where

13   it is, where the position is at.  It could be

14   something that needs done on the yard.  It could be

15   something that needs done in a building.  If a staff

16   member or a guard asks me, hey, I need a sign and they

17   realize that I -- I'm an artist.  I paint.  I'll paint

18   that sign.  I'll do that sign.  You know what I'm

19   saying?  I'm constantly contributing to help out.

20         DEPUTY COMMISSIONER KEENAN:  Then how do you

21   explain the failure to report?

22         INMATE LINN:  The what?

23         DEPUTY COMMISSIONER KEENAN:  Failure to

24   report.

25         INMATE LINN:  Those failures to report; the

26   one that was in 2000, I believe 2000, that one there I

27   actually had a class that day.  I missed both days of

32

1    ducket and the -- and my instructor gave me an "A" day

2    for it.  So I'm not going to sit here and tell you

3    that, you know, you know, I -- that it's his fault.

4    It's basically the way it happened was I had a

5    substitute teacher at the time.  So he told me to come

6    back with a ducket the next day and I did have the

7    ducket showing that I went to a group that day.  And

8    there wasn't a class after that.  There wasn't a class

9    for a good long period of time and that instructor

10   never came back.  So at that point, I never had a

11   chance to clear that one up.  But the ones prior to

12   that, I basically failed to get to work.  Some of them

13   just plain feeling I didn't want to go.  I just didn't

14   want to go on those days, okay?  And there was a

15   couple times where when I went to work, that one where

16   I appeared -- I showed up late and then left without

17   authorization, that one was because my instructor told

18   me -- well, actually, it was my boss.  He told me that

19   I was going to get an "A" day.  When I came in late,

20   he told me I was going to get an "A" day.  That means

21   absent.  And without thinking about it, I turned right

22   around and left work because the fact of if I'm

23   getting an "A" day, that means I'm absent.  So if I'm

24   getting a day of absence, why should I be at work so I

25   went ahead and left, which was the wrong thing to do.

26   That's what gave me the 115 for leaving my assignment

27   without authorization.  I should have said, hey, you

33

1   know, you're giving me an "A" day.  What's -- do I

2   have to be here and I should have handled it

3   correctly.  And I look back at that now and I realize

4   that I've made a bad decision on just taking off.  I

5   should have let him know what I had -- my intentions

6   were to just go ahead and you give me an "A" day.

7   I'll leave.  I can't make up any excuses why I didn't

8   get there, get to work on time or report.  There is no

9   excuse for that.  I just failed to get out of the cell

10  and go to work.

11          DEPUTY COMMISSIONER KEENAN:  Okay.  All

12  right.  I also see you worked in culinary also as a

13  maintenance carpenter -- maintenance carpentry shop.

14          INMATE LINN:  Yes (indiscernible).

15          DEPUTY COMMISSIONER KEENAN:  Support

16  services, maintenance paint, food server, janitorial,

17  porter, dining room server, sanitation.  Think you

18  picked up any marketable skills in any of those

19  fields?

20          INMATE LINN:  Yes, I have.  (indiscernible)

21  I would say in the carpenter shop, I was already a

22  journeyman carpenter so I was actually a big asset to

23  that shop.

24          DEPUTY COMMISSIONER KEENAN:  How long were

25  you in that?

26          INMATE LINN:  About a year and a half.

27          DEPUTY COMMISSIONER KEENAN:  Okay.  And at

34

1   that point, I went to a vocational trade so I moved

2   on.

3         DEPUTY COMMISSIONER KEENAN:  Okay.

4         INMATE LINN:  The culinary services, as I

5   mentioned earlier, they assigned me to these

6   positions, okay?  I know that I can say well, I want

7   to move on and go to another position in this

8   institution.  It's not undoable but it's not -- at the

9   same time, you have to go through the proper channels

10  and get the assignment lieutenant to do the paperwork

11  for you.  Usually, if I'm working in a position like

12  that I get on a vocational waiting list and then I

13  just wait it out.

14        DEPUTY COMMISSIONER KEENAN:  Okay.

15        INMATE LINN:  And then when those vocational

16  waiting lists are four years long, without me

17  realizing it's going to be a four-year wait, here I

18  am.  I'm still working in this position.  I continue

19  working but at the same time, I take my position

20  seriously, you know?  It's not a matter of me being in

21  prison.  I do an honest day's work.  I don't -- the

22  pay doesn't mean nothing.  It's my principle that, you

23  know, is the way I was brought up.  Working in

24  construction, I do a good job at what I do.

25        DEPUTY COMMISSIONER KEENAN:  All right.

26        INMATE LINN:  As far as marketable skills,

27  yes, there were some.  There was gardening because of

35

1   the fact that yard crew jobs --

2           DEPUTY COMMISSIONER KEENAN:  Is that the

3   landscaping?

4           INMATE LINN:  Landscaping.

5           DEPUTY COMMISSIONER KEENAN:  I saw that

6   mentioned.  I wasn't sure if that was vocational

7   landscaping or that was an assignment.

8           INMATE LINN:  That was basically a job in

9   the -- it was a program.  Basically, it's sort of a

10  program that -- where they were growing vegetables for

11  the community and I was involved in that.

12          DEPUTY COMMISSIONER KEENAN:  For how long.

13          INMATE LINN:  That was about two years.

14          DEPUTY COMMISSIONER KEENAN:  Okay.

15          INMATE LINN:  And during that time, I'd say

16  I became a bit of a farmer.

17          DEPUTY COMMISSIONER KEENAN:  Okay.

18          INMATE LINN:  You know, as far as growing

19  vegetables and I learned from --

20          PRESIDING COMMISSIONER SHELTON:  I'm

21  confused.  Let me interrupt.  Did you ever get a

22  vocation in particular?

23          INMATE LINN:  Yes.

24          DEPUTY COMMISSIONER KEENAN:  He did.

25          INMATE LINN:  I've had two.

26          DEPUTY COMMISSIONER KEENAN:  I haven't

27  gotten to the vocations yet.  We'll get there.

36

1              PRESIDING COMMISSIONER SHELTON:  All right.

2              INMATE LINN:  Yeah, this program anyway, as

3     far as the -- like I say, the marketable skills --

4              DEPUTY COMMISSIONER KEENAN:  You're not

5     talking about vocations yet; right?

6              INMATE LINN:  No.  No.

7              DEPUTY COMMISSIONER KEENAN:  Landscaping was

8     something else?

9              INMATE LINN:  Yes.

10             DEPUTY COMMISSIONER KEENAN:  Okay.

11             INMATE LINN:  I'm basically (indiscernible)

12     regular jobs, institutional jobs.

13             DEPUTY COMMISSIONER KEENAN:  Right.

14             INMATE LINN:  And like I say, as far as

15     marketable skills go, the only thing I could tell you

16     on that is, there's jobs --

17             DEPUTY COMMISSIONER KEENAN:

18     (indiscernible).

19             PRESIDING COMMISSIONER SHELTON:  No.  I just

20     wanted to clarify that we're still talking about work

21     experiences.

22             DEPUTY COMMISSIONER KEENAN:  Oh, okay.

23             PRESIDING COMMISSIONER SHELTON:  And not

24     certified vocations.

25             INMATE LINN:  What I can tell you about

26     these jobs, okay, is that I know that if I'm capable

27     of doing all these odds and ends jobs and putting

37

1   pride into what I do and doing a good job at each one

2   of them and going beyond what most people usually do.

3   I'll tell you right now, there's been a lot of times

4   where they don't require me to do certain parts of

5   those jobs and I do it because I now it needs to be

6   done.  And they're like, wow, that looks really good,

7   Mr. Linn.  And in other words, I carry on like that.

8           DEPUTY COMMISSIONER KEENAN:  I think you

9   answered my question.

10          INMATE LINN:  Okay.

11          DEPUTY COMMISSIONER KEENAN:  Let me move

12  forward to the vocations.  Drafting, you completed?

13          INMATE LINN:  Yes.

14          DEPUTY COMMISSIONER KEENAN:  Computer aided

15  drafting and design, completed?

16          INMATE LINN:  Yes.

17          DEPUTY COMMISSIONER KEENAN:  They're both

18  basically part of the same course; are they?  One

19  builds on the other?

20          INMATE LINN:  They're the same class.  They

21  are the same.  You have to complete the drafting

22  before you get into the computer aspect of it.  So

23  without completing the drafting, they don't allow you

24  to get on Auto-Cad or Versa-Cad.  Some people made it

25  that far and some people didn't.  There was some

26  people that went through just the drafting and then

27  they completed them.

38

1    DEPUTY COMMISSIONER KEENAN:  So you consider

2 that to be a completion of one vocation?

3    INMATE LINN:  Yes.

4    DEPUTY COMMISSIONER KEENAN:  Okay.  All

5 right.  Two components, though.

6    INMATE LINN:  Yes.

7    DEPUTY COMMISSIONER KEENAN:  Okay.  And also

8 you completed major appliance repair in '99.

9    INMATE LINN:  Yes, I have.

10    DEPUTY COMMISSIONER KEENAN:  Okay.  Oh, I'm

11 sorry.  You know, I saw two listings.  I saw

12 vocational appliance repair and major appliance

13 repair.  You had one in 03, as well.  Are these just

14 the same thing and you got back into it a little bit

15 later on?

16    INMATE LINN:  No.  What happened was they --

17 that was at the time where I was telling you about the

18 instructor not being there.  They -- what happened is,

19 he retired and they put a substitute in there.  The

20 substitute stuck around for a little while and then

21 they assigned somebody.  It took a year before they

22 got a new instructor for that class so there was a

23 break in between that time.  And during that time, I

24 volunteered on the yard crew with my time.

25    DEPUTY COMMISSIONER KEENAN:  Okay.

26    INMATE LINN:  I didn't just go out and sit

27 around.  I went to work every day.

39

1          DEPUTY COMMISSIONER KEENAN:  So in '03, you

2   completed the appliance repair, then?

3          INMATE LINN:  Huh?

4          DEPUTY COMMISSIONER KEENAN:  In '03, was it,

5   that you completed the appliance repair?

6          INMATE LINN:  Yes.  Yes.

7          DEPUTY COMMISSIONER KEENAN:  Okay.  It also

8   notes here that you -- something you do in your spare

9   time is read tech manuals?

10         INMATE LINN:  Yes.

11         DEPUTY COMMISSIONER KEENAN:  In what areas?

12         INMATE LINN:  Well, because I was in

13  drafting and my background is construction doing

14  homes, I went through a lot of drafting books.  I

15  did --

16         DEPUTY COMMISSIONER KEENAN:  So drafting

17  would be the area?

18         INMATE LINN:  Yes.  And I also would read --

19  man.  Oh, yeah, sailing.  I just studied sailing,

20  navigation; books that actually had some meaning.

21  They would teach me things about things that were

22  going on out there, you know.  I did a little -- a lot

23  of reading on camping and outdoor life type stuff, you

24  know.  Basically, what's going on with it and what

25  people are doing.  Backpacking, those types of skills

26  and stuff like that.  I did study in my spare time --

27  of course, I was in refrigeration, air conditioning

40

1   and appliance repair.

2           DEPUTY COMMISSIONER KEENAN:  I saw mention

3   of that in the last transcript.  The transcript of the

4   last hearing.

5           INMATE LINN:  Yeah.

6           DEPUTY COMMISSIONER KEENAN:  And I thought

7   that the conclusion was that you picked up a

8   certificate but you did not complete an entire course.

9   is that accurate?  That you had some certificate of

10  achievement but you never completed the entire course.

11          INMATE LINN:  No.  The two trainings that

12  I've actually been able to get into, I completed them.

13  What I have is, in the drafting I had a few extra

14  things involved where I did a -- I entered into a

15  drawing contest on computer and --

16          DEPUTY COMMISSIONER KEENAN:  I saw that.

17          INMATE LINN:  Okay.  So I got honorable

18  mention.

