# EXHIBIT   B - PART 3 OF 4

106

1   the causative factors of the commitment offense.  His

2   work history in the institution shows that he's a

3   viable, valuable employee and he has earned marketable

4   skills.  He does have justifiable pride in his work

5   and many accomplishments and a genuine healthy

6   curiosity.  He thinks about consequences, as is

7   evident as he speaks.  Turning to his parole plans, he

8   has viable residential plans, viable employment plans.

9   And the detail to which the practical aspects he needs

10   to help him reintegrate outside of prison are

11   discussed at length in those letters.  So I would

12   submit based on that, although I think Mr. Linn has a

13   statement he'd like to read.  Thank you.

14          PRESIDING COMMISSIONER SHELTON:  Thank you.

15   Mr. Linn, would you like to read your closing

16   statement, please?

17          INMATE LINN:  Yes.  Basically, I'm here

18   before you guys today, you know, for trying to get

19   across to you that I'm not going to commit any more

20   crimes, okay?  I think the bottom line is I know that

21   you don't want people out there that are gonna disobey

22   the rules, commit crimes.  And besides what you guys,

23   you know, the People of California, the District

24   Attorney and the Board.  Besides what you guys want;

25   you don't want that to happen.  You don't want someone

26   to get out if they're gonna commit a crime and I'm not

27   going to do that.  I have to live my life realizing

107

1    just what I've learned since I've been in prison and

2    it's taken years to understand this.  That the

3    consequences of my actions are gonna -- I'm going to

4    suffer for them every single time.  So for me to go

5    out there and do some kind of petty crime or not

6    function as a human being in the modern, you know,

7    civilization, then I am going to be lacking in

8    fulfillment and happiness.  I know that I'll -- I

9    create my own life at this point in my life.  I am

10   basically in control of my own destiny.  And I just

11   want you to understand that it's my -- I have -- I've

12   built principles.  I have good values and good

13   principles and I'm constantly building in the right

14   direction on those.  And the more I go in that

15   direction, the more fulfilled my life feels, the

16   happier person I am, the more I connect with other

17   people, whoever it is.  It doesn't matter.  I don't

18   care if it's the worst person on the yard.  I don't

19   discriminate with people so I try to not so much just

20   -- I don't -- I'm a good judge of character, okay, so

21   I'm not going to get in the wrong situation where I

22   get myself in trouble anymore.  But at the same time,

23   I'm not going to point the finger and say you're a bad

24   guy, you (indiscernible).  I say, you know, that's

25   that person's prerogative and just look out, you know.

26   You're going to pay the consequences for that.  But

27   the bottom line is about me.  I will be a law-abiding

108

1    citizen.  If you guys release me, I guarantee you

2    this.  I will follow every law and every rule before

3    me.  I won't -- you know, I sit in the prison and I

4    get disappointed when I see other people doing wrong

5    or still using drugs, especially people that I know

6    that shouldn't be using drugs.  I see that around me

7    and I become -- at this point in my life, I become

8    disappointed in that and disappointed in the person

9    for doing it.  I think at that point if I'm feeling

10   that way, you know, about that situation, then I think

11   I've grown enough to not put myself in -- and be that

12   person that I would be disappointed in by somebody

13   else.  I'd be disappointed in myself.  I won't let

14   myself down.  That's first of all, you know, by going

15   out there and destroying the rest of my life.  Because

16   I have in a sense destroyed the first part of my life,

17   although I've created a real good life for myself now.

18   Because I am living right, I'm honest and I don't make

19   -- I don't live life by assumption.  I live by fact.

20   I make -- I base my decisions on facts, okay?  And I'm

21   not -- I don't have -- as much as I want to respond to

22   the District Attorney's comments, I'm not gonna say

23   anything, okay?  Because I could go on all day about

24   things that have been said but I'm not going to.

25           PRESIDING COMMISSIONER SHELTON:  Let's wrap

26   it up.  You have about two minutes.

27           INMATE LINN:  All I want you to know is, I

109

1    have a strong connection between human beings, my

2    fellow man and God, okay?  So -- and I think what it

3    comes down to is we're all kind of like -- mostly

4    we're supposed to go in the same direction, you know.

5    Where we're supposed to be becoming more of a

6    civilized human race and I want to be a part of that.

7    I don't want to be that dirt-bag that is dragging

8    everyone else down, you know what I'm saying?  So I'll

9    just tell you right now, if you can let me go I would

10   be a happy person.  Even though I'm happy now but I

11   know I would have a very strong appreciation for

12   everything out there and I would value everything out

13   there and I will be a law-abiding citizen.  As I say,

14   I will be a participant and active member in the

15   community.  I won't be the guy that sits on the

16   sideline and says oh, well, you know what?  I see

17   those guys doing that, I don't want to be a part of

18   it.  Or no, I'm just going to watch TV and let

19   everyone else do it.  Because you know what?  I don't

20   owe anybody anything or nobody owes me, you know what

21   I'm saying?  I'm not going to become that person.

22   I've become a person now that I want to participate

23   and I want to help that modern, civilized person grow,

24   you know.  I have a lot of ideas for the community,

25   okay.  You know, I can sit here and say well, I could

26   do it while I'm in here.  But you know the thing is,

27   is this.  I'm not pressed for time.

110

1        PRESIDING COMMISSIONER SHELTON:  I can tell.

2        INMATE LINN:  I don't -- in other words,

3   what I want to let you know if I'm very patient with a

4   lot of things.  And my patience is this; many times

5   I've been to the Board.  I've tried to be honest every

6   single time.  You know, I have been honest.  You know

7   what I'm saying?  And I -- and each time I get turned

8   down, I got back and I sit there and it gets

9   frustrating but I grow more tolerant to this.  I grow

10  more tolerant to everything.  And now, I believe that

11  I'm tolerant about anything that comes before me and

12  my limitations are only going to be set by myself.  So

13  I know that my limitations are self-imposed.  I don't

14  -- I don't see any limitations from my mind, my heart

15  and my soul.

16        PRESIDING COMMISSIONER SHELTON:

17  (indiscernible).  All right.  We're going to --

18        INMATE LINN:  And I am a --

19        PRESIDING COMMISSIONER SHELTON:  -- recess

20  now for deliberations, sir.  We have heard you.

21        INMATE LINN:  All right.  All right.  I will

22  -- yeah.

23        PRESIDING COMMISSIONER SHELTON:  You can

24  just relax.  We are going to recess for deliberations.

25  The time is ten after 12:00 and we'll get everybody

26  back in here after we do that.  You can leave that

27  there if you want.

111

1          ATTORNEY FOX:  You want to leave that?

2          INMATE LINN:  Yeah.

3          ATTORNEY FOX:  Okay.

4          DEPUTY COMMISSIONER KEENAN:  We're off

5   record.

6                    R E C E S S

7                    --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

112

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3            DEPUTY COMMISSIONER KEENAN:  Okay.  Back on

4      record.

5            PRESIDING COMMISSIONER SHELTON:  All right.

6      Welcome back, everyone.  We are back here for the

7      Subsequent Parole Consideration Hearing for Robert

8      Linn, L-I-N-N, CDC Number C-82285.  Everyone has

9      returned to the room that was here during the hearing.

10     Mr. Linn, the Panel has reviewed all the information

11     received and we've relied on the following

12     circumstances in concluding that you are not quite yet

13     suitable for parole and would pose an unreasonable

14     risk of danger to society or a threat to public safety

15     if released.  I'm going to try to explain this to the

16     best that I can to you, sir.  You -- we're giving you

17     a one-year denial and that's because of a couple of

18     questions we have.  You presented extraordinarily well

19     today but there's still some unanswered questions in

20     our minds and in our hearts.  And you know, one of the

21     things I always say to people when I'm training them

22     about being a Commissioner, that it's not an exact

23     science.  This is a people project and I have to go

24     with my head and my heart and my gut.  Like I said,

25     you did a very good job today but I have a couple of

26     unanswered questions and these are issues that

27     ROBERT LINN · C-82285   DECISION PAGE 1   12/19/06

113

1   Commissioner Keenan and I both agreed upon.  So I am

2   going to go through those with you in just a second.

3   This was a difficult decision for us and I know you're

4   disappointed but you can't let it get you down because

5   you've got a couple more hoops to step through.

6   You've come this far.  You've got to get it together

7   just a little bit more.  And so we have -- we're going

8   to tell you what we're looking for specifically

9   because you are doing well.  I don't want you to drop

10  the ball and give up; all right?  I know you received

11  a date before and that was about four years ago.  And

12  people have been trying to bring you along and shore

13  you up.  There's three specific areas that we are

14  going to have looked at for you on a new psychological

15  evaluation.  One reason being that this is a 2005

16  Psyche.  It's not an old psyche for you but it doesn't

17  answer the questions that we have and there's a couple

18  of other issues.  So let me walk through this and keep

19  it as brief as I can for you, okay?  And this is your

20  one-year denial (indiscernible).  First of all, as in

21  every parole hearing in the Decision, we have to talk

22  about the commitment offense.  And one of the areas

23  that we struggle with is with regards to the

24  commitment offense and is the fact that there's a

25  couple different versions of how -- what you actually

26  did during the offense.  Versus what your companion

27  ROBERT LINN    C-82285    DECISION PAGE 2  12/19/06

114

1    did during your offense.  And that, tied in with the

2    fact that you committed a prior robbery and watched

3    your co-Defendant shoot somebody.  Somewhere, the

4    truth lies between both of those scenarios.  You had

5    an opportunity to stop when this situation came about

6    and I have to -- I'm trying not to ramble but this

7    was, like I said, a very important hearing for you so

8    I want to be very succinct.  There's always -- there's

9    been a question of your addition and I want to tell

10   you what I wrote on the psyche request was, is your

11   addiction real or was it exaggerated?  At what point

12   were you in -- there are so many varying statements

13   throughout the course of your file and gosh knows, we

14   read it.  But we want the psychiatrist to evaluate

15   that for us.  I need you to go in there when you meet

16   with the psychiatrist and just bear your sole?

17            ATTORNEY FOX:  You have psychologist on

18   this.

19            PRESIDING COMMISSIONER SHELTON:

20   Psychologist.  Thank you.  The other thing that we are

21   going to have them explore, where your head was at,

22   what your heart was at.  What was going on with you

23   during the prior robbery and how that fell into place

24   with you and your motivation to keep committing

25   robberies after you saw what happened to the victim.

26   I think you have a better understanding of that now

27   ROBERT LINN    C-82285    DECISION PAGE 3    12/19/06

115

1   than you did then but I think it's important to tie

2   those together because it could be looked at -- upon

3   as a string of offenses.  Where would you have gone if

4   you hadn't been caught for this one?  Would there have

5   been future victims down the road?  How long would

6   your addiction have carried on.  So you know, I think

7   with regards to that, that coupled with the fact that

8   you didn't participate in NA for about ten years and

9   you're getting back into it now.  The fact that you

10  told us a few times over that you kicked it by

11  yourself.  And if that's true, you should be very,

12  very proud of yourself.  But being, you know, the

13  history that I have with term -- with regards to prior

14  experiences in my professional life, you're always

15  going to need a support plan in whichever way you put

16  it.  And I think I understood what you were telling us

17  today when you didn't feel like you needed any at

18  first because you'd already kicked the habit.  But

19  once you got involved in it, I really appreciated what

20  you said when you said I found I didn't have to walk

21  it alone anymore.  And I remember those statements and

22  I think that's really important, as well.  The other

23  thing that I want the psychologist to explore is your

24  mental health issues.  What they said about you way

25  back when, when you first were evaluated and to rule

26  out any questions that there might be an ongoing

27  ROBERT LINN    C-82285    DECISION PAGE 4    12/19/06

116

1    problem there.  Do you understand what I'm saying?