19          DEPUTY COMMISSIONER KEENAN:  Correct.

20          INMATE LINN:  And the refrigeration, I went

21  ahead and -- there's only several people in this

22  institution that have actually achieved it and I got

23  the certification for refrigeration and air

24  conditioning.

25          DEPUTY COMMISSIONER KEENAN:  Well, let me

26  read from the last transcript.

27          "Deputy Commissioner Mejia; Is that a

41

1          completion -- completion of refrigeration?

2          I don't see it.  Inmate Linn; Right here.

3          Deputy Commissioner Mejia; That's an

4          achievement.  All right.  This is one aspect

5          of refrigeration; right?  Inmate Linn;

6          Yeah.  Commissioner Mejia; Okay.  I'm

7          talking about the complete -- completion of

8          the whole.  Inmate Linn; Sorry about that.

9          Commissioner (indiscernible); That's okay."

10    And then I don't know that it was resolved beyond

11    that.

12          ATTORNEY FOX:  Okay.  What I'm looking at is

13    a goldenrod colored Education Progress Report, which

14    I'll pass over.  What was that, Mr. Linn?

15          INMATE LINN:  Oh, this is a completion of

16    the refrigeration and appliance.

17          ATTORNEY FOX:  It's a vocational evaluation

18    of employability.

19          INMATE LINN:  That's a completion right

20    there of the appliance repair trade.  That right there

21    is the completion of the refrigeration and the

22    appliance repair completely.

23          DEPUTY COMMISSIONER KEENAN:  Okay.  This is

24    refrigeration unit repair under the hearing appliance

25    repair.

26          INMATE LINN:  Right.

27          DEPUTY COMMISSIONER KEENAN:  So as part of

42

1   your completion of appliance repair, you learned how

2   to repair refrigeration units?

3        INMATE LINN:  Yes.  And I think what he was

4   referring to was the fact that it was just a part of

5   refrigeration and air conditioning is that there

6   wasn't no heating involved in that, although I did

7   learn some heating units, about certain parts of

8   heating units.  But it was basically based on those

9   appliances and at that point, they cut it off, as I

10  said.  That's all they teach there.  They don't teach

11  the heating.

12       DEPUTY COMMISSIONER KEENAN:  Well, this is

13  in '99.  That was back when you had the original

14  teacher.  It's an Education Progress Report.

15       "Inmate Linn has completed this course.  He

16        has employable skills in many areas of

17        repair and refrigeration.  He's also EPA

18        certified in refrigeration.  He will excel

19        in this trade."

20  So somewhere while learning about appliance repair,

21  you sort of picked this up, as well.

22       INMATE LINN:  Yes.  Yeah, the EPA, which is

23  there, is basically a separate test that not

24  everyone --

25       DEPUTY COMMISSIONER KEENAN:  Yeah.  What

26  that does actually is it -- I'm not going to say

27  guarantees me a position in air conditioning and

43

1    refrigeration companies.  But an employer would be

2    impressed with that and there's probably a good chance

3    they would want to hire me, just for the fact that I

4    can do -- work on sealed systems, which is the

5    refrigerants themselves.

6              ATTORNEY FOX:  And it should be in the C-

7    file.  It's an ESCO Institute.  It's an EPA

8    certification and it states that Robert Linn has been

9    certified as a universal technician, as required by

10   the applicable Federal code.  And his scores were 100,

11   100, 100 and 96.

12             DEPUTY COMMISSIONER KEENAN:  Okay.

13             ATTORNEY FOX:  Thank you.

14             INMATE LINN:  All right.  Can I show you one

15   more thing with that?  There's -- I have this right

16   here, this chrono right here.  It was also during that

17   time that that shop was closed, during the time the

18   shop was closed, I did -- I went over to the -- and

19   helped reconstruct the shop itself to get it ready for

20   open -- reopening of the class again.

21             DEPUTY COMMISSIONER KEENAN:  Okay.  This is

22   11/23/01 from J. Kane (phonetic), supervisor of

23   vocational instructions and R. Lietzel (phonetic),

24   vocational residential electronics repair instructor.

25             "Inmate Linn was assigned February 20, '99

26             to position number" -- there's a code --

27             "with the vocational residential electronics

44

1          repair program.  He is a diligent and

2          talented student.  He works hard to

3          understand all facets of trade, including

4          quality control.  During the shop closure he

5          helped with the reorganization of the shop

6          and was a value asset and did an excellent

7          job.  He worked well with others and shared

8          his knowledge with them.  He is prompt and

9          always courteous to staff and other inmates.

10         Linn will be a valuable employee to a

11         residential electronics repair business."

12         **ATTORNEY FOX:**  Okay, thank you.

13         **INMATE LINN:**  Like I'm saying, you know,

14    that was during the shop closure, closing and I didn't

15    have to go over there and do that.  I volunteered to

16    help out.

17         **DEPUTY COMMISSIONER KEENAN:**  Okay.

18         **INMATE LINN:**  They -- I could have been out

19    on the yard and --

20         **DEPUTY COMMISSIONER KEENAN:**  Or playing

21    cards.

22         **INMATE LINN:**  -- doing nothing, you know.

23         **DEPUTY COMMISSIONER KEENAN:**  I understand.

24         **INMATE LINN:**  But I found that between that

25    and the gardening, I kept myself busy.

26         **DEPUTY COMMISSIONER KEENAN:**  Okay.  Let me

27    move onto the self-help programs.  Since your last

45

1   hearing, participated in NA from 7/05 to 12/05 and

2   there was a mention of a laudatory chrono from a

3   kitchen supervisor, COR. Rentoria (phonetic).

4           INMATE LINN:  Oh, yeah.

5           DEPUTY COMMISSIONER KEENAN:  And that's in

6   your C-file.

7           ATTORNEY FOX:  We have it right here.

8           DEPUTY COMMISSIONER KEENAN:  Okay.

9           ATTORNEY FOX:  If you want it?

10          DEPUTY COMMISSIONER KEENAN:  I have it,

11   also.

12          ATTORNEY FOX:  Oh, okay.

13          DEPUTY COMMISSIONER KEENAN:  9/28/05;

14              "Inmate Linn was initially assigned to CTF

15              north culinary sanitation crew.  He's

16              currently assigned to a position and since

17              being assigned to A.M. sanitation crew, Linn

18              has done an exemplary job of handling all

19              duties assigned to him.  In doing so, Linn

20              was recommended next to take over the lead

21              position in his crew.  He's been very

22              cooperative with assisting during

23              institutional lockdowns when he was at times

24              called upon to work regular days off.  Linn

25              also volunteered to work with other crews in

26              the kitchen when inmate workers were needed.

27              Linn consistently displays a mature attitude

46

1           and gets along with staff and inmates alike.

2           Performs his assignment with very little

3           supervisor.  Inmate Linn is an asset to

4           culinary and can be depended upon to perform

5           any duty assigned to him."

6   Also, I saw there was a -- something from Dave

7   Rodriguez, a sponsor.

8           "Inmate Linn has been an active member in NA

9           the third and fourth quarters of '05.  His

10          enthusiastic participation and support -- in

11          his enthusiastic participation and support,

12          he has achieved tremendous personal success

13          towards recovery and self-improvement.  He

14          should be commended for his sincerity and

15          commitment in dealing with his ongoing

16          challenge."

17  And going back in time, I see you participated in AA

18  from '95 to '97 and also from July 2000 to December

19  2000.  In NA, the Square One NA.  This was back in

20  '90.  Involved in NA from 2/90 to 6/91 and from 10/01

21  to 12/04.  You were in the Impact Program in '01.

22  That was a 14-week workshop focusing on victim

23  awareness.  Project Change, voluntary participation in

24  that 44-week course in '03.  You've been in beginning

25  stress management and relaxation training in '91.

26  That was a four-week group.  Substance abuse therapy

27  in '92.  Completed the eight-week program.  Also a

47

1    mention of several psychotherapy programs at CMC east.

2    What kind of programs at CMC East; psychotherapy

3    programs?

4              INMATE LINN:  They had several programs

5    there.  They had one-on-one and they had group

6    therapy.  I participated in substance abuse and stress

7    management.  I got -- I was on the waiting list for a

8    group therapy.  At the time I was on the waiting list

9    for that group and I fell right into one group after

10   another.  I'd complete a group and I'd try to get back

11   into another one.  If I wasn't going to one, I'd be on

12   the waiting list for another.  And at that point, I

13   was on the waiting list for group therapy and I was

14   transferred from CMC to here due to the points.  That

15   was a level III institution.  I had a level II in

16   points and they were transferring all level II inmates

17   out of that institution so I ended up at CTF at the

18   time.  I arrived here.  I'm not going to say there

19   wasn't any type of group therapy or one-on-one group.

20             DEPUTY COMMISSIONER KEENAN:  When did you

21   get here?

22             INMATE LINN:  I got here I think, I believe,

23   it was April of '93.

24             DEPUTY COMMISSIONER KEENAN:  Okay.  All

25   right.

26             INMATE LINN:  I -- at that institution at

27   CMC, all the -- they did have quite a bit of

48

1    programming there for inmates.  I came from a level IV

2    institution.  I was at two different IV's and counting

3    the county jail, that was like nine years of

4    institution, of maximum-security housing.  So I didn't

5    have an opportunity to get to an AA group or an NA

6    group.  There wasn't -- they weren't available at all.

7              DEPUTY COMMISSIONER KEENAN:  From when to

8    when?

9              INMATE LINN:  From the time I was arrested

10   to the time that I left -- it was -- the first

11   available AA or NA or any kind of self-help was

12   available to me at CMC east and I arrived at CMC east

13   in 1990 -- I think it was 1989.  Or 19 -- yeah, it was

14   the end of 1989.  And then at that point, that's when

15   I signed up for Narcotics Anonymous and I started

16   attending that Narcotics Anonymous.  That was the

17   first --

18             DEPUTY COMMISSIONER KEENAN:  Well, there's a

19   blank space on the Narcotics Anonymous from '91 to

20   '01.

21             INMATE LINN:  '91 to '01, right?

22             DEPUTY COMMISSIONER KEENAN:  I believe so.

23             INMATE LINN:  Yes.

24             DEPUTY COMMISSIONER KEENAN:  Why is that?  I

25   saw there was some AA in the interim, though; '95 to

26   '97 and in 2000.

27             INMATE LINN:  Yeah.  I went to a -- the NA

49

1    when I got -- I did the NA at CMC and then I went to a

2    substance abuse program also and stress management.

3    And from that point, like I mentioned earlier, I did

4    get on the waiting list for group therapy.  And the

5    NA, when I got here I didn't go to NA.  I did sign up

6    for -- let me see if I got that right.  Yeah, I signed

7    up for AA in '96.  No, I got here in '93, April of '93

8    and I didn't start attending AA -- I didn't start

9    attending AA until September of '95, okay.  But --

10          ATTORNEY FOX:  The quarter ending September

11   of '05.  That was September.

12          INMATE LINN:  Actually, to answer your

13   question on the NA, I did not go to NA from the time

14   that I left CMC East until 2000, which would be

15   (indiscernible).  Excuse me one second.  Yeah, it

16   would be 2001.  Is that what you have?

17          DEPUTY COMMISSIONER KEENAN:  I see starting

18   up in 2001.

19          INMATE LINN:  Yes.  Okay, so I just -- I

20   didn't get to an NA program.  In between that time, I

21   did attend some AA, several years here and I missed a

22   couple years.  And then I went back to AA.  I have a

23   outside sponsor that I have been corresponding with

24   since 1997 so it's -- I have been in touch and

25   participating in some parts of AA and NA.  Not running

26   together but it's like I go from one to the other.  I

27   try to stay within a group if I can.  There was two

50

1   years that I didn't go and like I said, that was when

2   I first arrived here, from '93 to '95.  I didn't

3   attend any AA or NA.