2             INMATE LINN:  (no audible response)

3             PRESIDING COMMISSIONER SHELTON:  Talked

4    about the commitment offense.  You know, we -- those

5    conclusions were drawn from the Statement of Facts

6    that came from the September 2006 Board Report, page

7    one.  We have discussed the robbery and homicide.  You

8    and your friend went out.  You were very clear to us;

9    your intent was to commit robbery.  It ended up being

10   a murder and both you and your co-partner got Murder

11   One.  The offense was carried out in a cruel and

12   callous manner and unfortunately, there were more than

13   one victim and you acknowledged that.  There was one

14   murder victim and two brothers, who had to watch their

15   brother die and carry that with them.  I don't know if

16   these men were married, had children.  They had to

17   have family somewhere.  Obviously, hardworking to earn

18   their own money working in an avocado orchard.  And

19   I'm not quite sure why there had to be a shooting.  I

20   know you can't get in the mind of your crime partner

21   but you both went there with guns and that happens

22   when people have guns.  And you were under the

23   influence of alcohol and a man lost his life.  In all

24   -- and you know, and with regards to the motive, the

25   motive of the crime was very trivial.  You were

26   looking for a way to support your drug habit at that

27   ROBERT LINN    C-82285    DECISION PAGE 5    12/19/06

117

1   point.  With regards to a prior record, you by your

2   own admission, have indicated that you were involved

3   in a prior robbery that -- for which you were not

4   arrested or charged.  Other than that, unless there's

5   something else that is not anywhere in the record or

6   you haven't shared, that's your only prior issue.

7   When you were 12 years old and you broke into a school

8   and/or whatever; took a bike, that was not violent or

9   assaultive.  It didn't appear to me that you had an

10  unstable history in any way because you grew up with a

11  family that you guys were close.  You're still close

12  and they still continue to support you and

13  wonderfully.  Your institutional behavior has been

14  very good.  You have received three 115's, the last in

15  August of '98.  You received three 128's, the last in

16  June of 2000.  I will get into your positive

17  attributes here in just a minute but one of the things

18  that we did want to encourage you to do this next year

19  is some more self-help.  Now, I don't mean NA or AA.

20  We rechecked your record and we haven't seen you do

21  anything in the way of self-help since 2003.  Since

22  programming is limited based on a lockdown here or you

23  don't have access to places, you said that you liked

24  to read.  And I noted that you read books with regards

25  to sailing, navigation, camping, backpacking,

26  drafting.  Read some self-help books and do book

27  ROBERT LINN    C-82285    DECISION PAGE 6    12/19/06

118

1    reports for us.  And I don't mean long book reports.

2    I mean like a couple paragraphs of what that book gave

3    to you.  And I encourage that for fellows that get

4    stuck in hard places, like if there's a riot or

5    whatever the case.  If there's anything that you can

6    read that helps you deal with substance abuse issues

7    or issues of being a follower, because there was

8    something else that you had said and I still think

9    you've in that mode a little bit.  And -- but although

10   I read some things in here that show me you're

11   starting to become a role model, which is really good.

12   I want you to try to get a better grip on why you did

13   what you did when you did it so that you can explain

14   why you won't do it again.  I mean, you can sit here

15   and you have spoke eloquently to that effect.  I don't

16   want to get in trouble again.  Why would I be a

17   horrendous monster to get in trouble again?  But I

18   think it's really important for you to be able to go

19   and say something more than I needed a friend and this

20   is what I got hooked up in.  Look at your make-up,

21   your personality, your character.  See what you were

22   operating under at that time.  A little self-analysis,

23   I guess.  So do some self-help this next year to make

24   up for the last three years.  Your work record is

25   exemplary but that's what you're focused on.  You

26   haven't focused on -- you focused on your work ethic.

27   ROBERT LINN    C-82285    DECISION PAGE 7    12/19/06

119

1   Your work, we heard about it a lot today. Focus on

2   you this next year. Let's put all these loose ends to

3   bed. Questions that people ask and let's find answers

4   to them. The Psychiatric Evaluation done by

5   Dr. Macomber in 2005 was positive. He gave you a

6   global assessment score of 90. Do you know what that

7   is?

8             INMATE LINN: I'm not really sure, no.

9             PRESIDING COMMISSIONER SHELTON: Most people

10   don't. It's called a global assessment functioning

11   score. A 90 is like an A-, which is excellent. I

12   don't -- you don't hardly see -- I think the highest

13   one I've seen is 95. How you would be in the

14   community so that's excellent. I want you to

15   understand that. But Dr. Macomber does not answer the

16   questions that we need answered. Dr. Macomber tends

17   to be very generous with his psychological

18   evaluations. We want some good, strong answers for

19   your own benefit. Your parole plans are excellent. I

20   would ask you to do one thing. That letter that came

21   from the transitional housing place, get a letter on

22   letterhead and original signature so that will make

23   that -- I mean, it'll be much more professional

24   looking. And make sure your family gives you updated

25   letters for their housing and their employment offers.

26   But otherwise, your parole plans are excellent,

27   ROBERT LINN   C-82285   DECISION PAGE 8   12/19/06

120

1    including (indiscernible) responses.  And if you could

2    attach a package to your next -- excuse me -- NA

3    locations and meeting times and dates that you would

4    be going to.  Attach that with your parole plans next

5    time.  We mentioned earlier about the 3042 responses

6    and as you know, Deputy District Attorney Ruiz spoke

7    for the Riverside District Attorney's Office in

8    opposition to your parole at this time.  I do want to

9    get on the record your successes because they've been

10   many.  You received your GED in 1998.  I mentioned the

11   books that you like to read.  You mentioned you are a

12   journeyman carpenter.  You have had -- probably the

13   strongest arena in your institutional history is your

14   work, between work and vocation.  You worked as a

15   kitchen sanitation worker, which you're doing

16   currently.  You recently received a chrono for doing

17   an exemplary job.  You've done maintenance work, both

18   in carpentry and painting.  You've been a dining hall

19   server.  You've worked in sanitation.  You have done

20   culinary services, landscaping and I was really

21   intrigued by your vegetables and the community

22   program.  You have vocational drafting and with a part

23   of that being computer drafting and design and a

24   vocation in major appliance repair.  You participated

25   in NA and AA and you received a laudatory chrono for

26   that, in NA especially. You've been an active member

27   ROBERT LINN    C-82285    DECISION PAGE 9    12/19/06

121

1   of that pretty much for the last five years.  You did

2   have a ten-year break where there was no

3   participation, except for a smattering of AA.  So

4   continue in NA, while we're discussing that.  You did

5   participate in the Impact Program, a 14-week program

6   in 2001.  Project Change, which was a 44-week program

7   in 2003.  And prior to that, stress management and

8   substance abuse classes, as well as back when you were

9   in CMC east, you participated in several psychotherapy

10  programs.  So I'm hoping, sir, that you understand

11  what we're -- the loose ends that we're trying to

12  shore up.  You received a date in 2002 and Governor

13  Davis turned it back.  And receiving a date and

14  getting it turned back means I have to do a better job

15  for you in my recommendation and make sure that, as we

16  go through this, that the questions that are posed are

17  answered so you don't get turned down again.

18  Commissioner, do you have anything to add?

19          **DEPUTY COMMISSIONER KEENAN:**  Nothing.  Thank

20  you.

21          **PRESIDING COMMISSIONER SHELTON:**  Mr. Linn, I

22  wish you all the luck in the word.  If you could take

23  care of these things, I believe it would be to your

24  advantage, sir.

25          **ATTORNEY FOX:**  Would it be possible to get

26  the transcripts of the co-Defendant's parole

27  ROBERT LINN    C-82285    DECISION PAGE 10    12/19/06

122

1    consideration hearings, also?  I think they may be

2    relevant, as far as what happened.

3              PRESIDING COMMISSIONER SHELTON:  That would

4    be something I would have to check into.

5              ATTORNEY FOX:  Okay.  I think that might

6    help future Panels.

7              PRESIDING COMMISSIONER SHELTON:  All right.

8    Congratulations.  That concludes this hearing at

9    1:00 p.m., sir.

10             ATTORNEY FOX:  Thank you.

11             PRESIDING COMMISSIONER SHELTON:  Good luck.

12             INMATE LINN:  Yeah, all right.  Thank you

13   very much.

14             PRESIDING COMMISSIONER SHELTON:  Take care,

15   sir.

16                        --o0o--

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON:  APR 1 8 2007

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO

26   THAT DATE, THE DECISION IS MODIFIED.

27   ROBERT LINN    C-82285    DECISION PAGE 11    12/19/06

123

## CERTIFICATE AND DECLARATION

## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of Scribes, have designated ANNA E. McGAUGHY, a duly designated transcriber with House of Scribes residing in the State of Pennsylvania, to prepare the foregoing transcript.  With my signature I do hereby declare and certify, under penalty of perjury, that I have directed her to transcribe tape(s) that total one in number and cover a total of 125 pages.  The recording was duly recorded at CALIFORNIA DEPARTMENT OF CORRECTIONS, CORRECTIONAL TRAINING FACILITY, SOLEDAD, and the foregoing pages constitute a true, complete and accurate transcription of the aforementioned tape to the best of her ability.

I hereby certify that House of Scribes and its designated transcribers are disinterested parties in the above-captioned matter and have no interest in the outcome of the proceeding.

Dated March 1, 2007, in Stockton, California.

_Tama Brisbane_

Owner, House of Scribes

**E X H I B I T**

**2**

Probation Officer's Report
May 11, 1983

1    A-137307

2

3

4                                                                      C

5                                                                  CHINO

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF RIVERSIDE

10                        PROBATION OFFICER'S REPORT

11   PEOPLE vs ROBERT JEFFREY LINN                         CR-18380

12   LEGAL STATUS:

13        On March 27, 1981, an Information was filed charging the defendant in

14   Count I with violation of Section 187 of the Penal Code (Murder), with the

15   Special Allegation that a principal was armed with a firearm within the meaning

16   of Penal Code Section 12022(a) and that the defendant personally used a

17   firearm within the meaning of Penal Code Section 12022.5 and that the murder

18   was committed while engaged in a robbery within the meaning of Penal Code

19   Section 190.2(a)(17)(i); and in Counts II and III, with violation of

20   Section 211 of the Penal Code (Robbery), with the Special Allegations that

21   a principal was armed with a firearm within the meaning of Penal Code

22   Section 12022(a) and the defendant personally used a firearm within the

23   meaning of Penal Code 12022.5.   On April 13, 1981, the defendant entered a

24   plea of not guilty and denied the Special Allegations, whereupon a trial was

25   set for August 24, 1981.  On July 27, 1981, the trial date was vacated and

26   reset for November 30, 1981.  That date was vacated and the matter was

27   reset and duly continued until April 19, 1983.  On that date, the defendant

28   withdrew his former plea of not guilty as to Counts I, II and III and entered

1  a plea of guilty to First Degree Murder as to Count I, and guilty as charged

2  in Counts II and III and admitted the Special Allegations as being armed with

3  a firearm and having personally used a firearm in all three counts, whereupon

4  the matter was referred to the Probation Officer for a pre-sentence

5  investigation and report, returnable on May 16, 1983, at 8:30 a.m., in

6  Department 13. At the time of sentencing, the special circumstances alleged

7  in Count I (190.2(a)(17)(i) of the Penal Code) will be stricken.

8      The defendant is in custody and is represented by R. Lorden, Attorney

9  at Law.

10  PERSONAL DATA:

11      The following information was provided by the defendant.

12      Address:  Riverside County Jail

13      The defendant is a 25-year-old, male Caucasian born January 5, 1958, in

14  West Covina, California, the third of five children born to the marriage of

15  Robert Linn and Betty Ayers.  The defendant has an older stepbrother and

16  stepsister from a previous marriage.  The defendant has fathered no children

17  and married Marian Snyder in March of 1981.

18      The defendant terminated his formal education during the ninth grade in

19  1973 when he attended Troy High School in Fullerton.  At the time of his arrest

20  he was employed as a construction foreman for Southern California Home Builders

21  in Anaheim where he earned a salary of approximately $400.00 a week.  The

22  defendant had worked for this firm for approximately ten years.  He has not

23  served in the military and currently has no income.

24      The defendant describes his health as good and suffers from a learning

25  disability and dyslexia.  The defendant claims to be an alcoholic and has

26  smoked marijuana since 11 or 12 years of age.  At the time of his arrest the

27  defendant stated that he was smoking five or six marijuana cigarettes a day.

28  He has experimented with LSD and PCP.  Also, he states that just prior to his

- 2 -

1  arrest he was injecting cocaine and described his drug usage as, "Spending all

2  the money I earned on it."