4           DEPUTY COMMISSIONER KEENAN:  Back to my

5   original question; why?

6           INMATE LINN:  Okay.  That's a perfectly good

7   question because I do have an answer to that.  I --

8   the first nine years of my sentence, you know, my

9   county time and my level IV time, AA and NA wasn't

10  available to me.  And during that time, I did not use

11  drugs or alcohol, okay?  So at this point in my life,

12  at the point where -- when it was available to me in

13  1989 or -- let's see.  Yeah, 1989.  Actually, I went

14  to AA at Tehachipi when it first opened up.  It was --

15  finally they got a group going in level IV.  But

16  besides that, I was going it alone and I was staying

17  clean.  So for me to go to an NA group or an AA group

18  at this point, it would be like asking for heart

19  surgery when I don't need it.  I mean, here I am.  I'm

20  not using drugs.  I'm refraining from even wanting to

21  use drugs.  I'm staying away from alcohol.  And now I

22  have this -- a Parole Board hearing and they're

23  expecting me to go to -- get to groups, okay?  So I

24  realized that I have to do my part, so I'm going to go

25  ahead and go to these groups and every time I went to

26  these groups, I came away with something.  It was --

27  even though I wasn't using drugs or alcohol and out of

51

1    my own self-will, I refrained from using or being a

2    part or participating in that, I was still

3    participating in those groups and had walked away with

4    a group atmosphere feeling.  Hey, you know, that was a

5    really nice speech that guy gave or that conversation

6    I had with this guy was really good.  So the group

7    actually was helping me along but all at the same

8    time, all I'm saying is I didn't have the -- I didn't

9    have NA and AA available to me the first nine years I

10   was in prison.  And I didn't go participate in those

11   guys smoking marijuana or those guys drinking alcohol

12   or doing drugs.  I stayed away from that.  I liked

13   staying away from it and I was staying away from it.

14   So I knew that I - as far as the group goes, it was

15   like learning to admit defeat, where I was not

16   defeated.  I actually overcame alcoholism and drug

17   addiction on my own.  I did that.

18            DEPUTY COMMISSIONER KEENAN:  Do you feel

19   like when you get out you're gonna need some kind of

20   ongoing drug program, like NA or whatever else?

21            INMATE LINN:  What I feel today is, I don't

22   have to have -- I don't have to go it alone on my own.

23   I can be open with other people about my past and my

24   weaknesses and my qualities.  So it's like today and

25   starting back quite a few years ago, I finally came to

26   understand what a group is all about.  It wasn't me

27   going in and saying hey, I'm powerless over an

52

1   addiction and this and that because I wasn't powerless

2   over my addiction.  What I'm powerless over is when I

3   have a -- when I'm doing drugs and if I'm doing

4   alcohol, then I'm powerless over that substance and

5   that's why I'll stay away from it.  I understand that

6   part.  But like you say, what -- do I feel like I want

7   to participate in self-help beyond prison and from

8   this point on?  Yes, I will and I look forward to

9   doing that because --

10        DEPUTY COMMISSIONER KEENAN:  Well, I don't

11   know if I asked you is that something you want to

12   participate in.  I'm saying is it something that you

13   feel in your case that you need?

14        INMATE LINN:  Yes, I do.

15        DEPUTY COMMISSIONER KEENAN:  All right.

16        INMATE LINN:  Because the fact is that my

17   addition, it goes beyond drugs and alcohol.

18        DEPUTY COMMISSIONER KEENAN:  But you haven't

19   participated in NA this last year, have you?

20        INMATE LINN:  Yes.  I -- the yard was locked

21   down for -- from the first of the year until the third

22   quarter and they reopened the NA and the AA program so

23   I'm back into the program now.  But there was a

24   lockdown because of a major riot on the yard.  And

25   prior to that, there was a -- the --

26        DEPUTY COMMISSIONER KEENAN:  Back in as of

27   when?

53

1          INMATE LINN:  This is a chrono for my last -
2  - this is the last participation, the most current,
3  okay, for it.
4          DEPUTY COMMISSIONER KEENAN:  Okay.  Let me
5  read it.  10/11/06 from David Rodriguez.
6              "Inmate Linn has been an active member of AA
7              at CTF north facility during the third
8              quarter of '06.  Through his enthusiastic
9              participation and support, he has achieved
10             tremendous personal success in his efforts
11             towards recovery and self-improvement.  He
12             should be commended for his sincerity and
13             commitment in dealing with this ongoing
14             challenge."
15 Okay.
16         INMATE LINN:  Okay.  I have something else
17 that would explain why I haven't gone to -- that
18 chrono is just by itself.  This right here gives you
19 the north facility.
20         ATTORNEY FOX:  It speaks to the lockdown.
21         DEPUTY COMMISSIONER KEENAN:  Okay.  7/19/06.
22             "Inmate Linn has been an active member in
23             Narcotics Anonymous north facility during
24             the first and second quarters of '06.  Due
25             to north facility being on full facility
26             suspended program and partial facility
27             lockdown, there's been no meetings conducted

54

1              for the first and second quarters.  He

2              should be commended for his sincerity and

3              commitment in dealing with this ongoing

4              challenge."

5    Okay.  Thank you.

6              INMATE LINN:  Okay.  But up to that point, I

7    have been attending Narcotics Anonymous.

8              DEPUTY COMMISSIONER KEENAN:  All through

9    '05?  Or well, from July '05 to 12/05.  I saw that

10   already.

11             INMATE LINN:  Well --

12             DEPUTY COMMISSIONER KEENAN:  We've already

13   covered it.  Okay.

14             INMATE LINN:  I've been doing that ever

15   since like 2001; right?  I had to be about 2001, some

16   time in 2001 when I started attending that NA.

17             DEPUTY COMMISSIONER KEENAN:  I believe

18   that's accurate.  Okay.  Let me focus on the

19   Psychological Evaluation at this point, from

20   M. Macomber, M-A-C-O-M-B-E-R, Clinical Psychologist,

21   dated 9/6/05.  In evaluating you, he goes over basic

22   identifying information, sources of information.

23   Under current mental status/treatment needs, I didn't

24   notice any problems noted here.  He notes in part that

25   you discussed significant life changes that you

26   experienced, particular since '98.  Because actively

27   involved in Christian Bible studies.

55

1          "He has a deep and serious relationship with

2          the Lord.  He stated that since his life has

3          been committed to serving God, his creator,

4          he has no interest in drug or alcohol use.

5          He understands that life is short, whereas

6          his existence in heaven is forever.  He is

7          determined to live a life worthy of his

8          biblical commitments.  He follows biblical

9          instructions in his life.  This includes

10         total abstinence from any destructive

11         behaviors, including drugs and alcohol.

12         Also notes prior to the commitment offense

13         24 years ago, he met the requirement for a

14         diagnosis of polysubstance abuse.  He's been

15         clean and sober throughout his prison

16         experience of 24 years.  He foolishly

17         allowed a cellie to make pruno in their cell

18         together when he first arrived, not

19         realizing the serious consequences of this.

20         He knows is now and he stated he definitely

21         would not allow this to happen anymore,

22         although cellies do try to make pruno or use

23         drugs.  He is totally intolerant of this

24         behavior.  He has shown significant growth

25         and change over the years.  At this point,

26         there's no diagnosable mental disorder."

27    Axis I and Axis II, the doctor notes no contributory

56

1    clinical disorder, no contributory personality

2    disorder.  Current GAF, global assessment of

3    functioning of 90.  That's on a scale of 1 to 100.

4    Review of life crime, he covers and notes in part:

5            "Inmate Linn does have deep feelings of

6            sorry and remorse for the victim's death and

7            I agree with prior evaluators, who also note

8            his sense of sorry and remorse is sincere

9            and genuine."

10   He notes that your potential for violence in the

11   institutional environment is definitely below average

12   in comparison with other inmates.  He states:

13           "In considering his potential for dangerous

14           behavior if released to the community at

15           this point, I agree with prior evaluators,

16           who stated that his violence potential in

17           the community would be no greater than the

18           average citizen in the community.  There are

19           several facts that support this conclusion.

20           Inmate Linn is not a criminally oriented

21           person.  He does not have antisocial

22           thinking or values.  He does not have a

23           personality disorder that would contribute

24           toward violence.  He definitely knows the

25           difference between right and wrong and he

26           has a well-developed conscience and a strong

27           abhorrence against wrong activities.  As a

57

1    Christian, he has strong values against

2    injuring others.  He has developed a

3    sensitivity and awareness of the disastrous

4    effects of illegal behavior.  He has changed

5    considerably since he was 21 years of age

6    and was involved in the commitment offense.

7    Other evaluators have noted that a risk

8    factor for Inmate Linn for potential

9    violence would be if he were to return to

10    the abuse or alcohol or drugs.  The fact

11    that this raises the issue about potential

12    future drug use is what has concerned the

13    Board of Prison Terms in the past.  In this

14    writer's opinion, this is no longer an issue

15    in this man's life.  I have been working

16    with criminals now for four years, both as a

17    parole agent and a psychologist.  If there

18    was any danger that he would revert to drugs

19    or alcohol, I would be able to discern this.

20    In my opinion, this is no longer a factor in

21    his life and therefore, is no longer a risk

22    factor."

23 His final comments here; clinical observations,

24 comments, recommendations.  The doctor says:

25    "There is no indication of any mental or

26    emotional problems that would interfere with

27    this inmate being granted parole.  The

58

1          prognosis for his successful adjustment in

2          the community in this case is excellent.

3          There are many factors that would support

4          this conclusion.  This inmate has a very

5          strong work ethic.  He has a strong work

6          history prior to the commitment offense and

7          a strong work history in the institution.

8          He's an outstanding worker who enjoys

9          working and will not have any trouble

10          securing employment.  He does have numerous

11          job offers in the community.  He has

12          accumulated several trades; vocational

13          drafting and computer drafting, vocational

14          refrigeration and air conditioning,

15          vocational appliance repair and working four

16          years as a glazier."

17  What is that?

18          INMATE LINN:  What's that?

19          DEPUTY COMMISSIONER KEENAN:  A glazier?

20          INMATE LINN:  Oh, that's a -- that was a

21  window repairer.  I did -- I worked for the paint

22  shop --

23          DEPUTY COMMISSIONER KEENAN:  Oh, in the

24  construction field?

25          INMATE LINN:  -- for about four years, three

26  and a half years and I was the lead man over there and

27  basically took care of a lot of things like that.  But

59

1    I was actually the window man, which is the glazier

2    and I fixed windows throughout the institution.

3              DEPUTY COMMISSIONER KEENAN:  Okay.  It says:

4              "In addition, he's a professional carpenter.

5              Compared to other inmates and even compared

6              to other lifers, his work skills and work

7              history are above average.  These factors

8              support the conclusion he'll do very well in

9              the community.  In addition, he does have

10             strong family support in the community.  His

11             sisters and brothers are doing well.  They

12             have good paying jobs.  They are anxious for

13             his release.  They will provide financial

14             assistance, employment and residence for

15             him.  This factor is also a strong indicator

16             of successful adjustment in the community.

17             His prognosis for success is excellent."

18   Anything you want to say about that report?

19             INMATE LINN:  Well, actually all I've got to

20   add to that is, you know, as you were asking me

21   earlier about my work ethic, I have -- there's not a

22   job out there that I won't do.

23             DEPUTY COMMISSIONER KEENAN:  Actually, I

24   think I know everything I want to know about your

25   work, your work abilities, your work history.

26             INMATE LINN:  All right.

27             DEPUTY COMMISSIONER KEENAN:  How about the

60

1    doctor's comment about remorse?