3   His stated interests include fishing and riding motorcycles and he related

4  that he has become interested in a Jewish-oriented religious faith while in

5  custody. His stated goal is to finish high school, get a college degree and

6  attend classes in architectural engineering so he can be a good builder when

7  he is released from custody.

8  PRIOR CONVICTION RECORD:  (CDL# N5811186)

9   A recent teletype transcript reflects no record for the defendant.

10 SUMMARY OF OFFENSE:

11  The following is a summary of the offense as contained in the Riverside

12 Sheriff's Department crime report.

13  On December 28, 1980, at approximately 4:30 p.m., deputies responded to

14 an avocado grove located in the Rancho California area on Camden Road

15 .45 miles south of Carancho Road to investigate a reported robbery and homicide.

16  Upon arriving at the scene the deputy was informed by Richard Wiley that

17 sometime around 3:30 p.m., Dryme Weaver, Ranch Foreman, reported via radio

18 to Sherry Wiley that two men driving a blue Pinto were shooting in the area

19 where Guadalupe, Jose and Abel Salgado were working. The men had scattered

20 and one individual was missing. They searched the area for Guadalupe, who was

21 missing, and after a short time they found him lying underneath an avocado

22 tree. They checked his body and could find no pulse.

23  Weaver reported to the deputy that she dropped the victims off at the

24 work site at approximately 1:00 p.m. and around 3:00 p.m. she was driving

25 on Camaron Road approximately one mile south of the work site when she observed

26 a dark blue Pinto fastback occupied by two male Caucasian subjects (later

27 identified as Linn and Crawley), approximately 20 years of age. The driver had

28 brown hair, nearly shoulder length, and the passenger had long red hair.

- 3 -

1   Weaver reported that when she drove past the work site a short time later, she
2   noticed that the Salgado brothers were missing. She found their tools
3   discarded at the scene and retrieved them. She called out to the workers but
4   received no answer. Thinking that the border patrol may have picked them up,
5   she drove through the groves and about a half mile from the work site, Jose
6   and Abel came out of the bushes crying, "Bandidos, bandidos." Weaver related
7   that they confirmed the blue Pinto occupants were the suspects and when they
8   returned to the area they found Guadalupe's body. They lifted his head to
9   check for breathing and found no signs of life.

10      The Salgado brothers related to officers that they were working at the
11  edge of the avocado grove when the car passed carrying two occupants. The
12  car drove northbound on Camaron Road and about two minutes later returned,
13  this time heading southbound. It drove past them, about 50 or 60 feet. Both
14  Linn and Crawley were carrying rifles and they motioned for the Salgado brothers
15  to lie on the ground. Abel and Jose lay down where they were, however,
16  Guadalupe turned and ran up the hill. He ran about ten yards when both Linn
17  and Crawley raised their rifles to their shoulders and shot in the direction
18  of Guadalupe. Guadalupe fell to the ground and made two noises and then lay
19  still. As soon as the shots were fired, Jose got up and started to run,
20  however, Abel told him to stop as he would be shot also. Directly after the
21  shots were fired, one suspect (believed to be Crawley), moved to where
22  Guadalupe lay. He took out his wallet, removed what money was in it, and then
23  threw it to the ground. The second suspect (believed to be Linn) took what
24  money Abel and Jose had in their wallets, and their watches. At this point
25  the suspects motioned for them to leave the area. Both Jose and Abel ran into
26  the avocado grove and hid until they saw Weaver.

27      Guadalupe Salgado was removed by Evans-Brown Mortuary, Sun City, and an
28  autopsy revealed that a bullet entered the left side, back, at and through the

- 4 -

1  tenth rib and proceeded upward and slightly forward to the left lung,

2  thoracic aorta, right lung, nicked the top of the fourth rib--right side,

3  and exited in the area of the right shoulder.  The cause of death was listed

4  as gunshot injury to the thoracic aorta.  Dr. Modglin advised that he

5  believed the victim to be unconscious within two or three seconds and dead

6  within two or three minutes.

7      During the course of the subsequent investigation the Crawley family name

8  came up as person to be considered as suspects because some of the boys had

9  red hair and Jon Crawley drives a dark green Pinto.  On December 30, 1980,

10  around 10:45 a.m., a deputy initiated a traffic stop on a dark green 1974

11  Pinto because the vehicle had an expired vehicle registration.  The driver,

12  Jon Crawley, and his brother Ronald were informed that deputies were

13  investigating a robbery and murder in the Rancho California area and their

14  car matched a witness' description.  Jon Crawley informed the deputy that he

15  was with a friend, Robert Jeffrey Linn, all day Sunday and that he had watched

16  the Rams football game on television.

17      On January 7, 1981, Richard Murphy informed investigators that he has an

18  employee, Ronald Crawley, who had confided in him about his younger brother

19  (Jon Crawley).  Ronald related to Murphy that Jon and Robert Linn had previously

20  robbed illegal aliens in the same area as the Salgado homicide and that Jon

21  and Linn both left Linn's residence with a rifle on the day of the murder.

22  Ronald Crawley confronted Jon Crawley with the murder and he (Jon) said that the

23  victim ran at him.  Ronald responded with something to the effect, "Bullshit,

24  he was shot in the back."  Jon responded back with, "If he hadn't started to

25  run."  Ronald told Murphy that he had put two and two together and without

26  being told, he knew that Jon and Linn had killed the alien.  Also, Ronald did

27  not want to "snitch on his brother or anyone else."

28      On January 8, 1981, officers contacted Marian Snyder, Linn's common-law

- 5 -

spouse. She related that she was unaware of any robbery or murder. During

the interview Snyder related that Crawley and Linn were usually open in their

conversations with her, however, since the day of the murder they had gone off

alone, obviously not wanting her to hear their conversations. Also, on

December 30, 1980, Linn had requested her to cut his hair. He told her that

he was tired of long hair. He had worn it in a pony tail prior to that date.

On one occasion Jon brought over a newspaper and the two of them read the

article about the shooting. Jon had never bought a newspaper prior to this.

She thought this was unusual, however, she did not question them about it.

On one occasion she heard Jon tell Linn, "Don't worry, you didn't do it." She

did not understand it at the time, however, she now thinks that Jon was telling

him not to worry as he was not the one who shot the individual.

Snyder gave officers permission to search the residence. Officers found

a .22-caliber semi-automatic with its stock broken so that gun would fit into

pieces in a washing machine. Officers also found two other .22-caliber

rifles and a .303 rifle.

On January 8, 1981, Linn was arrested on Anthony Street in Lake Elsinore.

He was advised that he was under arrest for murder and robbery and subsequently

advised of his Miranda Rights. Shortly after placing him into the cell he

asked to speak with Marian Snyder. They were allowed to talk for a short while

and when they finished talking he requested to speak to the officer. Linn

told officers, "I was there, I didn't do anything, I'll talk to you about what

I know, I didn't shoot anyone." He then stated he wanted to talk to an

attorney and thereafter, was placed back into the cell. On January 8, 1981,

at approximately 9:00 a.m., investigators took up a surveillance on the

Crawley residence. About 10:00 a.m., Jon Crawley left the residence and was

subsequently stopped by officers and requested to come to the Lake Elsinore

Sheriff's station for an interview. At the Sheriff's station, after being

1   advised of his Miranda Rights, Crawley related that on December 28, 1980, he

2   had gone over to Robert Linn's house and watched the Rams/Dallas football

3   game. They drank beer and after the game was over he and Linn picked up

4   Snyder in Temecula. From there they went to Murrieta Market in Murrieta and

5   purchased food for dinner and went directly to the Linn/Snyder residence. The

6   investigator confronted Jon Crawley with the murder and he denied it. At this

7   point in time he was advised that he was under arrest for robbery and murder

8   and booked.

9   DEFENDANT'S STATEMENT:

10      When interviewed at Riverside County Jail, the defendant related basically

11   the same version as contained in the crime report. He said that he and

12   Crawley had driven to the area for the purposes of finding some "wetbacks" to

13   rob. Linn related that during the robbery he was holding a rifle on one of

14   the "Mexicans" when he heard two shots. He turned around to see a puff of

15   smoke and Crawley was looking at him. Crawley then instructed him to "cover

16   the other Mexican" because one had run away. Linn instructed the other person

17   to come toward him and lay down. Crawley then ran after the fleeing person

18   and returned a short time later and said to him, "I think I killed him." Then,

19   they left the area after taking the "Mexicans'" money. Linn related that

20   Crawley was "really on a high." He said, "We did it" "all right," and then he

21   shook my hand. Then, they drove around the area looking for some more

22   "Mexicans" to rob. Linn related that he thought Crawley was kidding him about

23   killing the person and didn't believe it until he read it in the newspaper.

24   At first, Linn said that he thought the person may have just been wounded.

25      Linn related that he feels that he should be punished for the robberies

26   and believes that he should go to State Prison. However, he related that he

27   did not kill or shoot the victim and was only present.

28                                    ///

VICTIM INFORMATION:

   Guadalupe Salgado was pronounced dead on December 28, 1980, at 5:05 p.m.
The victim's next of kin have been notified by mail as to the date and time of
sentencing.

COLLATERAL INFORMATION:

   The Court is respectfully referred to a psychological evaluation prepared
by Sherry L. Skidmore on February 22, 1982. In her report she describes
the defendant as a "person who functions in the low average or dull normal
range of intellectual ability. His intellectual functioning ranges from
average down to borderline mentally retarded. His achievement scores are
consistent with his intellectual ability. Neuropsychological evaluation
indicates signs of moderate central nervous system dysfunction. The
personality is borderline and unstable and he decompensates into periodic
breaks from reality. Outbursts of aggression, strange behavior, impulsiveness
and other acting out behavior would be characteristic of Mr. Linn during these
kinds of episodes. Such behavior would be more likely to occur if he were
using drugs and/or alcohol to the point that his rigid defenses were rendered
even more ineffective. During these times Mr. Linn's preceptions, thoughts
and behavior are likely to be distorted to an extreme that is psychotic."

   The Court is respectfully referred to a criminological case evaluation
and sentencing recommendation completed by J. C. Hancock, Forensic Criminologist
In Mr. Hancock's report he recommends that criminal proceedings be suspended
and that the defendant be committed to the California Department of
Corrections not to exceed 90 days, pursuant to Section 1203.03 of the
California Penal Code.

   The C.B.I. transcript reflects the defendant has no prior criminal
history, however, he admits that he broke into a school when he was in the
seventh grade and was placed on Juvenile Probation in Orange County.

- 8 -

ADDITIONAL INFORMATION:

The Probation Officer received a letter from Charles Persinger, Ontario Police Officer, who was previously employed as a Deputy Sheriff with Riverside County. He reports that he became acquainted with Linn while employed by and assigned to the Riverside County Jail. He writes that on numerous occasions he observed Linn under tremendous pressure due to his Court proceedings, racial problems in the tank, general depression from being incarcerated, and threats from other inmates trying to get his trustee position. At no time did Persinger see Linn lose his temper; instead, he would ask for more work and work off the tension. Persinger found Linn to be nonviolent. Also, he writes that he found Linn to be very trustworthy, honest, hardworking and consistent. In summary, he writes that he is of the opinion that Linn is a salvageable and productive human being, and that if he owned a business and was looking for an honest and hardworking employee he would not hesitate to hire Robert Linn as he would be an asset.

The Probation Officer has contacted the District Attorney and the defendant's counsel and their views have been considered.

PROBATION OFFICER'S STATEMENT:

Appearing before the Court for sentencing is a 25-year-old, male Caucasian who has pled guilty to First Degree Murder and two counts of Robbery, all felonies. Also, he admits the Special Allegations of being armed and using a firearm. The mandatory penalty upon special findings are to be dismissed at the time of sentencing. When interviewed, the defendant discussed pertinent information in an honest and truthful manner and he appears to be an individual of below average intelligence.

The offense involved the defendant and his companion robbing illegal aliens working in an avocado grove. During the robbery one victim was shot to death. The defendant readily admits participating in the robbery, however, he denies

- 9 -

1   shooting the victim.  The defendant expressed remorse because the victim

2   died.  Linn admits that he should serve time in State Prison.

3       California Bureau of Identification reflects the defendant has no prior

4   criminal history, however, he admits that he broke into a school when he was

5   in the seventh grade and was placed on Juvenile Probation.