2            INMATE LINN:   Oh.   See, I understand that

3    more as my life -- as I live life.   I understand more

4    and more how -- what a tragedy, the crime it was that

5    I committed, you know.   I -- as I put more and more

6    value on my own life because I appreciate life more

7    and more as I experience it.   So I know what I did by

8    taking a person's life away from them, you know.   I

9    know what I stole away from them.   And they were

10   living out there and I intruded into their lives.   I

11   had no business -- or what I had no business doing

12   that way, intruding in their life that way.   So I

13   found that in my life, I take that crime that I

14   committed and I have to -- I've looked back at my --

15   in my past and moved forward from this point on.   I

16   look back and use every one of the things that I've

17   done wrong and what led up to the point of committing

18   that crime.   I will always keep that close to heart.

19   So those are my -- those lessons will never be

20   forgotten, you know, and what caused this to happen.

21   My life was actually a big mess at the time that I

22   committed the crime and then from there got worse,

23   because here I was responsible for someone losing

24   their life.   And I had to evolve into the

25   understanding of the real meaning of this guy losing

26   his life and the effects it had on his family and my

27   family and the community.   So as I go on, I kind of --

61

1    well, all I'm saying is, I realize that everything
2    that I've been through, I put them through.  I mean,
3    all of the sorrow that I caused in my own life, but I
4    did them -- they -- they were living their own life
5    and I put such a tragedy on their lives.  And to where
6    they had to deal with all these issues in their lives;
7    the sorrows, the griefs, their hate.  I mean,
8    everything that they didn't have to really go through,
9    I put them through.  And I know those experiences
10   because those human emotions, I experienced myself so
11   I understand those well.  I came to terms with all of
12   that and I just -- today, it's like one of the hardest
13   things is to understand, if they ever came around or
14   at what point in their life are they going to be able
15   to come to terms with this.  You know what I'm saying?
16   For what I did.  I know that it's a long-lasting
17   offense.  It'll never go away, this crime that I
18   committed.  The family will always have remembrance of
19   Guadalupe.  And I can't change that and nothing will
20   change that but at the same time, like I say, I
21   concern -- I'm concerned with how they dealt with
22   that, you know, what I did.  Or you know, I just hope
23   that they came back to what you -- more of a peaceful
24   state in life, you know.  I really hope that.  And I
25   hope that I didn't cause the brothers that I robbed
26   to, you know, act in a different way in their life
27   because of what I redirected their lives by committing

62

1   that crime, you know.  Because I know if somebody did

2   that to me, maybe I might be bitter or I might be mad

3   and then it may change the course of my life.  But I

4   think because they're human beings, you know, we all

5   come to conclusions and there's -- it's usually the

6   goodness in people.  They probably -- I'm hoping that

7   they worked it out for themselves to where they're

8   living a good life, you know.  And what I know about

9   religion is, you know, it doesn't change nothing.  But

10   you know, Guadalupe, you know, is in heaven.  So it's

11   not like, you know, I'm making up excuses that we're

12   all going to see him again, but that's a fact, okay?

13   That's going to happen.  But we have to -- I have to

14   live in this lifetime and I have to do my part and I

15   know what I caused.  I know what I did.  So I kind of

16   live my life today and I appreciate what I got out of

17   all this.  So far as, you know, I have to stay -- for

18   me to do anything wrong from this point on, is taking

19   this man's life and on top of what I've done, you

20   know, is just making things worse.  What kind of a

21   monster do I have to be to commit a crime now at this

22   point in my life?  I don't want to be that person and

23   I won't be that person.  I have to live with myself so

24   I'm not going to -- I keep Guadalupe and I keep those

25   lessons in my life close to my heart, to move on to

26   each day and create my values and principles.  So I --

27   all I can say is, that --

63

1           PRESIDING COMMISSIONER SHELTON:  We're going

2   to move on, sir.

3           INMATE LINN:  Okay.  All I want to say is --

4           PRESIDING COMMISSIONER SHELTON:  Two

5   seconds.

6           INMATE LINN:  All right.

7           PRESIDING COMMISSIONER SHELTON:  You like to

8   talk and I appreciate what you have to say but we need

9   to move forward.

10           INMATE LINN:  As far as about remorse goes,

11   you know, I don't want to try to overstate it or -- I

12   just basically want you to know I have a real good

13   understanding of my crime.  I have more of an

14   understanding than anybody.  That's -- I'll keep it at

15   that.

16           PRESIDING COMMISSIONER SHELTON:  And that

17   makes sense.

18           INMATE LINN:  And I am responsible for this

19   whole crime.  I am responsible for my co-Defendant

20   being in prison because I didn't have to say yeah,

21   let's go and then have to agree with him.  We had a

22   discussion to go do this crime and I agreed to go.  If

23   I would have said no, let's not go and do this, we

24   wouldn't have went and done that.  John did not say

25   I'm going to hold a gun to your head and make you go.

26   I could have said, no, that's not a good idea.  Let's

27   not go do this and we would not have done it.  We

64

1   would have not have done that.  So I am responsible

2   for John's life, my life and the worst thing is, I'm

3   responsible for Guadalupe's life being stolen away the

4   way it was.  And I'll leave it at that as far as --

5           PRESIDING COMMISSIONER SHELTON:  Okay.  The

6   next step in this process is to talk about your parole

7   plans and I'm going to refer to the packet you gave me

8   today, which I already had in the file.

9           ATTORNEY FOX:  I had -- just to be sure.

10          PRESIDING COMMISSIONER SHELTON:  No, I know.

11  Because lots of times, it's not.  So anyway, according

12  to your Board Report, it says here that you want to

13  live with your sister, Tricia, in Orange County?  Yes

14  or no?

15          INMATE LINN:  No.

16          PRESIDING COMMISSIONER SHELTON:  Okay.

17          INMATE LINN:  I have a --

18          PRESIDING COMMISSIONER SHELTON:  Just let me

19  go through this.

20          INMATE LINN:  Okay.

21          PRESIDING COMMISSIONER SHELTON:  Then you

22  have your second choice, according to this Board

23  Report, was your sister-in-law, Laura.  Yes or no?

24          INMATE LINN:  No.

25          PRESIDING COMMISSIONER SHELTON:  I know that

26  you're looking for something that you probably gave me

27  that has to do with the Anonymity Recovery House but

65

1   we're going to go through what the Board Report is so

2   we can make sure it's updated for future reference.

3   Let's talk about this, Mr. Linn.  You have a letter

4   here dated December 4, 2006, indicating there -- it

5   says:

6           "This letter is to confirm that you would

7           reside at the Anonymity House Recovery Sober

8           Living upon release from prison."

9   And that this house is located in Riverside.  It's

10  signed by Gary Pearson (phonetic), the Director.  What

11  I have a problem with this letter is, is number one

12  it's not signed.  Number two, it's not on letterhead.

13  It could have come from anywhere to anybody so -- and

14  I know that it went to --

15          ATTORNEY FOX:  And I do have a follow-up

16  phone number if that's something you would like.

17          PRESIDING COMMISSIONER SHELTON:  It's

18  actually something that somebody --

19          ATTORNEY FOX:  To reach Gary Pearson at the

20  Anonymity House.  Because of anonymity, anonymous --

21          PRESIDING COMMISSIONER SHELTON:  Yeah.  But

22  it still should have a letterhead and a signature on

23  this letter to verify it.  But there's no reason to

24  dispute it at this point, okay, because all of this

25  will be checked out.

26          ATTORNEY FOX:  Thank you.

27          PRESIDING COMMISSIONER SHELTON:  Okay.  So

66

1    that is your first choice, sir?  That's where you want

2    to live first choice?

3              INMATE LINN:  Yeah.  Because it is the county

4    of commitment and I thought it would probably be

5    easier to go back to that county than --

6              PRESIDING COMMISSIONER SHELTON:  Your family

7    -- your support system, your family and your AA

8    person, do they all live in that same area?

9              INMATE LINN:  They're in Orange County,

10   right next door.  The county next door.

11             PRESIDING COMMISSIONER SHELTON:  Okay.

12   According to your parole plan, we have here that you

13   want to have your residence be at Anonymity House.

14   You have a couple offers of employment and I noted

15   three of them; one at Storyland Foam Works.  Let me

16   find that letter.  It says here that they would offer

17   you a job as a laborer at $8 an hour.  You were

18   recommended by a friend.  Would that be your brother-

19   in-law?

20             INMATE LINN:  Yes.

21             PRESIDING COMMISSIONER SHELTON:  You also

22   received an offer of employment from Sterling

23   Meridian.  That is a maintenance position and you

24   would be paid $10.75 an hour.  And this is your

25   brother?

26             INMATE LINN:  Yes.

27             PRESIDING COMMISSIONER SHELTON:  Then you

67

1    were offered employment by a Mr. Carlson,

2    Gary Carlson, who as I understand it, is an old friend

3    of yours and also your AA sponsor.

4            INMATE LINN:  Yes.

5            PRESIDING COMMISSIONER SHELTON:  Not only

6    did he offer you employment through his construction

7    company.  He offered you a place to live with him and

8    he wrote a very nice letter about you, by the way,

9    too.  Also with regards to financial support, it says

10   your sister, Tricia, and your brother, Ron, have

11   agreed to pay the $425 per month that it costs to stay

12   at Anonymity House so that was very nice.  You also

13   have been in contact with -- your family's been in

14   contact with NA in Riverside County?

15           INMATE LINN:  Yes.

16           PRESIDING COMMISSIONER SHELTON:  You're

17   going to go back to Riverside County, then that would

18   be a good place to go for the follow-up, as we talked

19   previously.  Your brother's also helped to -- has

20   agreed to help you obtain a car and auto insurance and

21   your sister said she's held you get your driver's

22   license.  Did you put this package together?

23           INMATE LINN:  My sister, she -- I wrote

24   letters to all these people.

25           PRESIDING COMMISSIONER SHELTON:  Uh-huh.

26           INMATE LINN:  And they sent her copies.

27           PRESIDING COMMISSIONER SHELTON:  Very nice.

68

1    Very nice package.

2            INMATE LINN:  She put it together.

3            PRESIDING COMMISSIONER SHELTON:  It says

4    your family all supports you.  Everybody is involved

5    in the Calvary Church.  You have a good support

6    system.  But what I'm especially surprised at and

7    somewhat impressed is that your sentencing judge wrote

8    you a letter of recommendation.  That's Robert Timlin

9    (phonetic).  He wrote this letter June 28 of 2006.

10           ATTORNEY FOX:  Judge Timlin typically

11   writes.  He's very interested in follow Robert's case.

12           PRESIDING COMMISSIONER SHELTON:  I noticed

13   that he has written before on several occasions.

14   Primarily, he's writing a support letter.  I'm not

15   going to read it because it's lengthy but I -- he

16   feels that you have everything it takes to be

17   successful on parole.  He -- there was one sentence in

18   here.  He felt you had a -- I thought this was

19   interesting -- a malleable personality.  Which, do you

20   know what malleable means?

21           INMATE LINN:  Yes.

22           PRESIDING COMMISSIONER SHELTON:  Okay.  And

23   felt that you were influenced by your use of your --

24   well, your addiction, as we've talked about.  He said

25   of all the Defendants who had previously appeared

26   before him, you were particularly rehabilitateable and

27   feels that you would not be a possible risk of danger

69

1  to society.  That was a very nice letter.  We also

2  have -- let's see what else we have in here.  We also

3  have a letter from a Ronald Lordon (phonetic), who

4  evidently was your defense attorney for a couple of

5  years.

6        DEPUTY DISTRICT ATTORNEY RUIZ:  Is that the

7  letter dated 1996?

8        PRESIDING COMMISSIONER SHELTON:  No.  This

9  is a July 5, 2006.  Do you have that one, sir?

10       DEPUTY DISTRICT ATTORNEY RUIZ:  I had one

11  dated in '96.  Go ahead.