6       Circumstances in aggravation would include that the crime involved great

7   violence wherein a human being lost a life; the defendant was armed with and

8   used a weapon at the time of the commission of the offense; and there appears

9   to have been premeditation.  Also, the defendant has engaged in an offense

10  which indicates a serious danger to society.  Circumstances in mitigation

11  would include that he has an insignificant record of criminal conduct.

12      In summary, the defendant is not eligible for a grant of probation.

13  State Prison would be recommended for the protection of society.

14  BARGAIN FOR PLEA:

15      Court records reflect that at the time of sentencing the special

16  circumstances alleged in Count I of the Information, 190.2(a)(17)(i), will

17  be stricken upon the motion of the people.

18  CREDIT, TIME SERVED:

19      Total time credited, 1,825 days; local time, 1,215 days; PC 4019 time,

20  607 days; state institution time, 0.

21          Arrest Date                  Release Date

22          January 8, 1981              May 16, 1983  (sentencing)

23                          ///

24

25

26

27

28

- 10 -

RECOMMENDATION:

In the matter of Robert Jeffrey Linn, CR-18380, it is respectfully recommended that probation be denied and the defendant be committed to State Prison.

DATED this 11th day of May, 1983.

<div style="margin-left: 50%;">

Respectfully submitted,

LAWRENCE F. SMITH
Probation Officer

BY:   DEWAINE BREEDEN
Senior Probation Officer

</div>

DB:vb

I hereby certify that I have read and considered the Probation Officer's report

_____
Judge of the Superior Court

**E X H I B I T**

**3**

Abstract of Judgment
March 1, 1984



## In the Superior Court of the State of California

in and for the County of _____

# Abstract of Judgment

## Commitment to State Prison

Dept. No. _____13_____ Case No. _____CR-18380_____

The People of the State of California

          , vs.

    ROBERT JEFFREY LINN

                              Defendant.

Present:

Hon.     ROBERT J. TIMLIN

      Judge of the Superior Court

          W. Astin

      Prosecuting Attorney

         R. Lorden

      Counsel for Defendant

This certifies that on the __22nd__ day of __February__, 19 __84__, judgment of conviction of the above-named defendant was entered as follows:

(1) In Case No. __CR-18380__ Count No. __1__ he was convicted by _____; on his plea of __Guilty__

                                               (court or jury)

(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of __Murder, 1st Degree__

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of __Section 187, Penal Code__

(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

Defendant has been held in jail custody for __1711__ days as a result of the same criminal act or acts for which he has been convicted. (Local time, 1141 days; P.C. 4019 time, 570 days)

Defendant __++++__ armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weap-
     (was or was not)
on at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code. (No Findings)

Defendant __was__ armed with a deadly weapon at the time of his commission of the offense within the meaning of Sec-
     (was or was not)
tions 969c and 12022 of the Penal Code.

Defendant __used__ a firearm in his commission of the offense within the meaning of Sections 969d and 12022.5 of
     (used or did not use)
the Penal Code.

(Repeat foregoing with respect to each count of which defendant was convicted.)

(2) Defendant ___++++___ adju... ...itual criminal within the meaning ot . ... ...a ___++___ of Section 644 of the Penal
(was or was not)                                                    (a or b)

Code; and the defendant ___++___ a habitual criminal in accordance with Subdivision (c) of that Section. (No Findings)
(is or is not)

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in
the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County
of ___Riverside___ and by him delivered to the Director of Corrections of the State of California at _____
**California Institution for Men, Chino, Chino, California**

**25 years to life**                                      to
It is ordered that sentences shall be served in respect to one another as follows (concurrently or consecutively as to each count):
**Count I will run concurrent to Counts II & III and the Special Allegation (12022.5 PC)
as to Count II.
Special Allegations as to Count I are both stayed. Stay becomes permanent as to 12022
on completion of sentence as to Ct I & 12022.5 PC. Stay becomes permanent as to 12022
on completion of sentence as to Ct I.
As to Count II: Special Allegation 12022(a) is stayed and on completion of sentence as
to Ct II & 12022.5, stay becomes permanent.
As to Count III: Special Allegations are both stayed. Stay becomes permanent as to
12022(a)PC on completion of sentence as to Ct III and 12022.5PC. Stay becomes permanent
as to 12022.5PC on completion of sentence as to Ct III.**

(4) To the Sheriff of the County of ___Riverside___ and to the Director of Corrections at the _____

**California Institution for Men at Chino, California**

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at ___the California Institution for Men at Chino___
California, at your earliest convenience.

Witness my hand and seal of said court

this ___1st___ day of ___March 1984___

___WILLIAM E. CONERLY___ Clerk,

by ___C. Tolar___ Deputy

State of California,

County of ___RIVERSIDE___ } ss.

SEAL

I do hereby certify the foregoing to be a true and correct abstract of judgment duly
made and entered on the minutes of the Superior Court in the above entitled action as
provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court this ___1st___ day of ___March___
19__84__ ___WILLIAM E. CONERLY___, Clerk

___by: C. Tolar, Deputy___

County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of
___RIVERSIDE___

The Honorable ___ROBERT J. TIMLIN___

Judge of the Superior Court of the State of California, in and for the County of _____

___RIVERSIDE___

NOTE: If probation was granted in any sentence of which abstract of judgment is certified, attach
a minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

# E X H I B I T

## 4

Initial Parole Consideration Hearing Decision Transcript
December 4, 1996

46

1          CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3          PRESIDING COMMISSIONER KOENIG:   Okay, we'll

4     reconvene the Panel hearing on Robert Linn.   All

5     participants are present who were present prior to the

6     recess.   The Panel unanimously finds the prisoner

7     unsuitable.   We do feel he would pose an unreasonable

8     risk of danger to society if released at this time for

9     the following reasons:   The first reason is the crime

10    the prisoner committed.   The crime the prisoner

11    participated in, the robbery of three Mexican workers.

12    And during the course of the robbery the crime partner

13    shot and killed one of the workers and robbed the

14    victim.   The prisoner was armed during the robbery and

15    he, himself, robbed two of the victims.   And then

16    participated in the spending of the money prior to the

17    arrest.   They were arrested several days later,

18    showing no remorse for the crime they had committed.

19          The prisoner had a prior record consisting of

20    theft from a school.   He also had participated in two

21    prior robberies of Mexican workers.   The third reason

22    is the need for additional programming.   It is noted

23    that the prisoner received only one 115 since he's

24    been incarcerated.   That was for home brew in 1984.

25    Since then he has been disciplinary free, and we

26    commend the prisoner for that.   We also commend the

27    ROBERT LINN    C-82285   DECISION PAGE 1     12/04/96

47

1    prisoner for his upgrading in the various areas,

2    vocationally, drafting, and painting, receiving his

3    GED.  Also his participation in AA for a period of

4    time.  And notes that he has received chronos for

5    being an excellent worker.  Generally the programming

6    has been excellent by the prisoner; however there's a

7    need for additional programming in the self help area,

8    and particularly AA.

9         The Board report from McElroy states the

10   prisoner would pose an unpredictable degree of threat

11   to society if release.  That's McElroy, CCI.  Batemen,

12   although it's not a negative report, the Doctor does

13   show a concern regarding the prisoner's alcohol and

14   drug usage prior to the instant offense.  Therefore,

15   the Panel finds that when we consider the crime the

16   prisoner committed, the violent shooting to death of

17   the Mexican worker, who the prisoner and his crime

18   partners preyed on, and was involved in this prior to

19   the instant offense at least at two other locations,

20   his prior drug and alcohol abuse and usage, and the

21   need for additional programming, in considering these

22   factors there's not sufficient evidence at this time

23   that the prisoner would behave different.

24        In a separate decision the Panel finds that

25   it's not reasonable to expect that the prisoner would

26   receive a parole date during the following two years.

27   ROBERT LINN    C-82285    DECISION PAGE 2    12/04/96

48

1    This is a two-year denial.  The reason for the two-

2    year denial is the crime the prisoner committed, his

3    prior criminal history, and drug usage, and the need

4    for additional programming.

5         In the ensuing two years we ask that the

6    prisoner remain disciplinary free.  That he upgrade

7    educationally and continue in the vocational area.

8    And participate in self help and therapy programming,

9    particularly AA or NA.  This concludes the reading of

10   the formal decision.

11        It's a necessity that you continue in the AA/NA

12   area and all the steps, because there's always going

13   to be concern that you would return to use of drugs

14   and alcohol.  You're going to have to realize that

15   you're in prison for a long period of time, because of

16   the 25 to life.  Your matrix is probably around 28

17   years, but you're willowing it down quite rapidly

18   because you've been disciplinary free.  You're going

19   to want all the good time you can get, so whatever you

20   do, do not get a 115.  Keep busy like you've been busy

21   in the last several years.  That's immensely important

22   that when you come before the Board two years from now

23   that you can show hey, here's what I'm doing, I'm

24   programming here, I'm doing this and so on down the

25   line.

26        You're a sad case, you really are, because you

27   ROBERT LINN     C-82285     DECISION PAGE 3     12/04/96

49

1    have the support and people think a lot of you, as we

2    read the letters, and the way you work and participate

3    with other people and so on.   It's just too bad that

4    this crime occurred.   Here's a copy of the decision.

5    Good luck, Mr. Linn.   We'll see you in two years.

6         COMMISSIONER VAN COURT:   Keep up the good work.

7         COMMISSIONER BAKER:   You know, it would be very

8    wise for you to have several good vocations.

9                        --c)o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED TWO YEARS

26    EFFECTIVE DATE OF THIS DECISION _____ JUN 1 6 1997 _____

27    ROBERT LINN    C-82285    DECISION PAGE 4        12/04/96

**E X H I B I T**

**5**

Subsequent Parole Consideration Hearing Decision Transcript
December 16, 1998

43

1         CALIFORNIA BOARD OF PRISON TERMS

2            D E C I S I O N

3        PRESIDING COMMISSIONER SHELTON:  We're back on

4   record and everyone who was in the room when we

5   recessed for deliberation has returned and the Panel

6   reviewed all information received from the public and

7   relied on the following circumstances in concluding

8   the prisoner is not suitable for parole and would pose

9   an unreasonable risk of danger to society and a threat

10   to public safety if released from prison.  The offense

11   was carried out in an especially cruel and callous

12   manner.  The offense was carried out in a

13   dispassionate and calculated manner.  The conclusions

14   are drawn from the Statement of Facts wherein the

15   prisoner and his crime partner were on a robbery spree

16   of robbing illegals.  One of the victims tried to flee

17   the scene and his crime partner shot and killed him.

18   He has an escalating pattern of criminal conduct,

19   previous 211 robberies transpiring prior to this

20   arrest.  He wasn't arrested for it but he was on a

21   robbery spree.  He has a persistent pattern of

22   tumultuous relationships and criminal behavior which

23   commenced at an early age and the use of alcohol and

24   drugs and dropping out of school.  He programmed in a

25   limited manner while incarcerated.  He's failed to

26   upgrade educationally and vocationally as previously

27   ROBERT LINN      C-82285      DECISION PAGE 1   12/16/98

C-FILE

44

1  recommended by the Board.  And he has not participated
2  in self-help and therapy programs, AA and NA, in the
3  last year or so.  He's failed to demonstrate evidence
4  of positive change.  Misconduct while incarcerated
5  includes three 115s and two of those being in the last
6  year of 1998.  The prisoner needs therapy in order to
7  face, discuss, understand and cope with stress in a
8  nondestructive manner.  Until progress is made, the
9  prisoner continues to be unpredictable and a threat to
10 others.  The prisoner's gains are recent and he must
11 demonstrate an ability to maintain gains over an
12 extended period of time.  Nevertheless, the prisoner
13 should be commended, we always try to find something
14 to commend you for.  I want to commend you for your
15 work record yet you got your 115s for not getting
16 there.  The Hearing Panel finds that it is not
17 reasonable to expect that parole would be granted in a
18 hearing during the next one year.  So we're giving you
19 one year and hoping you get your stuff together, all
20 right?
21        INMATE LINN:  Yeah.
22        PRESIDING COMMISSIONER SHELTON:  We recommend
23 that you remain disciplinary-free, that you continue
24 to upgrade educationally and vocationally where you
25 can, and participate in self-help and therapy programs
26 and by that, again, AA and NA.  You can't drop out.
27 ROBERT LINN        C-82285        DECISION PAGE 2   12/16/98

45

1    You have to be in it all the time.  And you need to

2    firm your parole plans.  When you get the letters in,

3    make sure you've read them, you know where you're

4    going, and know that you have to go to Riverside

5    County.  If it gets transferred, fine, but for our

6    purposes, Riverside, okay.