12       PRESIDING COMMISSIONER SHELTON:  Okay.  This

13  was at the very -- they had them filed not under

14  letters this time in the Board Report.  It was filed

15  under miscellaneous.

16       DEPUTY DISTRICT ATTORNEY RUIZ:  Okay, go

17  ahead.

18       PRESIDING COMMISSIONER SHELTON:  Okay.  And

19  basically, this letter indicates that he represented

20  you for a couple of years.  The judge was interested

21  in this case and evidently, at that time it was

22  unusual for you to be sent for a diagnostic evaluation

23  but we did find that in the file earlier today.

24  Realize what you did was serous.  Basically, this is a

25  letter of support from him, as well.  I have a letter

26  from Laura Snyder (phonetic), dated July 1, 2006 and

27  that's a support letter, as well.  November 2006 from

70

1   your sister; she said she's willing to provide you

2   with emotional and financial support as long as

3   necessary.  And again, verifies her willingness to

4   help pay for your room and board, help you secure a

5   driver's license and work with your other -- your

6   brother to do the car and all that.  This is your

7   youngest brother, Ron.  Talks about being very sorry

8   about the crime that you were involved in and it says:

9           "We think about the Zelgado family often."

10  He thinks you will not commit any more crimes and he's

11  verifying assistance to help pay for rent, utilities,

12  groceries and all that.  Driver's license and he has a

13  used truck for you, as well as a construction job.

14  And then finally, a letter dated August 14, 2006 from

15  Susan and David Long, who are your sister and brother-

16  in-law.  This is a support letter.

17          "Our entire family realizes that Bob is not

18           the victim here.  We realize that a terrible

19           crime was committed."

20  I appreciate her saying that.  And that's a support

21  letter, financially and emotionally, as well.  That's

22  a nice parole package.  Anything that you would like

23  to add with regards to your parole plans?

24          INMATE LINN:  Yes.

25          PRESIDING COMMISSIONER SHELTON:  Parole

26  plans, nothing else.

27          INMATE LINN:  Okay.  As far as the parole

71

1    plans so, you know I thought it through, definitely.

2    I have several different parole plans because of the

3    fact that I have to reach out and make sure I have

4    something available.  So I know that it's the Board's

5    -- it kind of has been the Board's policy in the past

6    to get parole plans for the county of commitment so I

7    did reach out and found something in Riverside.  Like

8    I told you earlier, I had just moved to Riverside

9    recently before my arrest so I didn't have family out

10   there.  I didn't have -- I do have a few acquaintances

11   out there, which is a sister-in-law.  A guy that used

12   to work under me as a foreman, he's out there.  He has

13   a business now.  Those are the people that I got in

14   contact with.  Everyone else --

15                        --oOo--

16   [TAPE 1 SIDE 2]

17                        --oOo--

18        DEPUTY COMMISSIONER KEENAN:  We're back on

19   record on side two.  You might want to repeat the last

20   couple sentences.

21        INMATE LINN:  Okay.  Anyways, I reached out

22   to Riverside, the people that I was able to get in

23   contact with.  And I acquired parole plans a couple

24   different times here through the years, okay?  I may

25   have feel short the last hearing and the hearing

26   before that.  But as far as the parole plans go, I

27   guess I gave it a lot of -- considerable thought.  I

72

1   feel that I'm probably better off going into an

2   environment where there's some people that have the

3   same interests as me, which is the halfway house. And

4   I spoke with the person that owns the house, the

5   chairperson and he -- we had a discussion about 20

6   minutes on the phone and he's more than happy to have

7   me in there. He explained the rules to me, what the

8   rules -- house rules were and he'll give me more

9   details later. But as far as moving in with a friend

10  in say Orange County or working for my brother or

11  anything like that. You know, I'm kind of -- I don't

12  want to be that burden to those -- my family any more

13  than I have to. So I think for me to go into an

14  atmosphere with people with the same interests and

15  strive in life with these people here; they're clean

16  and they're sober living people and that's the way

17  they want to stay. They do -- have nothing to do with

18  anything that has to do with alcohol or drugs. That

19  gets me into more a independent situation. Although I

20  have their support and they'll have -- support me to a

21  certain point, I will be independent of my family

22  members, which will actually make me grow out there

23  faster and be more responsible for myself. Rather

24  than put the burden on sister, brother, friend and

25  live at their house. I mean, you know, they're

26  willing to help me and everything and that's -- I love

27  that. That's great. And they will be there if all

73

1    else fails.  They would be there for me but I have to

2    stand on my own two feet and that's I think a great

3    part of getting that stuff for Riverside.  And the

4    Board was right about that, you know.  I think they

5    kind of pushed me into that because --

6           PRESIDING COMMISSIONER SHELTON:  We have --

7    we need to move on, sir, but I think that we

8    understand your parole plans very well and

9    (indiscernible).

10          INMATE LINN:  Okay.  And as far as the jobs

11   go, I'm not planning on stopping at one employment.  I

12   am going to seek other employment because out there,

13   the opportunity is open.  The market is open.

14          PRESIDING COMMISSIONER SHELTON:  You've got

15   a --

16          INMATE LINN:  And I'm a refrigeration

17   technician and a carpenter.

18          PRESIDING COMMISSIONER SHELTON:  You've got

19   a decent --

20          INMATE LINN:  I will make it.

21          PRESIDING COMMISSIONER SHELTON:  You have

22   some decent skills for yourself.  All right.  We're

23   going to move forward.  This is the portion of the

24   hearing where we can ask questions.  That would mean

25   the Commissioner and myself, as well as both

26   attorneys.  All questions will be asked, at least

27   through the -- by the District Attorney's Office,

74

1     through the Board. And at this present time I think I

2     don't have any questions so I'm going to go ahead and

3     defer to the Commissioner.

4              DEPUTY COMMISSIONER KEENAN: No questions.

5              PRESIDING COMMISSIONER SHELTON: Okay.

6     Mr. Ruiz, do you have any questions at this time?

7              DEPUTY DISTRICT ATTORNEY RUIZ: Yes. Yes,

8     please. I'd like the Panel to ask the inmate, since

9     the inmate blames drugs for the commitment offense,

10    how long was --

11             ATTORNEY FOX: I'm going to object to that.

12    That mischaracterizes the testimony. He doesn't blame

13    the commitment offense on drugs.

14             DEPUTY DISTRICT ATTORNEY RUIZ: I'll

15    rephrase.

16             ATTORNEY FOX: He's accepted responsibility.

17             DEPUTY DISTRICT ATTORNEY RUIZ: I'll

18    rephrase.

19             PRESIDING COMMISSIONER SHELTON: Go ahead.

20             DEPUTY DISTRICT ATTORNEY RUIZ: Since the

21    inmate claims that he was addicted to cocaine at the

22    time of the offense, how long does the inmate claim

23    that he had been using cocaine?

24             PRESIDING COMMISSIONER SHELTON: Prior to

25    the offense or --

26             DEPUTY DISTRICT ATTORNEY RUIZ: Yes.

27             PRESIDING COMMISSIONER SHELTON: Okay. Do

75

1    you understand the question?

2              INMATE LINN:  Yes, I do.

3              PRESIDING COMMISSIONER SHELTON:  Okay.  How

4    long?

5              INMATE LINN:  I started using cocaine

6    approximately five and a half months before the

7    commitment offense.  I'd been in -- I wasn't shooting

8    up cocaine until like three months before the

9    commitment offense.  I just was snorting it and then I

10   progressed into using a needle.

11             DEPUTY DISTRICT ATTORNEY RUIZ:  Isn't it

12   true that this inmate has lied to prison staff,

13   specifically psychologists, and exaggerated the number

14   of years to which he was abusing cocaine?

15             PRESIDING COMMISSIONER SHELTON:  Do you

16   understand the question?

17             INMATE LINN:  I never told anyone other than

18   what I've just stated now.  That I started using

19   cocaine five, six months before the commitment

20   offense.

21             DEPUTY DISTRICT ATTORNEY RUIZ:  Does the

22   inmate think it might help refresh his memory about

23   that statement he just made if he were to review page

24   two of the report that was prepared for the Parole

25   Board in 1998, specifically October 13, 1998?  Wherein

26   he represented to Dr. Tureen (phonetic) that he began

27   abusing cocaine four years prior to the -- well, for

76

1  the last -- to quote the doctor, "the last four years

2  of his freedom."

3           PRESIDING COMMISSIONER SHELTON:  Do you

4  remember telling Dr. Tureen that, that you used

5  cocaine for four years, sir?

6           ATTORNEY FOX:  Well, if I may read the

7  entire paragraph?

8           DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

9  I'm doing the questioning at this point.

10          INMATE LINN:  Excuse me.  Is that the Psyche

11  Evaluation Report?

12          DEPUTY DISTRICT ATTORNEY RUIZ:  This is the

13  Psychological Evaluation dated 10/13/98, page two,

14  paragraph nine and I'm doing the questioning here.

15          ATTORNEY FOX:  And what was the question?

16  Did he remember why he said it?

17          DEPUTY DISTRICT ATTORNEY RUIZ:  I've asked

18  the question.  I'd ask that the inmate answer the

19  question.

20          PRESIDING COMMISSIONER SHELTON:  I'm going

21  to take over this.  Page two.

22          INMATE LINN:  Oh, that's incorrect.  This is

23  an incorrect statement on this Psyche Evaluation

24  Report.  I never said that and I see where you found

25  that.  That is not correct.

26          PRESIDING COMMISSIONER SHELTON:  All right.

27          DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

77

1          INMATE LINN:. They included -- what they did

2     is they included the marijuana and the alcohol abuse

3     prior to my conviction and somehow incorporated the

4     cocaine into that.  And that's not even -- that's not

5     a fact.

6          PRESIDING COMMISSIONER SHELTON:  All right.

7          DEPUTY DISTRICT ATTORNEY RUIZ:  So in other

8     words, if any Board has previously relied on a history

9     of cocaine abuse for four years in finding him

10    previously suitable for parole because his abuse of

11    cocaine appeared to be for four years, that would have

12    been an incorrect assumption on that prior Board's

13    part.  Is that correct?

14         ATTORNEY FOX:  Objection.  Calls for

15    speculation.

16         DEPUTY DISTRICT ATTORNEY RUIZ:  No.  That is

17    a hypothetical question.

18         PRESIDING COMMISSIONER SHELTON:  It's a

19    sustained objection.

20         DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

21         PRESIDING COMMISSIONER SHELTON:  All right?

22    And I would like to remove both counsels that this is

23    supposed to a congenial type hearing.  I don't want

24    either one of you to get defensive.  Let's move

25    forward and ask questions so we can determine

26    suitability.

27         DEPUTY DISTRICT ATTORNEY RUIZ:  Thank you.

78

1   I'm trying to get to the truth here.

2           PRESIDING COMMISSIONER SHELTON:  Sure.

3           DEPUTY DISTRICT ATTORNEY RUIZ:  Did the

4   inmate represent to the Panel at this hearing that he

5   would consume $500 to $1,000 worth of cocaine over a

6   several day period?

7           INMATE LINN:  I didn't understand the

8   question.

9           PRESIDING COMMISSIONER SHELTON:  Let me

10  rephrase it.  Did you indicate to us that you would

11  use $500 to $1,000 worth of cocaine over a several day

12  period?

13          INMATE LINN:  My statement that I made --

14          ATTORNEY FOX:  I think (indiscernible).

15          INMATE LINN:  Was I was going through $500

16  to $1,000 of cocaine in -- per week.  It was a weekly.

17  I went from paycheck to paycheck and that's where I

18  went in debt.  Because the -- it was more $500 than

19  $1,000 but occasionally, yes, the guy would give me

20  $1,000 worth.

21          DEPUTY DISTRICT ATTORNEY RUIZ:  So then am

22  in correct in my assumption then that Dr. Tureen is

23  wrong when he writes that the inmate told him that he

24  was doing $500 to $1,000 a day of cocaine?