7              INMATE LINN:  Okay.

8              PRESIDING COMMISSIONER SHELTON:  All right,

9    keep your chin up.  Do a good job.  Lots of luck to

10   you.

11             INMATE LINN:  Thank you.

12             PRESIDING COMMISSIONER SHELTON:  Any comments?

13             DEPUTY COMMISSIONER FILANGERI:  It's unusual

14   for you to have such a quick return given your recent

15   downturn and your recent disciplinary history.  We

16   took into consideration the maintenance and mitigation

17.  about that and the fact is that most of your

18   disciplinary history has been very good.  The pressure

19   is on you to perform during this next year, to

20   immediately get back into AA and NA, and to do

21   everything possible that you can on another vocational

22   or educational upgrade.  You need to keep yourself

23   very, very busy during this next year.  Otherwise, the

24   next Panel probably won't be so considerate.

25             INMATE LINN:  I will speak with my counselor

26   this week and talk about getting, tell him how I'm

27   ROBERT LINN         C-82285        DECISION PAGE 3  12/16/98

46

1    getting into the trade, that I've been on the waiting

2    list for along time, I need to get started, I know

3    enough.

4         DEPUTY COMMISSIONER FILANGERI:  You can point

5    to my comments in this decision, when you get this

6    decision, when you speak with your counselor.  Good

7    luck to you.

8         INMATE LINN:  All right.

9         DEPUTY COMMISSIONER FILANGERI:  Good day.

10        INMATE LINN:  Thanks.

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   EFFECTIVE DATE OF THIS DECISION_____
                                        JAN 1 5 1999

27   ROBERT LINN      C-82285     DECISION PAGE 4   12/16/98

**E X H I B I T**

**6**

Subsequent Parole Consideration Hearing Decision Transcript
July 18, 2000

62

1      CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3          PRESIDING COMMISSIONER LAWIN:   All parties

4      have returned to the room for the hearing for

5      Mr. Linn.   The Panel has reviewed all information

6      received from the public and relied on the following

7      circumstances in concluding that the prisoner is not

8      yet suitable for parole and would pose an

9      unreasonable risk of danger to society or a threat

10     to public safety if released from-prison.   The

11     commitment offense was carried out in an especially

12     cruel.   Multiple victims were attacked, one was

13     killed in the same incident.   And it was carried out

14     in a dispassionate manner and in a manner which

15     demonstrates an exceptionally callous disregard for

16     human suffering.   These conclusions are drawn from

17     the Statement of Facts wherein the prisoner and his

18     crime partner had gone on something of a crime

19     spree, robbing several farm workers.   On this

20     particular occasion, they had attempted to rob three

21     farm workers.   One of them ran off and was shot by

22     the crime partner and died at the scene.   The inmate

23     and his crime partner robbed the individuals in this

24     occurrence.   The prisoner has an escalating pattern

25     of criminal conduct.   He has an unstable social

26     history which includes juvenile probation, and he

27     ROBERT LINN   C-82285   DECISION PAGE 1   7/18/00

63

1    did present that to us.  It's not clear in our Board

2    Report.  In fact, it indicates there were no

3    juvenile detentions or petitions and he did set the

4    record straight with us and indicate that he had

5    actually been on probation as a juvenile.

6    Additionally, he began using marijuana at a very

7    early, around the age of ten and some alcohol.  He

8    then progressed to other drugs, including hashish,

9    attempted, or tried LSD, several other drugs, and

10   eventually cocaine.  The prisoner has not

11   sufficiently participated in beneficial self-help

12   programs.  In terms of parole plans, he lacks

13   realistic parole plans in that he does not have

14   viable residential plans in the last county of legal

15   residence.  We do know that he has a couple of job

16   offers so he probably has acceptable employment

17   plans, they do seem to be in the last county of

18   legal residence and we have letters in the file to

19   validate them.  The Hearing Panel notes that

20   responses to PC 3042 notices indicate opposition to

21   a finding of parole suitability, specifically from

22   the District Attorney of Riverside County whose

23   representative spoke to the issue today.  The Panel

24   makes the following findings:  The prisoner needs

25   therapy in order to face, discuss, understand and

26   cope with stress in a nondestructive manner.  Until

27   ROBERT LINN    C-82285   DECISION PAGE 2   7/18/00

64

1   progress is made, the prisoner continues to be

2   unpredictable and a threat to others.   Nevertheless,

3   the prisoner should be commended for his work in

4   appliance repair, for his continuing participation

5   in that program, for his Drafting certification, as

6   well as for his staying out of trouble and not

7   having a serious 115 since 1998, which was for

8   reporting late.   However, these positive aspect of

9   his behavior do not outweigh the factors of

10   unsuitability.   This is a one year denial.   In the

11   coming year, the Board recommends, the Panel

12   recommends that the prisoner remain disciplinary-

13   free, continue to upgrade vocationally, we hope that

14   you'll be able to complete all of the appliance

15   repair courses, and participate in self-help

16   programming.   Mr. Linn, your case was a majority and

17   I'm going to let Commissioner Bordonaro speak to

18   that issue in a moment.   I should have mentioned

19   that earlier.   I wanted to indicate to you in terms

20   of parole plans, it's one area that I think that you

21   are lacking.   You're never guaranteed of a date,

22   regardless of what you do, but had you had a couple

23   of things in order today, you were very close to

24   walking out of here with a date.   What you need in

25   parole plans, get your sister to write a letter

26   indicating that they will pay for an apartment.   We

27   ROBERT LINN   C-82285   DECISION PAGE 3   7/18/00

65

1   don't have anything in the file that verifies that

2   they will support you financially.  You need to get

3   something in there.  If you can get a letter from

4   your, it would really be the third letter of

5   employment, but if you can get a letter from your

6   friend, that's great, you do have two letters in

7   there about a job, but you need to get something

8   about housing.  Since she does live out of the

9   county, that's a very important factor.  We have a

10  form similar to this that we have to utilize when

11  we give a date.  On that form it asks, does he have

12  acceptable housing?  We couldn't have checked that

13  today.  So I think, you know, it won't take much

14  work for you to do that, start working on it now,

15  get her to write the letter.  Additionally, I'm

16  going to let, I'll pass the gavel here, let

17  Commissioner Bordonaro speak last, if you don't

18  mind, since he did dissent for a date.  And

19  Commissioner Filangeri?

20          DEPUTY COMMISSIONER FILANGERI:  Thank you.

21  I want to refer to the letter of the Honorable

22  Robert J. Timlin.  In the fourth paragraph, he said

23  that he concluded, I'll quote this:

24          "I concluded that he (meaning you)

25          had a malleable personality and his

26          involvement with controlled

27  ROBERT LINN   C-82285   DECISION PAGE 4   7/18/00

66

1          substance caused him to be subject

2          to the substantial influence of his

3          co-defendant in the commission of

4          the crime for which he is now

5          serving the sentence."

6    That's the same conclusion that I've drawn today,

7    is that your personality structure allows you to be

8    suggestible.  Now, you've demonstrated that, that

9    you can keep yourself from being suggestible in the

10   structured setting of the prison, and you should be

11   commended for that, as you should be for all the

12   other things that Commissioner Lawin mentioned, and

13   that you live your life with the 12 Steps in mind.

14   Nevertheless, when you find yourself back on the

15   street, it's going to be incredibly stressful, more

16   stress than you've ever endured in the past.  And

17   what I'd like to see, before I could find you

18   suitable, is that you've developed a sense of

19   community with other people who are trying to do

20   the same sorts of things as you, that is to refrain

21   from drug use, so that you'll have this added

22   strength of them to help you over the stress of

23   going back into the community.  Not only that, but

24   I think you have something to offer those people,

25   whether it be AA or NA, in custody or out of

26   custody.  I want you to get in the habit of that.

27   ROBERT LINN    C-82285   DECISION PAGE 5   7/18/00

67

1    And if you would have had that sort of thing today,

2    even in the absence of really sound parole plans, I

3    think I could have found you suitable today.  I

4    want to impress that upon you, and I hope you take

5    that as, I hope you can take some advice from that.

6         INMATE LINN:  I will.

7         DEPUTY COMMISSIONER FILANGERI:  I certainly

8    wish you the best of luck.

9         INMATE LINN:  Thank you.

10         PRESIDING COMMISSIONER LAWIN:  Commissioner

11   Bordonaro?

12         COMMISSIONER BORDONARO:  I did vote for your

13   suitability today.  I think that you're very close

14   and I, you know, one of the things that I surely

15   don't want you to do is to take this as a

16   disappointment or a frustration.  There are some

17   loose ends and both of the Commissioners have

18   spoken to those and made a pretty good point about

19   those loose ends.  If you had received enough votes

20   here, I don't believe that your case would have

21   made it all the way through the process because of

22   those loose ends.  But I do feel you're suitable,

23   you've got a lot of good, you've got a lot of great

24   things going for you.  You've got the Judge, you've

25   got the D.A., you've got the letters, you've got,

26   you know, you weren't the shooter, that's pretty

27   ROBERT LINN   C-82285   DECISION PAGE 6   7/18/00

68

1  clear.  And you probably have more things going for

2  you than 99 percent of the lifers in this facility.

3  You just need to kind of take a little more control

4  of your life and kind of do some things, not for

5  this Panel, but for you.  I think you've

6  demonstrated that you understand the Steps for AA

7  and NA, but I had to kind of get it out of you.

8  And I kind of read that, where Commissioner

9  Filangeri was going when he was questioning you

10  about that, and so I took it upon myself to try to

11  fish out more evidence, that you know about those

12  Steps and that you have the tools to stay clean and

13  sober.  And so, with that, I think you've got a

14  year, that's enough time to tighten up your parole

15  plans, get those letters of support in the county

16  of last legal residence, which would be Riverside.

17  You know, you can even find out where the AA

18  meetings are, when they are.  Get your friend to

19  write a letter saying he'll sponsor you on the

20  outside.  There are things that you can do to show

21  us that you're serious about this, and I think that

22  you've got a pretty darn good shot the next time

23  you come in if you do those things, that you'll be

24  able to convince the Panel and be able to make it

25  all the way through the process.  And I do want to

26  wish you the best of luck.  You're definitely

27  ROBERT LINN    C-82285    DECISION PAGE 7   7/18/00

69

1    close.  Don't give up hope.

2          INMATE LINN:  All right, thank you.

3          PRESIDING COMMISSIONER LAWIN:  So we're

4    issuing you a challenge today.

5          INMATE LINN:  Okay.  I know I let you guys

6    down last, last time and I feel real bad about

7    that, I really do.

8          PRESIDING COMMISSIONER LAWIN:  Don't feel

9    bad about it, just get it squared away.

10         INMATE LINN:  And like I say, I just, you

11   know, I appreciate that you guys give me a little

12   hope, you know.

13         COMMISSIONER BORDONARO:  It's there.

14         INMATE LINN:  Before this, I had no hope.  I

15   know I don't deserve to cry or whine about all

16   this, you know, but it's just --

17         PRESIDING COMMISSIONER LAWIN:  Now you just

18   go out there and you can get it done, and we'll see

19   you next year.

20         INMATE LINN:  Okay, thank you, thank you

21   very much.

22         PRESIDING COMMISSIONER LAWIN:  That

23   concludes the hearing at 5:10.

24                    --o0o--

25   PAROLE DENIED ONE YEAR                AUG 0 4 2000

26   EFFECTIVE DATE OF THIS DECISION_____

27   ROBERT LINN   C-82285   DECISION PAGE 8   7/18/00

**E X H I B I T**

7

Subsequent Parole Consideration Hearing Decision Transcript
December 5, 2001

74

1        CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3        DEPUTY COMMISSIONER STEVENSON:  You're on the

4    record.