25          INMATE LINN:  $500 to $1,000 worth of

26  cocaine a day I think would probably kill me.  Even

27  though I was (indiscernible).

79

1          DEPUTY DISTRICT ATTORNEY RUIZ:  Excuse me.

2     The question calls for a yes or no answer.  Was

3     Dr. Tureen wrong when he says the inmate told him he

4     was doing $500 to $1,000 a day, as stated in that same

5     paragraph I've already identified?

6          INMATE LINN:  Yes, he's wrong.

7          DEPUTY DISTRICT ATTORNEY RUIZ:  Isn't it

8     true that the inmate only started using cocaine -- I'm

9     sorry.  Isn't it true that the inmate only used

10    cocaine for a three-month period?

11         INMATE LINN:  I used intravenously for three

12    months.  That's how long I was intravenously using

13    cocaine, for three months prior -- just prior to the

14    conviction.

15         DEPUTY DISTRICT ATTORNEY RUIZ:  Isn't it

16    true that Ron Lordon, his lawyer, hired an expert to

17    prepare a pre-sentencing report for Judge Timlin?

18         INMATE LINN:  Yes.

19         DEPUTY DISTRICT ATTORNEY RUIZ:  And didn't

20    this inmate talk to that expert in preparation of that

21    report?

22         INMATE LINN:  Yes.

23         DEPUTY DISTRICT ATTORNEY RUIZ:  And didn't

24    this inmate talk about, among other things, his

25    history of drug abuse?

26         INMATE LINN:  Yes.

27         DEPUTY DISTRICT ATTORNEY RUIZ:  And didn't

80

1  he specifically tell that individual that he started

2  using cocaine and he didn't -- when he first started

3  using cocaine, he didn't immediately start slamming or

4  injecting cocaine at the very beginning of using

5  cocaine?

6           ATTORNEY FOX:  Objection.  It's a compound

7  question, I think.  It's a inappropriate question.

8           PRESIDING COMMISSIONER SHELTON:  Would you

9  please rephrase that?

10          DEPUTY DISTRICT ATTORNEY RUIZ:  Yes.  Did

11 the inmate start injecting cocaine from the very

12 beginning of his use of cocaine?

13          INMATE LINN:  No.

14          DEPUTY DISTRICT ATTORNEY RUIZ:  I'm confused

15 here, Mr. Ruiz, because he's answered this question a

16 couple of different times and he talked about it

17 earlier today.

18          DEPUTY DISTRICT ATTORNEY RUIZ:  Right.

19 These questions are foundational to see if he's lying

20 about his length of use of cocaine.  He has said that

21 he slammed it for -- I'm sorry -- used it

22 intravenously for three months.  This report says he

23 used it for a total of three months.  He's drawing a

24 distinction.  In this report, he says he did not start

25 -- when he first started using cocaine, it wasn't by

26 injection.  He's exaggerating the length of his use of

27 cocaine.  That's why I'm asking.

81

1              ATTORNEY FOX:  I'd object to --

2              DEPUTY DISTRICT ATTORNEY RUIZ:  I'm --

3              ATTORNEY FOX:  I'd object to the entire line

4    of questioning.  I believe this goes more towards

5    argument rather than suitability.

6              DEPUTY DISTRICT ATTORNEY RUIZ:  I am trying

7    to establish that this inmate is malingering and

8    exaggerating the length of his cocaine abuse as an

9    excuse for his conduct, which shows his unsuitability,

10   which is the key question at this hearing.

11             PRESIDING COMMISSIONER SHELTON:  You know, I

12   can read this paragraph and I will read this paragraph

13   into the record.  And it says:

14             "Together with Mr. Crawley, Robert started

15             using cocaine.  He explains that Crawley and

16             another friend were going to slam it or

17             inject it and initially refused, yet later

18             decided to go along.  Continued to use

19             cocaine for three months, terminating abuse

20             approximately one month prior to his

21             arrest."

22   I guess it's a matter of interpretation as to how you

23   want to read the paragraph but I would like to move

24   on.  I'm not sure where you're going with this.  I

25   know what you're saying with setting a foundation but

26   I'm not sure it's going to make a big difference.

27             DEPUTY DISTRICT ATTORNEY RUIZ:  Very well.

82

1    I just want to draw your attention to the last

2    sentence on page three where he specifically says a

3    few months prior to his arrest, he did start using

4    cocaine.

5            PRESIDING COMMISSIONER SHELTON:  I

6    appreciate that.  Any other questions, sir?

7            DEPUTY DISTRICT ATTORNEY RUIZ:  Yeah.  Oh,

8    is it true that the inmate stopped using cocaine on

9    his own one month prior to his arrest?

10           INMATE LINN:  It's true that I stopped using

11   cocaine but it wasn't a month prior to my arrest.

12           DEPUTY DISTRICT ATTORNEY RUIZ:  Would it

13   help refresh the inmate's memory about what he told

14   that expert hired by his lawyer, if he were to look at

15   page four of that Pre-sentencing Report, second full

16   paragraph, last sentence?

17           ATTORNEY FOX:  He's reading that now.

18           INMATE LINN:  No, that's not true.  I used

19   the cocaine more like up to a few days, maybe a week

20   before I committed that last -- that crime.  That

21   crime was probably committed five days -- the last

22   time I used cocaine was probably about four -- three,

23   four or five days before that time.  And I didn't use

24   any cocaine up to that -- from then on.

25           PRESIDING COMMISSIONER SHELTON:  I know I

26   recall you told me you were under the influence of

27   about six beers that day.

83

1          INMATE LINN:   I drank alcohol that day.

2          DEPUTY DISTRICT ATTORNEY RUIZ:   Well, on

3    that issue, isn't it true though that this inmate has

4    told -- has made several statements about that,

5    including he only felt a slight buzz because that was

6    an everyday thing for him, consuming six beers?  Isn't

7    that true?

8          INMATE LINN:   I referred to like that -- I

9    referred to it as a slight buzz as compared to being

10   straight drunk.  I was still under the influence and I

11   wasn't -- I'm not going to sit here and blame the

12   alcohol.  But the fact is that I drank at least six

13   beers that day and I felt intoxicated on that day.

14         DEPUTY DISTRICT ATTORNEY RUIZ:   Okay.  Now

15   getting back to this statement then about stopping its

16   use, the cocaine use one month prior, isn't it true

17   that his memory about when he stopped using cocaine

18   was more fresh back in 1982 than it is now, 26 years

19   later?

20          ATTORNEY FOX:   Objection.  Argumentative and

21   I think it's time to move on.  We're here to discuss

22   suitability.  We're not here to retry the case.

23         PRESIDING COMMISSIONER SHELTON:   And I would

24   sustain that objection.  Come on, Mr. Ruiz.  Let's

25   move this forward.

26         DEPUTY DISTRICT ATTORNEY RUIZ:   In this

27   typewritten statement that has been presented to the

84

1  Board by the inmate --

2           ATTORNEY FOX:  By the inmate's attorney.

3           DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

4  Did the inmate prepare the document entitled

5  circumstances tending to show suitability?

6           ATTORNEY FOX:  Objection.  Relevance.

7           DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

8  Has the Board been asked to consider this document or

9  not?

10          ATTORNEY FOX:  Objection.  Relevance.  It's

11 attorney/client privilege, work product.

12          PRESIDING COMMISSIONER SHELTON:  Wait a

13 second.  I'm going to overrule your objection and I'm

14 going to ask you -- we have not yet reviewed his yet.

15 We're going to review it during recess.

16          DEPUTY DISTRICT ATTORNEY RUIZ:  Exactly.  If

17 you're going to consider it --

18          PRESIDING COMMISSIONER SHELTON:  And yes, it

19 was given -- this was given to us by the inmate's

20 attorney.  The inmate prepared this himself.

21          DEPUTY DISTRICT ATTORNEY RUIZ:  Right.

22          PRESIDING COMMISSIONER SHELTON:  So what is

23 your question?

24          DEPUTY DISTRICT ATTORNEY RUIZ:  I want to

25 ask him questions about what he prepared, to test the

26 truth and voracity of the representations this inmate

27 is making to this Board.  Whether he says it to your

85

1    face or he hands it in a document to you, I have the

2    right to ask questions about it to test its voracity.

3             PRESIDING COMMISSIONER SHELTON:  Does it go

4    to his issue of suitability for parole?

5             DEPUTY DISTRICT ATTORNEY RUIZ:  Absolutely.

6    It goes to the --

7             PRESIDING COMMISSIONER SHELTON:  Ask a

8    question, Mr. Ruiz.

9             DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

10    There was an objection.  I'm simply responding.  You

11    haven't ruled.

12             PRESIDING COMMISSIONER SHELTON:  I overruled

13    it.

14             DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  With

15    respect -- well, the first thing I want to know is did

16    he prepare this?

17             ATTORNEY FOX:  Objection again.  Work

18    product, attorney/client privilege.

19             DEPUTY DISTRICT ATTORNEY RUIZ: If it is work

20    product then is this attorney saying she prepared it?

21    Because if she prepared it then he did not and you

22    need to know this.

23             ATTORNEY FOX:  Objection.  Work product and

24    attorney/client privilege.  It is what it is.

25             DEPUTY DISTRICT ATTORNEY RUIZ:  That is

26    not --

27             PRESIDING COMMISSIONER SHELTON:  Actually --

86

1        DEPUTY DISTRICT ATTORNEY RUIZ:  If it is a

2   statement made by a Defendant, who is acting as a

3   witness and that is what he is doing, he making

4   averments to you, statements to you.  Whether they are

5   statements made orally or in writing, they are

6   statements.  He is therefore a witness.

7        PRESIDING COMMISSIONER SHELTON:  Ms. Fox,

8   when you handed this to me you told me that your

9   client prepared this.  Is that not true?

10       ATTORNEY FOX:  I told you that, yes.

11       DEPUTY DISTRICT ATTORNEY RUIZ:

12  Attorney/client privilege is waived by that

13  representation.  Did this -- well actually, I don't

14  need to ask a question now.

15       ATTORNEY FOX:  Ask the question.

16       DEPUTY DISTRICT ATTORNEY RUIZ:  With respect

17  to paragraph two, previous record of violence and your

18  represent -- and sorry, the inmate's representation

19  that he does not have any history of previously

20  inflicting or attempting to inflict serious injury on

21  another person.  What happened at that prior robbery

22  of the other, as the inmate likes to call them, wet

23  backs?

24       ATTORNEY FOX:  Once again, objection.  We're

25  not here to retry the case.

26       DEPUTY DISTRICT ATTORNEY RUIZ:  No.  The

27  entire question is his suitability and one of the

87

1    things that all of these --

2             PRESIDING COMMISSIONER SHELTON:    I would

3    over -- I mean, I would sustain your objection based

4    on the fact that it's not on the record.    It was on a

5    statement.    There is nothing, there's no legal record

6    of him committing prior robberies.

7             DEPUTY DISTRICT ATTORNEY RUIZ:    Oh, yes

8    there is.

9             PRESIDING COMMISSIONER SHELTON:    Where?

10            DEPUTY DISTRICT ATTORNEY RUIZ:    It is in his

11   statement submitted to the Court for consideration at

12   sentencing; his statement by his sentencing report

13   that was submitted to the Court.    That is part of the

14   record in this case, just like the Probation Officer's

15   Report.    Judge Timlin took that into consideration

16   when he referred it for the 1203.03 diagnostic.    That

17   is part of the record in this case.

18            PRESIDING COMMISSIONER SHELTON:    All right.

19   So what's your point?    The fact that --

20            DEPUTY DISTRICT ATTORNEY RUIZ:    One of the --

21            PRESIDING COMMISSIONER SHELTON:    -- he said he

22   didn't have any prior record?