5        PRESIDING COMMISSIONER MOORE:  Okay, let the

6    record show that all interested parties have

7    returned to the room and this is Robert Linn, CDC

8    number C-82285.  The Panel has reviewed all

9    information received from the public and relied on

10   the following circumstances in concluding that the

11   prisoner is not suitable for parole and would pose

12   an unreasonable risk of danger to society or a

13   threat to public safety if released from prison.

14   The committing offense was carried out in an

15   especially cruel callous manner.  There were

16   multiple victims attacked, injured or killed in the

17   same incident.  The offense was carried out in a

18   manner which demonstrates an exceptionally callous

19   disregard for human suffering.  These conclusions

20   are drawn from the Statement of Facts wherein the

21   prisoner and his crime partner had gone on some kind

22   of a crime spree robbing several farm workers and on

23   this particular occasion they had attempted to rob

24   three farm workers.  One of them ran off and was

25   shot by the crime partner and died at the scene.

26   The inmate and his crime partner robbed the

27   ROBERT LINN  C-82285   DECISION PAGE 1    12/05/01

75

1    individuals in this occurrence.  The previous

2    record, the prisoner has an escalating pattern of

3    criminal conduct.  He has an unstable social history

4    which includes juvenile probation, something that

5    the prisoner brought to the attention because the

6    record was incorrect at the time.  He's failed to

7    profit from society's previous attempts to correct

8    his criminality.  He has juvenile probation.  He has

9    an unstable social history in that he had use of

10   marijuana at an early age, alcohol at an early age.

11   He tried various drugs, LSD, cocaine, an ugly

12   cocaine habit.  Institutional behavior, the prisoner

13   has not sufficiently participated in self-help and

14   beneficial therapy programming.  The Panel notes

15   3042 notices indicate an opposition to a finding of

16   parole suitability.  Specifically the District

17   Attorney's office of Riverside, California who is

18   the District Attorney's Office and they had a

19   representative present at the hearing today and were

20   in opposition to a finding of suitability at this

21   time.  The Panel makes the following findings:  The

22   prisoner needs therapy in order to face, discuss,

23   understand and cope with stress in a non-destructive

24   manner.  Until progress is made the prisoner

25   continues to be unpredictable and a threat to

26   others.  Nevertheless the prisoner should be

27   **ROBERT LINN   C-82285    DECISION PAGE 2     12/05/01**

76

1    commended for his positive work reports, remaining

2    disciplinary-free since 1998. Let's see,

3    nevertheless participating -- Strike that for a

4    moment. Participating in the Impact Workshop and

5    completing it as well as having marketable skills.

6    However these positive aspects of his behavior don't

7    outweigh the factors of unsuitability. This is a

8    one year denial, sir, in terms of the process.

9    You're doing the right things, continue to do those

10   but remain disciplinary-free. You can do that as

11   you've already done as well as continue to maintain

12   your work program as well as self-help programs that

13   you continue to go in. That concludes our hearing.

14   Commissioner Stevenson, any comments? Oh, also

15   we're going to order a new psych report.

16        DEPUTY COMMISSIONER STEVENSON: Mr. Linn, I

17   am concerned by your presentation here today and

18   spoke with Commissioner Moore about the need for a

19   new psych report. You were not focused today. Now

20   maybe you were nervous today, I don't know, but you

21   were not focused. You kept losing your way and you

22   appeared to me to be emotionally quite fragile.

23   Now, I understand the consequences of these hearings

24   are very great. I think I'd probably be emotionally

25   impacted as well but the frequency of it concerned

26   me a little bit and so I want the doctors to take a

27   ROBERT LINN  C-82285   DECISION PAGE 3    12/05/01

77

1    look at that and see if there's anything that needs

2    to be addressed.   There may not be but I was

3    concerned about that aspect today.   I will also give

4    you my recommendation not withstanding

5    Mr. Champlin's very able defense of your parole

6    plans.  I think you need to be explicit in terms of

7    residential and not indicate just different options.

8    Somebody needs to say this is my house and it is

9    Robert's when he's out or words to that effect.   I'm

10   a very literal person in that regard and I

11   understand that better than plans so those were the

12   two areas that I had concerns with today.   Other

13   than that I concur with Commissioner Moore's

14   comments about the other programming that you are

15   conducting.   Nothing further, thank you,

16   Commissioner Moore.

17         PRESIDING COMMISSIONER MOORE:   Thank you,

18   sir.  This concludes our hearing.  Good luck to you,

19   sir.   18:00 hours.

20                      --oOo--

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   EFFECTIVE DATE OF THIS DECISION  JAN 0 2 2002

27   ROBERT LINN   C-82285    DECISION PAGE 4    12/05/01

**E X H I B I T**

8

Subsequent Parole Consideration Hearing Decision Transcript
December 4, 2002

62

1          CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3          DEPUTY COMMISSIONER JOHNSON:  We are back on

4      the record.

5          PRESIDING COMMISSIONER ANGELE:  This is in

6      the matter of Robert Linn.  Mr. Linn, before I

7      read the decision, I want to say for the record

8      that we admonished you initially that you don't

9      have to admit your offense or discuss your

10     offense.  However we do accept as true the court

11     proceedings.  And also our job here is to

12     ascertain whether or not you are suitable for

13     problem and whether or not you'd be a risk to

14     society or a threat to public safety.  Based upon

15     the record, I will be able to read, we have

16     concluded that you would not be a threat to public

17     safety and there are -- after reviewing all the

18     information received from the public and relying

19     on the following circumstances in concluding that

20     you are suitable for parole and would not pose an

21     unreasonable risk of danger to society or a threat

22     to public safety if released from prison.  You

23     have no juvenile record of assaulting others and

24     had it not been for your own statements, you would

25     have no juvenile record at all.  You have a stable

26     social history exhibited by reasonable stable

27     ROBERT LINN   C-82285   DECISION PAGE 1   12/4/02

63

1    relationships with others and, while in prison,

2    enhanced your ability to function within the law

3.   upon release through participation and educational

4    programs receiving your GED in 1988, self-help and

5    therapy, AA, NA, 12-step program, vocational

6    programs, appliance repair, and refrigeration, air

7    conditioning repair, institutional job

8    assignments, painting and culinary.  You committed

9    the crime as the result of a significant stress in

10   your life.  You lack a significant criminal

11   history of violent crime.  In fact, you have no

12   adult history other than the commitment offense.

13   Because of maturation, greater understanding and

14   advanced age, you have reduced the probability of

15   recidivism.  You do have realistic parole plans

16   that include job offers, family support, and

17   residence.  You have maintained close family ties

18   while in prison by way of letters, visits, and

19   telephone calls.  You have recently maintained

20   positive institutional behavior which indicates

21   significant improvement in self-control during

22   your incarceration receiving three 128(a)

23   counseling chronos and two 115s.  These all had to

24   do with failure to report or missing work.  In

25   fact, all three of the 128s were failure to report

26   and the two 128s, one -- both in 1998, were for

27   ROBERT LINN   C-82285   DECISION PAGE 2    12/4/02

64

1  reporting late and then the report -- actually
2  both were for reporting late.  Your last 128 was
3  in 2000.  You show signs of remorse and indicate
4  that you understand the nature and magnitude of
5  the offense and accept responsibility for the
6  criminal behavior and have a desire to change
7  toward good citizenship.  Psychological evaluation
8  which is dated 11-26-02, and this is by Dr. Jeff
9  Howlin, H-O-W-L-I-N, is supportive in that in
10 regards to threat to the public, it places your
11 threat at no more than the average citizen.  It
12 also indicates under diagnostic impressions under
13 Axis I, Polysubstance Abuse Dependence, In
14 institutional remission.  Under Axis II, No
15 contributory personality disorder.  And under
16 Axis III, No contributory physical disorders,
17 with a GAF score of 85.  The doctor indicates that
18 the inmate is competent and reasonable for his
19 behavior.  He has had the capacity to abide by
20 institutional standards and has generally done so
21 during the approximately 18 years CDC time period.
22 The inmate does not have any mental health
23 disorders which would necessitate treatment either
24 during his incarceration period of following
25 parole.  The inmate appears to have made gains
26 since being incarcerated.  He has completed a GED
27 ROBERT LINN  C-82285  DECISION PAGE 3  12/4/02

65

1    and received vocational training.  He has

2    actively involved himself in Alcoholics Anonymous

3    and Narcotics Anonymous in addressing his

4    substance abuse history.  Once again estimated

5    that his violence potential if released to the

6    community would be no more than the average

7    citizen as long as he is able to abstain from the

8    use of alcohol or drugs.  The term of

9    confinement:  The prisoner has been convicted of

10   murder in the first degree, 187 of the Penal

11   Code.  The offense occurred on December the 20th,

12   1980.  The term is derived from the matrix located

13   at CCR Title 15 at 2403(b), boy, first degree

14   murder, offense committed on or after 11-8-78,

15   Category -- or the Panel finds Category C-III is

16   appropriate in that death resulted from severe

17   trauma inflicted with deadly intensity and the

18   inmate had no relationship with the victim.  The

19   Panel assesses 360 months for the base term and

20   notes that this is the middle term.  Additionally

21   there are concurrent, nonlife sentence imposed by

22   the court, count number two, robbery, 211 of the

23   Penal Code, case number CR18538 -- I'm sorry,

24   18380, 18380, imposing one half the court term

25   which is 18 months.  Count three, 211 of the

26   Penal Code, robbery, case number CR18380, imposing

27   ROBERT LINN   C-82285   DECISION PAGE 4    12/4/02

66

1   18 months which is one half the court assessed

2   time of three years. In addition, this Panel

3   finds that the inmate was armed with a firearm at

4   the time of the commitment and that the three

5   charges accordingly we assessed the following,

6   one half of 12 months for which, which is six

7   months per three, 18 months. Base term is 360

8   months with nonlife terms of 36 months, plus

9   (indiscernible) of 18 months, total term is 414

10  months. Post-conviction credits from 3-8-84 to

11  12-4-02 is 70 months. Total period of confinement

12  344 months. Special conditions of parole: Do not

13  use alcoholic beverages, submit to alcohol

14  testing, submit to anti-narcotic testing, submit

15  to THC testing, participate in substance abuse

16  programs such as AA or NA. These special

17  conditions of parole are imposed due to the

18  inmate's prior use and abuse of alcohol and a

19  controlled substance. That does conclude the

20  reading of the decision. Comments, Commissioner

21  Johnson?

22          DEPUTY COMMISSIONER JOHNSON: No, I don't

23  have any.

24          PRESIDING COMMISSIONER ANGELE: That does

25  conclude the hearing. The time is approximately

26  2:35 p.m. I wish you good luck, sir.

27  ROBERT LINN  C-82285  DECISION PAGE 5   12/4/02

67

```
 1          INMATE LINN:  Thank you very much.

 2                       --o0o--

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE GRANTED

26   EFFECTIVE DATE OF THIS DECISION_____

27   ROBERT LINN  C-82285  DECISION PAGE 6   12/4/02
```

APR 0 3 2003

**E X H I B I T**

**9**

Subsequent Parole Consideration Hearing Decision Transcript
April 21, 2004

127

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    **DEPUTY COMMISSIONER MAY:**  Back on the

4    record.