23            DEPUTY DISTRICT ATTORNEY RUIZ:    The question

24   on suitability takes into consideration, as you must,

25   whether or not he committed -- whether or not he has

26   an escalating history of violence.    And where he

27   admits to you and where he admitted to the judge that

88

1    he has, in fact, engaged in conduct exactly like this

2    on a prior occasion.  And that the psychologists, when

3    they say he's not a danger to the community because

4    he's never engaged in any conduct like this before

5    except the commitment offense.  Then I get to get up

6    here and argue to you that the psychologist's opinion

7    is based on a faulty foundation because they didn't do

8    their homework.  And they don't realize that he did

9    the exact same thing a month and a half before.  Just

10   like Dr. Macomber writes and just like Dr. Zeka

11   (phonetic) wrote in the report before that.  And he's

12   -- I'm going to have him admit it.  I'm going to get

13   it out of his own mouth and that's going to give me

14   the argument that these psychologists got their

15   opinion wrong.  And the prior opinion of suitability

16   by a prior Board was based on those faulty opinions.

17          PRESIDING COMMISSIONER SHELTON:  All right.

18   Let's go with this, since I get to be the one in

19   charge in this room.  First of all, I already heard

20   Mr. Linn admit to the fact that he did commit a prior

21   robbery, okay?  If it was not acknowledged in the

22   psychologist's report, then they did not do their

23   homework, as you said.  Point being, all right, I will

24   accept the fact, based on your definition, that

25   Mr. Linn has a prior record of violence.

26          DEPUTY DISTRICT ATTORNEY RUIZ:  There is one

27   other thing, however, that I would ask your indulgence

1    on.  In that prior incident, according to this inmate,

2    John Crawley shot the victim in that case, another wet

3    back, in the hand because he made the poor victim --

4    and this inmate will acknowledge this.  Hold a can up

5    for kicks and he tried to shoot that can out of the

6    hand of that poor victim and he shot him through the

7    hand on November 2, 1980.  And he and his lawyer

8    presented that in the Pre-Sentencing Report and

9    John Crawley thought it was hysterical.

10         ATTORNEY FOX:  Objection (indiscernible).

11         DEPUTY DISTRICT ATTORNEY RUIZ:  Hey, no.

12   Let me offer push to this Commissioner.  And so --

13         PRESIDING COMMISSIONER SHELTON:  You're

14   pushing your luck with me, sir.

15         DEPUTY DISTRICT ATTORNEY RUIZ:  And so don't

16   you want to know that if he was there and present and

17   saw this and he willingly goes on another robbery,

18   doesn't that evince a callous disregard for the human

19   suffering of other people?  I think that's --

20         ATTORNEY FOX:  (indiscernible).

21         PRESIDING COMMISSIONER SHELTON:  Are you

22   making a closing statement, sir, or are you asking

23   questions (indiscernible)?

24         DEPUTY DISTRICT ATTORNEY RUIZ:  I'm asking

25   for evidence to base my argument on.  I can't make

26   that argument if I don't have evidence to base it on

27   now, can I?

90

1          PRESIDING COMMISSIONER SHELTON:  We're here

2   to discuss suitability.

3          DEPUTY DISTRICT ATTORNEY RUIZ:  And a record

4   of violence is the very essence of suitability.

5          PRESIDING COMMISSIONER SHELTON:  Okay.  We

6   discussed the fact that Mr. Linn has a prior record of

7   violence.  Your discussion of his previous robbery is

8   pushing your limit when it comes to you telling me

9   that his co-partner laughed at the poor victim and

10  you're supposing what Mr. Linn did.  So I would like

11  you to close your questioning, take what's important

12  for you and let's move forward on this.  Your points

13  have been thoroughly taken and understood by this

14  Panel.  I appreciate that.

15         DEPUTY DISTRICT ATTORNEY RUIZ:  It -- then

16  can I ask this?  Is what I just described about the

17  prior shooting a fair characterization of what

18  happened?

19         ATTORNEY FOX:  Objection.

20         DEPUTY DISTRICT ATTORNEY RUIZ:  Is that

21  fair?

22         ATTORNEY FOX:  Objection.  We're not here

23  for fair characterizations based on impressions.  This

24  is a speech.  It's not a question to the inmate.  And

25  my understanding is, the District Attorney's

26  questioning is to be towards suitability.  The file is

27  what the file is.  Consistent statements, inconsistent

91

1    statements; that all goes towards argument.

2         PRESIDING COMMISSIONER SHELTON:  I sustain

3    your objection.  You want to put that into a question,

4    sir, that's easier to answer?

5         DEPUTY DISTRICT ATTORNEY RUIZ:  Is the --

6    yes.  Is the description of what happened at that

7    prior robbery on November 2, 1980 a fair

8    characterization of what happened out there in that

9    prior robbery?

10        PRESIDING COMMISSIONER SHELTON:  Maybe an

11   accurate description.

12        DEPUTY DISTRICT ATTORNEY RUIZ:  An accurate

13   description of what happened out there on that prior

14   robbery?

15        ATTORNEY FOX:  Do you understand that,

16   Robert?

17        INMATE LINN:  I'd like to have that question

18   rephrased.

19        PRESIDING COMMISSIONER SHELTON:  Let me

20   rephrase it.

21        INMATE LINN:  Or just -- I'd like to hear

22   the question again so I'm clear on this.

23        PRESIDING COMMISSIONER SHELTON:  I will

24   rephrase it.

25        ATTORNEY FOX:  Thank you.

26        PRESIDING COMMISSIONER SHELTON:  You

27   admitted to us that you were involved in a robbery

92

1   that you were not held accountable for, in and of

2   itself. And you admitted that you and your partner

3   did another robbery. Is it true that your partner

4   shot the victim in the hand and he made him hold up a

5   can and your partner laughed at him?

6          INMATE LINN: Yes. The crime happened but

7   that's not how it happened. That's not what happened.

8   He didn't have his hold his hand up so he could shoot

9   the beer out of his hand. We had him -- I guess I'm

10  going to have to admit to everything if you want me to

11  talk about a crime --

12         ATTORNEY FOX: I'm going to object.

13         PRESIDING COMMISSIONER SHELTON: Yeah. I

14  mean --

15         INMATE LINN: I'll go ahead and tell you.

16  No, he had his hand up in the air with a beer can in

17  his hand already. John kept telling him but the beer

18  down and he still held it up and John shot him in the

19  hand. But he was shooting -- excuse me -- he was

20  shooting the beer can to shoot -- I don't know what he

21  was thinking. He was shooting at the beer, not

22  realizing that it was going to go through the guy's

23  hand or whether he realized it was going to go to the

24  hand. I can't speak for John. All I know is I saw

25  John pointing the gun towards him, telling him to put

26  the beer down and then he fired a shot at the beer

27  can.

93

1        PRESIDING COMMISSIONER SHELTON:    I guess

2    what -- where we're going here and tell me if I'm

3    wrong, Mr. Ruiz.   But I have a feeling that where

4    we're going is, you did this one robbery with this guy

5    and you used a gun and you hurt somebody.   Why would

6    you go do another one?

7        INMATE LINN:   That's exactly my point.   I

8    saw what John did and I know that he didn't shoot --

9    at that point, it was my belief that John was shooting

10   the beer can out of the guy's hand and not shooting

11   him in the hand.   It's just --

12       PRESIDING COMMISSIONER SHELTON:   So that's

13   what happened.

14       INMATE LINN:   It happened that way.   So for

15   me to think that he was going to -- you know what?   It

16   was bad judgment on my part to believe that he wasn't

17   going to shoot again, okay, at the time.   I did go do

18   another robbery with him.

19       DEPUTY DISTRICT ATTORNEY RUIZ:   That's fine.

20   That's fine.   I'm done with that.   The inmate had been

21   asked about a prior school burglary where some band

22   equipment was taken.   Isn't it true that the inmate

23   was placed on probation for stealing a bicycle as a

24   juvenile, as well?

25       INMATE LINN:   No.

26       DEPUTY DISTRICT ATTORNEY RUIZ:   I'll just

27   expedite this.   I know you want to move on.

94

1          PRESIDING COMMISSIONER SHELTON:    Thank you.

2          DEPUTY DISTRICT ATTORNEY RUIZ:    I'll just

3    draw the Panel's attention then to page five of that

4    report, the same report prepared for the judge at

5    sentencing and part of the record in this case and

6    part of the inmate's C-file.    Mr. Linn reported that

7    he was placed on probation at the age of 12 for

8    burglary in the elementary school and stealing a

9    bicycle.    He finished probation without incident.    In

10   this statement -- again, going back to the typewritten

11   statement presented to the Panel.    The inmate writes:

12          "Mr. Linn does not have any history of

13          mental problems."

14   Does the inmate remember being interviewed by a doctor

15   hired by his lawyer by the name of Dr. Sherry Skidmore

16   (phonetic)?

17          INMATE LINN:    Yes.

18          DEPUTY DISTRICT ATTORNEY RUIZ:    And does the

19   inmate remember Dr. Skidmore telling the judge that

20   the Defendant's personality is borderline and

21   unstable?

22          "He decompensates into periodic breaks on

23          reality.    Outbursts of aggression, strange

24          behavior, impulsiveness and other acting out

25          behavior would be characteristic of Mr. Linn

26          during these episodes.    During these times,

27          Mr. Linn's perceptions, thoughts and

95

1               behaviors are likely to be distorted to an

2               extreme that is psychotic."

3    Does the inmate remember his lawyer presenting that

4    information to the court?

5               ATTORNEY FOX:  Once again, I'd object based

6    on relevance and -- based on relevance.  We're not

7    here to retry the case.

8               DEPUTY DISTRICT ATTORNEY RUIZ:  Well, then

9    I'll offer this.  Does the inmate and his attorney

10   then wish to withdraw number five, psychological

11   figures, from consideration by this Panel?

12              ATTORNEY FOX:  No.

13              DEPUTY DISTRICT ATTORNEY RUIZ:  Well, then I

14   think it is relevant if she wants you to consider it.

15              PRESIDING COMMISSIONER SHELTON:  And this

16   point then, Mr. Ruiz, we're going to -- the Panel will

17   consider all -- everything presented to us.  And we --

18   I think that we're in a position to be able to sort

19   out what we feel is viable for suitability, as well.

20              DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

21              PRESIDING COMMISSIONER SHELTON:  So let's

22   move along.

23              DEPUTY DISTRICT ATTORNEY RUIZ:  All right.

24   We have presented this then at a prior hearing.  This

25   is in the inmate's file, documented in our letter of

26   April 1, 2004.  Is it true that at the 2001 hearing,

27   the inmate experienced an emotional collapse?

96

1             INMATE LINN:  No.

2             ATTORNEY FOX:  Objection -- okay.

3             DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  Okay.

4             INMATE LINN:  I can (indiscernible) on that

5    if you like.

6             PRESIDING COMMISSIONER SHELTON:  No.

7             ATTORNEY FOX:  I don't know what an

8    emotional collapse is.

9             PRESIDING COMMISSIONER SHELTON:  I'm not

10   sure where this is all leading but you know, I'm

11   getting a little bit frustrated.  So if you would

12   finish your questioning, please.

13            DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

14   I'm just reading from Commissioner Steven's note that

15   present -- and I'm sorry.  I'm quoting from note to

16   CDC staff, parole denied, recommendations and request.

17            "Presentation not focused.  Close to

18            emotional collapse during portions of

19            presentation."

20   I'm just going by what the Panel said.

21            PRESIDING COMMISSIONER SHELTON:  I read that

22   already, thank you.

23            DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  Since

24   he put it in issue, I'm just asking him about this.

25            PRESIDING COMMISSIONER SHELTON:  I think

26   your point is made.

27            DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

97

1        PRESIDING COMMISSIONER SHELTON:  So are we

2   ready?  Are you done?  Not to rush you or anything,

3   sir, but I'm -- I -- I'm following your line of

4   questioning.