5    **PRESIDING COMMISSIONER DALY:**  We're back on

6    the record in the matter of Robert Linn.  The Panel

7    has reviewed all of the information received from

8    the public and relied on the following

9    circumstances in concluding the Prisoner is not yet

10   suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.  Multiple victims

13   were attacked.  Two in this particular situation,

14   and one of them was -- three, and then one of them

15   was killed.  The offense was carried out in a very

16   calculated manner in that the Prisoner and his

17   crime partner left the Prisoner's residence armed

18   with loaded weapons with the intent of going out

19   and finding some farm laborers to rob.  And the

20   offense was carried out in a manner which

21   demonstrated a total and callous disregard for

22   human suffering in that while two of the victims,

23   who were brothers, were being held at gunpoint, the

24   third victim, another brother was running off and

25   was shot and killed right where they were able to

26   hear the gunshot and know what was going on.  They

27   ROBERT LINN  C-82285  DECISION PAGE 1   4/21/04

128

1    had no concern for the trauma and the suffering

2    that was inflicted upon the victims.  And the

3    motive for the crime was very trivial in relation

4    to the offense, in that the whole motive for this

5    crime was a very selfish desire to support a

6    cocaine habit and there were other choices that

7    would have been available.  These conclusions are

8    drawn from the Statement of Facts wherein the

9    Prisoner and his crime partner left the Prisoner's

10   house armed with weapons and seeking out somebody

11   to rob for personal gain and when they came upon

12   the three farm laborers, they drove by, came back,

13   got out of the car with their guns pointed at them

14   and when one of them ran away, he was shot and

15   killed.  The other two were robbed and then they

16   left.  The Prisoner had an escalating pattern of

17   criminal conduct, even though he may not have had a

18   lengthy arrest, lengthy history of arrest and

19   convictions.  Nevertheless, he had been involved in

20   a lot of illegal activity with all of his drugs and

21   what was happening in his life.  He has a history

22   of unstable relationships with others, dropping out

23   of school in the eighth grade, being involved in

24   alcohol from the age of 10.  He has a long history

25   of different types of drugs that he has used, which

26   ran just about the whole gamut of everything and,

27   ROBERT LINN  C-82285  DECISION PAGE 2   4/21/04

129

1    in fact, was under the influence of alcohol on the

2    night that this, on the day that this robbery was

3    committed.  The Prisoner has not sufficiently

4    participated in beneficial self-help programs at

5    this time and he has failed to demonstrate evidence

6    of real positive change.  And what concerned me and

7    we didn't go into it at length.  I think we went

8    into a whole lot of everything and I think that we

9    gave a very, very thorough hearing, but we did not

10   go into what was happening on the disciplinary

11   actions that you had.  Two of them, two 115's in

12   1998, which is really quite recent.  And maybe it

13   doesn't seem like much.  Reporting late and leaving

14   work assignment without authorization.  But I don't

15   think 115's are written for that type of behavior

16   unless there have been other actions.  And the

17   three 128(a)'s for failure to report, March of '98,

18   July of '99 and June of 2000.  So, to me, the gains

19   have been recent.  The psychiatric/psychological

20   report is favorable, but what concerns me are the

21   recentness of so many things that we have heard at

22   the hearing today.  In 1996, Dr. Bruce Bakeman on

23   page two of his report indicated that he feels the

24   Inmate is showing improvement in his behavior.  So

25   just showing improvement, to me, isn't there yet.

26   But he does say if released, he should be able to

27   ROBERT LINN  C-82285  DECISION PAGE 3   4/21/04

130

1   maintain the gains he has made provided he

2   continues in his determination to avoid alcohol and

3   illicit drugs.  And I think every doctor's report

4   says, yeah, I don't think he's going to be a risk,

5   if he can stay away from alcohol and drugs, which

6   leads me to your AA and your NA and the statements

7   that you had made that you recently got back into

8   your spiritual connection, which was three or four

9   years ago, and you're building stronger as the days

10  progress and you're more connected to yourself and

11  to your higher power.  But then, you also made

12  comments to, I believe it was the psychiatrist in

13  about '98 that you were just now beginning to

14  understand what AA and NA was all about.  And I

15  asked you if that was true, that approximately '97

16  or '98 you really began to realize what AA and NA

17  was all about and you agreed that that was true.  I

18  find that to be quite recent.  You do have good

19  parole plans and the Hearing Panel notes that

20  responses to 3042 indicate an opposition to a

21  finding of parole suitability specifically from the

22  District Attorney of Riverside County.  The Panel

23  finds that your gains are recent and you must

24  demonstrate an ability to maintain them over an

25  extended period of time.  However, we do want to

26  commend you.  I think you did quite well.  I read

27  ROBERT LINN   C-82285   DECISION PAGE 4   4/21/04

131

1    the prior transcripts and I was expecting a little
2    bit different presentation from you today than what
3    you gave.  And I think you did quite well.  And by
4    the things that I said, I don't mean to minimize
5    anything that you have accomplished.  I understand
6    alcoholism and I understand that you can go to
7    meetings for years and then all of a sudden a light
8    goes on and it hits you.  And I think that you have
9    reached that point.  You have your three vocations.
10   You have, in spite of your educational background
11   and the difficulties that you had with learning,
12   you have obtained your GED.  You have tried to test
13   to do college entry.  You've held a number of jobs
14   with all kinds of laudatory comments about your
15   work product.  You have been participating in AA
16   and NA.  You've been in Anger Management, the
17   Impact Program.  And I don't want to overlook the
18   fact that at CMC East you participated in several
19   psychotherapeutic programs.  And we didn't go into
20   that, as to exactly what those entailed, but I know
21   that they were very in-depth and that you had to do
22   a lot.  And you've been at Square One, in NA and
23   Beginning Stress Management and Relaxation, and you
24   do have an outlet with your artistic talent for you
25   to be able to focus on.  And here again, all of the
26   excellent work reports that you have been getting.
27   **ROBERT LINN   C-82285   DECISION PAGE 5   4/21/04**

132

1   Like I say, it's going to be a one-year denial.

2   And I have to be really honest with you.  When you

3   got through talking today, I was ready to give you

4   two years.  And every panel is different in how

5   they look at things.  I was not swayed by the

6   judge's letter.  I think he's very remotely

7   disconnected to this.  I mean, it's so far back.

8   Even the deputies in the jail.  You know, I agree

9   with the District Attorney.  You had to be on your

10  best behavior.  You were facing, you know, a death

11  charge case.  I was convinced by my partner here

12  that it should just be a one-year and, actually, we

13  were convinced by what the District Attorney had to

14  say.  I feel that you have a ways to go.  We're

15  going to ask that you remain disciplinary free,

16  continue with your vocational studies and

17  participate in whatever self-help you can.  I'm

18  also asking for a new psychiatric evaluation to be

19  completed for the next hearing and I'm going to ask

20  the doctor to read this lengthy transcript where we

21  have gone into a lot of things, so that he can

22  understand what our concerns and issues are.  And I

23  think it would also be helpful if he would read the

24  prior transcripts to see how much your demeanor has

25  changed.  I think you have done very well.

26  Personally, when I worked this up last night and I

27  ROBERT LINN  C-82285  DECISION PAGE 6    4/21/04

133

1    read all of the stuff, I was surprised by your

2    presentation in here.  And I went to great length

3    to allow you to express yourself in every way

4    possible, because I wanted to make sure this was a

5    fair hearing for you in light of the fact that you

6    were given a date last time.  So, I hope that you

7    feel that you have been able to put everything on

8    the record and I know that you will continue on the

9    course that you are.  And I think you should·feel

10    very proud of the presentation that you made in

11    here today.  And with that, I wish you very much

12    luck.  Commissioner.

13         **DEPUTY COMMISSIONER MAY:**  Good luck to you.

14         **INMATE LINN:**  All right, thank you.

15         **ATTORNEY GIVENS:**  Thank you.

16         **PRESIDING COMMISSIONER DALY:**  Okay.  It is

17    4:10.  This hearing is concluded.

18              --oOo--

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:___AUG 1 9 2004___.

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    ROBERT LINN  C-82285    DECISION PAGE 7    4/21/04

**E X H I B I T**

**10**

Subsequent Parole Consideration Hearing Decision Transcript
September 30, 2005

82

1          CALIFORNIA BOARD OF PAROLE HEARINGS
2                    D E C I S I O N
3          PRESIDING COMMISSIONER ST. JULIEN:
4   (Indiscernible) Robert Linn. And Mr. Linn, the
5   Panel has reviewed all the information received
6   from the public and relied on the following
7   circumstances in concluding that the inmate is
8   not suitable and would pose an unreasonable risk
9   of danger to society or a threat to public
10  safety if released from prison. Specifically,
11  as it regards the commitment offense.  The
12  offense was carried out in an especially cruel
13  and callous manner.  Multiple victims were
14  attacked, and one was killed in the same
15  incident.  There were three victims in total.
16  Three brothers.  One brother was killed as he
17  attempted to flee the scene from -- from the
18  scene of the robbery.  And two brothers were
19  left, and they were going to be robbed and their
20  other brother was also shot to death in front of
21  their eyes.  So this indeed was a crime that was
22  carried out in a manner which demonstrates an
23  exceptionally callous disregard for human
24  suffering.  And the victims did not have to --
25  the victim did not have to be killed in order to
26  commit the robbery.  There were two other
27  ROBERT LINN   C-82285   DECISION PAGE 1  9/30/05

83

1  brothers that were still there that could have

2  been robbed.  Why, and I understand completely

3  that you were not the shooter, but why Jose

4  Selgado -- I'm sorry, Guadeloupe Selgado had to

5  be shot at when the other two brothers were

6  there is beyond comprehension.  And the motive

7  for the crime is inexplicable and very trivial

8  in relation to the offense, in that the crime

9  was committed in order to get money for -- to

10  buy illegal drugs.  And these conclusions are

11  drawn from the Statement of Facts, as they

12  appear in the April 2005 Board Report, wherein

13  it states

14        "On December 28, 1980, at

15        approximately 4:30 p.m.

16        (indiscernible) deputies were

17        called to a homicide and robbery

18        in an avocado drive on Cameron

19        Road near Rancho California.  Once

20        at the scene the officers took

21        statements from Jose and

22        (indiscernible) Selgado, the

23        victims of the robbery.  The

24        Selgado brothers stated that they

25        and their brother, Guadeloupe

26        Selgado, had been (indiscernible)

27  ROBERT LINN    C-82285    DECISION PAGE 2    9/30/05

84

```
1          at the edge of the avocado grove
2          when two white men robbed them at
3          gunpoint.  Guadeloupe attempted to
4          run away but was shot and killed
5          by the two robbers.  Subsequent
6          investigation revealed that Linn's
7          crime partner, John Crawley, had
8          left Linn's house armed with a
9          rifle.  Investigators received a
10          statement from Ronald Crawley
11          indicating that John had a history
12          of robbing illegal aliens and had
13          left Linn's house armed with a
14          rifle on the day of the homicide.
15          Linn was arrested for murder
16          shortly afterwards."
17 The inmate has failed to profit from society's
18 previous attempts to correct his criminality,
19 and such attempts include juvenile probation.
20 And has an unstable social history, which
21 includes the use of illegal narcotics, dropping
22 out of school at a very early age, ninth grade,
23 drug use as a minor, alcohol use as a minor.
24 And the psychological report dated September 6,
25 2005, by Dr. Macomber, M-A-C-O-M-B-E-R, is
26 favorable and he is (indiscernible) release.
27 ROBERT LINN   C-82285    DECISION PAGE 3  9/30/05
```

1    The inmate does have realistic parole plans.  He

2    does have viable residential plans.  He has

3    several plans that he can choose from.  He does

4    have acceptable employment plans and he does

5    have a marketable skill.  The hearing Panel

6    notes that in response to 3042 notices,

7    opposition has been expressed to a finding of

8    parole suitability from the District Attorney of

9    Riverside County.  And the Panel makes the

10   following findings, the inmate needs therapy in

11   order to face, discuss, understand, and cope

12   with stress in a non-destructive manner.  And

13   the inmate's gains are recent, and he must

14   demonstrate the ability to maintain these gains

15   over an extended period of time.  And sir, this

16   is a one-year denial.  And Commissioner Mejia,

17   do you want to commend Mr. Linn for his

18   accomplishments.

19        DEPUTY COMMISSIONER MEJIA:  Mr. Linn,

20   first of all I'd like to commend you for your

21   work assignment.  Right now you are excellent

22   (indiscernible) report.  I am (indiscernible)

23   one of the hardest places to work and that's why

24   I asked you how long you'd been working there

25   (indiscernible) and still getting some good work

26   reports.  Your supervisor wrote (indiscernible)

27   ROBERT LINN   C-82285   DECISION PAGE 4  9/30/05

86

1    chrono.  So I do feel that you have a good

2    (indiscernible).  You should be commended for

3    that.  Not everybody wants (indiscernible) job.

4    And you also in the years of your incarceration

5    have completed your (indiscernible) when you

6    came in, in spite of the (indiscernible) able to

7    get three vocations -- completions.  Appliance

8    Repair, which (indiscernible) years ago.  And

9    you have the Computer Aided Drafting, and the

10   vocational Drafting.  That's very commendable.

11   You (indiscernible) for refrigerants.  You have

12   attended AA and NA and applied (indiscernible)

13   and impact, and some therapies (indiscernible).