5        DEPUTY DISTRICT ATTORNEY RUIZ:  As you can

6   see, I'm moving onto different questions when you ask

7   me to.  Okay.  The inmate has stated that immediately

8   upon exiting the vehicle, John Crawley went rushing

9   after or pursuing the fleeing murder victim.  Isn't it

10  true that John Crawley was standing just a few feet

11  away from the inmate when he fired that shot at the

12  victim?

13        ATTORNEY FOX:  Objection.  Relevance.  We're

14  not here to retry the case.

15        DEPUTY DISTRICT ATTORNEY RUIZ:  Oh, I'll

16  make an offer of proof or --

17        ATTORNEY FOX:  It'll be the same objection.

18        DEPUTY DISTRICT ATTORNEY RUIZ:  I'll make an

19  offer of proof.

20        ATTORNEY FOX:  That's argument.

21        DEPUTY DISTRICT ATTORNEY RUIZ:  Then I'll --

22        ATTORNEY FOX:  I think it's an argument.

23  Objection to relevance again.

24        PRESIDING COMMISSIONER SHELTON:  Mr. Ruiz,

25  what does that have to do with suitability?

26        DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  Okay.

27        PRESIDING COMMISSIONER SHELTON:  Like I

1    said, I'm going to be cutting you off here real quick

2    if we don't wrap this up.

3                **DEPUTY DISTRICT ATTORNEY RUIZ:**  Okay.

4                **PRESIDING COMMISSIONER SHELTON:**  You need to

5    bring your points to the point.

6                **DEPUTY DISTRICT ATTORNEY RUIZ:**  Okay.

7                **PRESIDING COMMISSIONER SHELTON:**  And I've

8    not ever had to do that to a Deputy District Attorney

9    before but we're hearing this out.

10                **DEPUTY DISTRICT ATTORNEY RUIZ:**  In the '02

11    Psychological Report, his version of the offense was

12    they arrive on scene and one of them, one of the

13    victims take off running.  And he says that he

14    remained back to guard the other two workers and the

15    co-Defendant runs off after the victim.  He guards the

16    two other victims and after that, he hears two shots.

17    It creates the impression that he doesn't even see

18    Crawley shoot.  My offer of proof is no wonder these

19    psychologists find him so blameless.  And what I'm

20    going to do -- no, I'll go ahead and save it for

21    argument at this point.  That's fine.  Since I've

22    tried the patience of the Panel, I'll go ahead and

23    save it for argument.

24                **PRESIDING COMMISSIONER SHELTON:**  Yes, you

25    have tried our patience.

26                **ATTORNEY FOX:**  Then I'd move to strike the

27    last part of that speech.

99

1          DEPUTY DISTRICT ATTORNEY RUIZ:  Oh, no.  Or

2   fine.

3          PRESIDING COMMISSIONER SHELTON:  So done.

4          ATTORNEY FOX:   There was no question

5   pending.

6          PRESIDING COMMISSIONER SHELTON:  All right.

7          ATTORNEY FOX:  And I have no questions.

8          PRESIDING COMMISSIONER SHELTON:  Thank you.

9          ATTORNEY FOX:  You're welcome.

10          PRESIDING COMMISSIONER SHELTON:  Before we

11   move into closing statements, I do want to let you

12   know that we send out what are called 3042 Notices to

13   agencies or people that might have an interest in your

14   case.  And we did receive, obviously, a response from

15   the Riverside County District Attorney's Office and

16   none other.  So we're going to go into closing

17   statements now.  And Mr. Ruiz, I would read a

18   statement to you to remind you what your parameters

19   are.

20          "The Hearing Panel accepts as true the

21          findings of the Court.  You are allowed to

22          comment on the facts of the case and present

23          an opinion about the appropriate

24          disposition."

25   And if you start going sideways on me, sir, I will

26   interrupt you.  So feel free to make a brief closing

27   statement, as I know the inmate's counsel will be

100

1    brief at this point in time.

2            DEPUTY DISTRICT ATTORNEY RUIZ:    Being

3    intimately familiar with In Re: Elkins and Rosenburg

4    -- I'm sorry Rosencrans and Danenburg, I'm perfectly

5    familiar what my parameters are.    The question before

6    this is suitability and the question of the

7    reasonableness of the risk to public safety is

8    measured by certain factors.    One of those factors is

9    the degree to which the Defendant has engaged in a

10   pattern of criminality.    If this were the only crime

11   that the inmate had engaged in, then given the time

12   that he has served, it tends to inure to the benefit

13   of the inmate on the question of suitability.    That he

14   has enjoyed a relatively free disciplinary free --

15   excuse me -- pattern of behavior and good programming

16   history in this institution.    To the extent that that

17   is not true, he is unsuitable.    If you review each one

18   of my questions under that standard, you will find

19   that each one is germane and highly relevant.    I know

20   what I am doing.    I did my first parole hearing in

21   1991.    Every one of my questions is relevant because

22   each one, having spent six hours going over each one

23   of my questions, they were all designed to elicit

24   answers relative to the question of his willingness to

25   be honest about his substance abuse.    Because as we

26   all know, the more that drugs played a role in this,

27   the less blameworthy he is if he has a handle on it

·101

1    through AA and NA and years of good behavior.   Where

2    he hasn't been found guilty of any 115's or 128-A's

3    related to substance or narcotics abuse, obviously.

4    This is so obvious it can't be questioned.   That's why

5    I went into his substance abuse history.   It becomes

6    very germane whether he was using cocaine for four

7    years, five months or only three months.   And whether

8    he stopped it on a dime like that, like he told his

9    expert.   His lawyer obviously told him to be as honest

10   as possible with his own expert that his own lawyer

11   hired because mitigating circumstances are very

12   important to a sentencing judge.   Now, if we want to

13   know whether or not drugs played a role in that or

14   whether or not he did this for kicks and therefore,

15   needs more programming.   And needs to be more honest

16   with you and just get up and here and say, you know, I

17   did it because I was stupid, because back then I was

18   criminally oriented.   I was using a lot of coke but,

19   hey, you know to be honest, I'm going to quit blaming

20   coke.   I'm going to quit using the Flip Wilson line,

21   the devil made me do it, like so many do now.   It's

22   the drugs.   I'm going to admit to you. I'm going to

23   admit to you, it was that point I was at in my life.

24   I was just stupid and I did it.   You know, there's no

25   way he can explain to you with a straight face

26   watching John Crawley shoot that poor guy in the hand

27   and then say, you know, I did get -- I did three days

102

1    after Christmas, did go and pull another robbery with

2    him. You know, I did. And then expect you to believe

3    that, hey, you know, I did just commit this one crime.

4    And until he is honest with the Parole Board,

5    completely honest with the Parole Board, he's not

6    suitable. Because lack of insight, lack of honesty,

7    confronting his demons means he's not rehabilitated.

8    That is so bottom line. That's a truism. It's

9    axiomatic. That's why he's not suitable. He has been

10   telling this story, mitigating his involvement. Look

11   at the Psychological Report from 2002. His version is

12   that as soon as they get out of the car, Guadalupe

13   goes running into the orange grove and John Crawley

14   goes running after him. And I stand there, I'm

15   guarding the two other Mexicans and he disappears out

16   of sight. And so I rob the two Mexicans and I hear

17   these two shots being fired. And when he comes back

18   he says, oh, I must have killed the guy. Well, no

19   wonder these psychologists say oh, poor, poor

20   Mr. Linn. You know, he didn't have anything to do

21   with it. Well, wait a minute. That's a different

22   picture of how callous and cruel he was out there when

23   you consider that he -- that isn't the way it went

24   down. When they get out there, they stand there.

25   Poor Guadalupe goes running but Crawley shoots him.

26   What does that prove? This inmate was standing right

27   there when Crawley shoots him. And if he's this poor

103

1   innocent waif who feels so bad about this, what would

2   a person like that do in that situation?  He'd freak

3   out.  He'd go oh, my God.  What have I gotten myself

4   into?  But what does he do?  He has the presence and

5   cold, calculated unconcern for human suffering.  He is

6   such a willing robber and down for it, that he

7   continues to go and rob these two guys.  He doesn't

8   say my God, what have I gotten myself into?  This is

9   horrible.  That's the kind of person that Bob Timlin

10  thought he was sentencing.  I agree with the prior

11  Panel in '04.  They weren't swayed by Bob Timlin's

12  letter.  Go ahead and read it for yourself.  That

13  Panel was not swayed by Bob.  I've known Bob Timlin

14  since 1982.  He's a nice guy.  He's a real nice guy

15  but he's detached from this case.  He was doing a

16  calendar back then.  He was doing a lot of cases.

17  He's a nice guy.  I'll leave it at that.  The Panel

18  wasn't impressed with his letter.  I don't think you

19  should be either, because this guy saw that guy get

20  shot and he was as ruthless, cold and calculating.  He

21  continued with that robbery.  You see, those are two

22  different people depending upon how those facts went

23  down.  And that's why I wanted to get into it but

24  we've got to move on.  Fine, I'll move on.  That has

25  to do with suitability.  If you don't understand the

26  commitment offense, you're going to come to the wrong

27  conclusions about this case and you're going to come

104

1    to the wrong conclusion about suitability.  The

2    offense was carried out in a -- I'm quoting his own

3    paperwork.

4            "The offense was carried out in a manner,

5            which demonstrates an exceptionally callous

6            disregard for human suffering."

7    He just saw that that guy was shot and he robs the two

8    brothers of that man.  That's how down he was to this

9    thing, after seeing his crazy partner having shot

10    another victim on November 2, a month and a half

11    before.  And he had quit cocaine a month before he was

12    arrested.  Look at the Probation Report.  He's

13    arrested on January 8.  That means he quit using

14    cocaine on his own.  He didn't go into rehab and he'd

15    only been using cocaine for three months.  How

16    addicted to cocaine could he have been for three

17    months?  Remember, this is 1980.  Crack hadn't hit the

18    streets in 1980.  That was cocaine hydrochloride.  You

19    sniff that stuff.  And he quit it on his own?  What's

20    that tell you?  Use your common sense.  What's that

21    tell you?  He wasn't that addicted to cocaine if he

22    could stop it on his own without rehab and he did.

23    And he told his lawyers expert back in 1982 --

24            ATTORNEY FOX:  I'm going to object again and

25    I apologize for doing that during closing argument.

26    This is a finding of suitability.  It's not the place

27    for hyperbole, histrionics or hubris.  We're here to

105

1   discuss suitability and factors that would lend itself

2   for --

3          **PRESIDING COMMISSIONER SHELTON:** I'll sustain

4   your objection.  Let's -- we're discussing

5   suitability, sir.

6          **DEPUTY DISTRICT ATTORNEY RUIZ:**  Oh.  There

7   -- being familiar with In Re: Elkins, there's enough

8   in here to sustain any (indiscernible) reversal on

9   suitability.  I'll submit it.

10          **PRESIDING COMMISSIONER SHELTON:**  Thank you.

11   Counsel?

12          **ATTORNEY FOX:**  Thank you.  I respectfully

13   disagree with my colleague.  I think it would be

14   appropriate to find Mr. Linn suitable for parole.

15   That's because he is.  He sits before the Panel today

16   and honest -- he's articulate.  He's even eloquent

17   from time to time.  He has exceptional supervisor's

18   reports and that should be no surprise to any of us.

19   The Board Report is supportive based on years of

20   studying Mr. Linn.  The Psychological Evaluation also

21   is supported.  The global assessment of functioning is

22   90, which comes up five points from the last one.

23   That's exceptionally high in society generally and

24   also, in the prison environment.  Mr. Linn makes no

25   excuses for who he has been in the past or who he is

26   now.  He's thoughtful and considerate of others.  He's

27   even reflective and he has demonstrated insight into