14   You only have three 115s (indiscernible) since

15   1984 that you related to your substance abuse

16   (indiscernible) in '84.  And I'd like to also

17   (indiscernible) same thing regardless of what

18   happened today, and (indiscernible).  Okay?  You

19   are right on the right direction, you just have

20   to maintain some more to show us the consistency

21   that you can show and sustain good programming

22   for us.  All right?

23          INMATE LINN:  Okay.

24          PRESIDING COMMISSIONER ST. JULIEN:  All

25   right.  And also I should commend you for

26   obtaining the AA Sponsor.  That's very

27   ROBERT LINN    C-82285    DECISION PAGE 5   9/30/05

87

```
 1   important, and that's something that we don't
 2   see a lot.  And I definitely feel that you have
 3   genuine remorse, and you do have feeling for
 4   your victims.  So in that way I think you have
 5   definitely progressed.  However, a longer period
 6   of observation and evaluation of the inmate is
 7   required before the Panel will find that the
 8   inmate is suitable for parole.  Okay?
 9            INMATE LINN:  All right.
10            PRESIDING COMMISSIONER ST. JULIEN:  We
11   will recess, and the time is 12:55 p.m.
12
13
14
15
16
17
18
19
20
21
22
23   PAROLE DENIED ONE YEAR
24   THIS DECISION WILL BE FINAL ON: _____
25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT
26   DATE, THE DECISION IS MODIFIED.
27   ROBERT LINN   C-82285   DECISION PAGE 6   9/30/05
```

**E X H I B I T**

**11**

Psychological Evaluation
July 21, 1983

PSYCHOLOGICAL REPORT

TESTS ADMINISTERED:  Revised Beta, California Achievement Test, Revised Minnesota Paper Form Board, Draw-A-Person, Who-Are-You, Sentence Completion, Personal Information, Diagnostic Interview.

INTRODUCTORY STATEMENT:  This inmate is a twenty-five year old white married male presently convicted of the crimes of murder and robbery. On interview, he admitted his guilt, complicity, and remorse concerning his offenses.  He said that he "ripped off" other Mexicans to secure money to purchase cocaine.  The court requested diagnostic information under terms of Penal Code Section 1203.03.

PREVIOUS PSYCHIATRIC AND PSYCHOLOGICAL REPORTS:  There is a very thorough report requested by the defense.  In brief, it pointed up or emphasized the probability of organic brain damage, minimal to moderate in nature.

Information received indicates a polygraph examination was conducted and that this individual was truthful in his responses.

INTELLECTUAL AND EMOTIONAL RESOURCES:  The test productions of this inmate indicate that he has a Revised Beta I.Q. of 78, considered to be of about borderline intelligence.  His vocabulary is good, and his reading poor.  Information received stated that he has dyslexia.  On interview, he seemed to be suffering from a mild speech disorder, including slurring.  His stream of conversation was lucid, coherent, and relevant, if kept to simple topics.  His thinking appeared to be concrete.  Abstract reasoning and inferential thinking were beyond him. His mood and affect varied appropriately.  His reality orientation was sufficient for a person of borderline intelligence.  There were no signs of overt psychosis elicited during the course of the interview or present in the test material.

PERSONALITY EVALUATION:  The outstanding finding in the test material and on interview is this inmate's inadequate orientation.  He is a person who makes inadequate and/or ineffectual responses to emotional, social, and intellectual demands placed upon him.  While he is certainly not mentally deficient, he does show considerable inadaptability, ineptness, and poor judgment, particularly in situations he finds stressful, which may appear to be minimal to others.

Feeling inadequate, this individual looks for emotional support and guidance from people he regards as more intelligent or more capable than himself.  He is gullible and suggestible.  Should he find himself with people who are prosocial in orientation, he is apt to conduct himself well within the community in which he resides.  By contrast, should he be surrounded by antisocial people, who can influence him, he may engage in antisocial acts.  He generally has regret and feels guilt and shame for his antisocial behavior.

Committed on 3/8/84 as C-82285          RCC/CIM          3/27/84          kb

LINN          9-68738-2          RC-C          rwc          7/21/83

DIAGNOSTIC IMPRESSION: (301.82) Personality disorder, inadequate personality, with limited intelligence.

RECOMMENDATIONS: In view of the seriousness of his offenses there is question in this examiner's mind with regard to his eligibility for probation. Should he be placed on probation, and in absence of anti-social individuals who can influence him, he has potential for conducting himself well within the community in which he resides. Appropriate restrictions including nonassociation with delinquent or antisocial elements, nonpossession of dangerous weapons, maintenance of adequate employment and/or training, should be stringent requirements.

Believing him not eligible for probation at the present time, it is recommended that his stay in the California Department of Corrections be continued.

7/21/83                              E. Rivlin, Senior Psychologist
                                     Licensed Psychologist No.:  PJ000394

Committed on 3/8/84 as C-82285      RCC/CIM        3/27/84        kb

LINN        C-68736-Z              RC-C    rwc      7/21/83

**E X H I B I T**

**12**

Psychological Evaluation
April 14, 1986

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI


Linn, Robert, C-82285, Psychiatric Consultation, BPT-AD 82/8,
CCI-Tehachapi, 4/14/86.

HISTORY:

The patient is a 28-year-old, white, married male who entered
prison in 1981 on a 25-year to life sentence for first degree
murder. He has 100 points. He could possibly be released about
1997. He states he pled guilt because he was afraid of the death
sentence, and that a man named Crawley actually did the murder.
States he was along with him, but was on Cocaine at the time.

PAST HISTORY:

Date of birth January 5, 1958 in Covina, California. Father,
deceased, described as an athlete, a boxer, who also served time
in prison. When he was 5 years old, his parents split. States
his mother, living, is a person he had a good relationship with.
He has two brothers and four sisters, and he is the third to
youngest child. He completed the 8th grade of school. States
he has worked as a house builder and an artistic painter. He
doesn't have any religion, but states he studied the Bible some.
He is not depressed, sleeps good, eats good and in the past has
had rare suicidal thoughts - when he was first arrested, but does
not now. He married his current wife, Marion Snyder, in 1981.
They are still married, but will probably get a divorce. He has
no children. He has no operative history. According to the
record, he is suppose to have had dyslexia as a child, but states
now he can read pretty well. He has no VD history and no prior
psychiatric contact. His sexual history is conventional with an
initial coitus when he was 15 years of age. His arrest history
includes drunk and burglary charge. He has no military history.
He uses alcohol some of the time. He used to smoke, but quit on
January 1. He has used Marijuana, LSD and PCP, and also Cocaine
intravenously which he states he got addicted to.

MENTAL STATUS:

Patient is a young, white, male whose attention span and stream of
talk are satisfactory. He is not depressed and no hallucinations,
delusions, or significant dreams are elicited. His I.Q. test result,
according to the C-file, is 80 and he is rated in the dull-normal
range. His memory seems intact for recent remote events and he is
oriented as to time, place and person. His three wishes are (1) This
had never happened (2) To start life over again (3) Be famous for my
art work. He gave concrete answers to proverbs presented to him for
abstraction. Comprehension level rated as poor. His self-concept
is, "I'm quiet, shy, I don't speak up, I fear being hurt." He asked
me no significant questions.



SUMMARY AND DISCUSSION:

We have here a man whom diagnostically we may see two ways.  As a
BORDERLINE PERSONALITY 301.83 and COCAINE ABUSE 305.6x.  I have
no recommendation at this time for him.


CHARLES D. WILLIS, M.D.
Diplomate American Board of
Psychiatry and Neurology


Linn, Robert  C-82285        CCI-Tehachapi        bs        4/14/86

**E X H I B I T**

**13**

Psychological Evaluation
January 29, 1987

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI


Linn, Robert J., C-82285, Psychiatric Evaluation for the BPT,
CCI-Tehachapi; IV-B, 1/26/87.

HISTORY:

The patient has been seen previously and since my prior consult,
he has been doing very well.  He has a G.E.D. goal.  He has had
no 115's and is presently in school.  There is no essential change
so that the prior consult applies to his current situation.


CHARLES D. WILLIS, M.D.
Diplomate American Board of
Psychiatry and Neurology


1/29/87

**E X H I B I T**

**14**

Psychological Evaluation
February 16, 1990

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
MARCH 1990 CALENDAR
CMC-EAST

<u>TYPE OF REPORT:</u>  This is the second psychological evaluation written
for the Board of Prison Terms on the inmate, Mr. Robert Linn, C-
82285.

<u>FREQUENCY OF CONTACT:</u>  The inmate was interviewed and questioned for
a total of one hour.  The data derived from this interview as well as
information gathered from the inmate's central file and medical
records were incorporated into this, current evaluation.

<u>PSYCHOPATHOLOGY:</u>  A review of the inmate's medical records and
central file revealed no psychiatric history in his past.  In April
of 1986, he was diagnosed as a borderline personality, 301.83, by Dr.
Charles Willis, M.D.  The current examiner disagrees totally with
this diagnosis, since the inmate at no time has shown any of the
requisite characteristics that would warrant such a diagnosis.

Moreover, during the mental status examination, the inmate was found
to be affable, sociable, and quite forthright in his ability to
discuss his situation with the examiner.  His ideational processes
were completely intact.  Mr. Linn displayed no confusion, no
neologisms and did not report any content which seemed to be in any
way denoting a delusional system.  No ideas of reference, no thought
insertion, no psychotic ideation, and no bizarre behavior were noted.
In point of fact, Mr. Linn appeared to be a well-adjusted, focused
and coherant 31-year-old male.

In discussing his instant offense, the inmate stated that he feels he
made a terrible mistake.  He also feels that the gravity of his
offense calls for a certain degree of punishment.  He was quite
candid in stating that what he has attempted to do while
incarcerated, is to make the best use of his time.  Thus, he has
spent his time in getting through his GED courses.  He has also
attended Narcotics Anonymous and claims to have gotten a great deal
out of that experience.  Looking back on his previous use of LSD and
PCP as well as cocaine and marijuana, the inmate shakes his head and
states that he was just caught up in the times.  Looking back now, he
feels that he has made terrible decisions in his life and is willing
to try to rectify them.

With regard to the murder which occurred, the inmate explained in
detail how it occurred.  He still maintains that he did not kill
anyone, but is willing to take the punishment due for the offense
because he was involved in it.  Mr. Linn states that the man that was
killed was killed by accident.  Nonetheless, he concedes that he was
there to commit robbery and he did possess a firearm.

<u>PSYCHIATRIC DIAGNOSIS:</u>

PSYCHOLOGICAL EVALUATION FOR THE
BOARD OF PRISON TERMS – Page 2


        Axis I:    V71.09
        Axis II:   V71.09

**PSYCHIATRIC CONCLUSIONS:**  It is important to note, given the gravity
of the offense, that the inmate's psychological problems were in no
way causative in the act.  Mr. Linn's substance abuse activities
certainly contributed to the inmate's poor judgement which allowed
him to get involved in such a fiasco, but they did not directly
influence the commission of the act.

The inmate appears to have made an excellent adjustment while
incarcerated.  There is only one disciplinary chrono documenting the
inmate's involvement in the making of pruno.  However, there are many
other chronos which document the inmate's above-average work and his
willingness to be of service while incarcerated.  There is nothing in
the records studied or in the inmate's behavior which leads the
examiner to think that the inmate has any problems with impulse
control.  If anything, prison life has been beneficial to the inmate
for it has afforded him the opportunity to continue his education and
to stop his drug abuse habits.

It is concluded, therefore, that if the inmate were to placed in a
less restricted environment, such as would be the case were he to
return to life outside the prison, he would not constitute any
greater danger to the general public than would the average inmate.
His behavior at present, and for the past few years, indicates that
he would be an excellent candidate for continuing the progress he has
already made.  Thus, once again, the present examiner does not
believe that the inmate would present any greater danger to the
public with regard to violence than any other average inmate.

**RECOMMENDATIONS:**  In conclusion then, there appears to be no basis
for positing psychological considerations as impediments to releasing
the inmate on parole.

                    Paul Rodriguez, Ph.D.
                    Staff Psychologist


          Noted:    James B. Hollingsworth, M.D.
                    Assistant Warden, Psychiatric Services

R/D/T:02-16-90