# EXHIBIT D –PART 2 OF 4

**E X H I B I T**

1

Subsequent Parole Consideration Hearing Transcript
December 19, 2006

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE**

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-82285
                                    )
ROBERT LINN                         )
                                    )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 19, 2006

9:30 A.M.

PANEL PRESENT:

LINDA SHELTON, Presiding Commissioner
WILLIAM KEENAN, Deputy Commissioner

OTHERS PRESENT:

ROBERT LINN, Inmate
PAT FOX, Attorney for Inmate
JOHN RUIZ, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No          See Review of Hearing
_____   Yes         Transcript Memorandum

Anna E. McGaughy                    House of Scribes

ii

## INDEX

|                                      | PAGE |
|--------------------------------------|------|
| Proceedings . . . . . . . . . . . . . . . . . . . . | 1 |
| Case Factors. . . . . . . . . . . . . . . . . . . . | 8 |
| Pre-Commitment Factors. . . . . . . . . . . . . | 17 |
| Post-Commitment Factors . . . . . . . . . . . . | 28 |
| Parole Plans. . . . . . . . . . . . . . . . . . . | 64 |
| Closing Statements. . . . . . . . . . . . . . . | 99 |
| Recess. . . . . . . . . . . . . . . . . . . . . . | .111 |
| Decision. . . . . . . . . . . . . . . . . . . . . | .112 |
| Adjournment . . . . . . . . . . . . . . . . . . . | .122 |
| Transcriber Certification . . . . . . . . . . . | .123 |

1

**P R O C E E D I N G S**

1

2          DEPUTY COMMISSIONER KEENAN:   Okay, we're on

3    record.

4          PRESIDING COMMISSIONER SHELTON:   All right.

5    Good morning, everyone.   We are here for a Subsequent

6    Parole Consideration for Robert Linn, L-I-N-N, CDC

7    Number C-82285.   Today's date is December 19, 2006 and

8    the time is 9:30 a.m.   We are located at CTF Soledad.

9    Let's see.   Mr. Linn was received from Riverside

10   County on March 8, 1984.   His life term began that

11   same date; March 8, 1984 and he has a minimum eligible

12   parole date of October 23, 1997.   Controlling offense

13   for which Mr. Linn has been committed is 187-PC,

14   Murder, First, Case Number CR-18380.   Also non-

15   controlling offenses; Count Two, 211-PC, Robbery;

16   Count Three, 211-PC, Robbery.   Mr. Linn received a

17   term of 25 years to life.   All right.   Sir, this

18   hearing is being tape-recorded for voice

19   identification purposes so we will go around the room

20   and introduce ourselves.   Say our first name, our last

21   name, spell our last name and when we get to you,

22   please add your CDC number.

23          INMATE LINN:   All right.

24          PRESIDING COMMISSIONER SHELTON:   My name is

25   Linda Shelton, S-H-E-L-T-O-N, Commissioner.

26          DEPUTY COMMISSIONER KEENAN:   Bill Keenan,

27   K-E-E-N-A-N, Deputy Commissioner.

2

1          DEPUTY DISTRICT ATTORNEY RUIZ:  John Ruiz,

2     Deputy District Attorney, R-U-I-Z.

3          ATTORNEY FOX:  Pat Fox, F-O-X, Attorney for

4     Mr. Linn.

5          INMATE LINN:  Robert Linn, L-I-N-N, C-82285.

6          PRESIDING COMMISSIONER SHELTON:  Thank you.

7     And for the record, we have two officers in the room

8     for security purposes, who will not be participating

9     in today's hearing.  All right.  Sir, before we get

10    started I want to go over some ADA issues with you.

11    You signed BPT Form 1073 on May 3, 2006, indicating

12    that you had no disabilities that needed

13    accommodation.  Is that true?

14          INMATE LINN:  Yes.

15          PRESIDING COMMISSIONER SHELTON:  Counsel,

16    did you have a chance to go over the form I gave you

17    today with him?

18          ATTORNEY FOX:  Yes, I do and I have the

19    executed document right here.

20          PRESIDING COMMISSIONER SHELTON:  Thank you.

21          ATTORNEY FOX:  The only comment I have,

22    Mr. Linn does not suffer from any maladies that would

23    require ADA accommodation.  And regarding the

24    statement on that form regarding confidential

25    material, I would object at this state -- at this

26    stage to any use of confidential material because I've

27    been denied access to it.  And of course, I wouldn't

3

1    be able to defend any allegations that may or may not

2    be contained in there.

3              PRESIDING COMMISSIONER SHELTON:  Well, we

4    don't know if we have any or if we're going to use any

5    so we'll get to that at that time, okay?

6              ATTORNEY FOX:  Okay, thank you.

7              PRESIDING COMMISSIONER SHELTON:  Um-hum.

8    Just a couple questions for the record.  Mr. Linn, do

9    you wear glasses?

10             INMATE LINN:  No.

11             PRESIDING COMMISSIONER SHELTON:  Okay.  And

12   so you don't need glasses; right?

13             INMATE LINN:  No.

14             PRESIDING COMMISSIONER SHELTON:  Your

15   hearing is okay?  You can hear me fine?

16             INMATE LINN:  My hearing is fine.

17             PRESIDING COMMISSIONER SHELTON:  Are you on

18   any medication, sir?

19             INMATE LINN:  No.

20             PRESIDING COMMISSIONER SHELTON:  Okay.  Your

21   mobility is okay?  You're comfortable sitting,

22   standing, walking?

23             INMATE LINN:  Yes.

24             PRESIDING COMMISSIONER SHELTON:  Okay.  Than

25   I think we're ready to go.  What do you think?

26             INMATE LINN:  Yes.

27             PRESIDING COMMISSIONER SHELTON:  All right.

4

1   I want to remind you of a couple of things, even

2   though I know you've been here before.  You have

3   certain rights and those rights include the right to a

4   timely notice of this hearing, the right to review

5   your central file.  And it looks to me that you

6   reviewed your central file on June 2, 2006?

7          INMATE LINN:  Yes.

8          PRESIDING COMMISSIONER SHELTON:  Okay, good.

9   And the right to present relevant documents.  And I

10  know your attorney handed us some documents and we'll

11  review those as we go along.  Counsel, have we met

12  your client's rights so far?

13         ATTORNEY FOX:  Yes, as to this hearing.

14         PRESIDING COMMISSIONER SHELTON:  Okay,

15  great.  Mr. Linn, you also have an additional right to

16  be heard by an impartial Panel.  And today, your Panel

17  would be Commissioner Keenan and myself.  Is that all

18  right with you?

19         INMATE LINN:  Yes, it is.

20         PRESIDING COMMISSIONER SHELTON:  Okay, thank

21  you.  A couple of years ago the regulations changed

22  with regards to your right to appeal.  So if you have

23  any questions about that, consult with your attorney

24  or go to the prison law library.  I'll give you a

25  postscript to that.  Evidently, there's going to be

26  some future changes made to that, as well.  So if you

27  need that information, kind of try to keep abreast of

5

1    it.  I just -- I don't have all the particulars right

2    now to tell you.  Now, sir, you are not required to

3    admit to or discuss your offense, however, this Panel

4    does accept as true the findings of the Court.  Tell

5    me what that means.

6              INMATE LINN:  It means that the evidence

7    that was -- that was -- that I'm convicted of, you

8    know, the crime that I'm convicted of.  It means that

9    I am convicted of First Degree Murder and that's what

10   the Court found and Robbery.

11             PRESIDING COMMISSIONER SHELTON:  Very good.

12   It also means that we're not here to retry your case.

13   We're here to discuss issues of suitability for you,

14   okay?

15             INMATE LINN:  Yes.

16             PRESIDING COMMISSIONER SHELTON:  Now,

17   Commissioner, do we have any confidential information?

18             DEPUTY COMMISSIONER KEENAN:  We do.  And it

19   will not be used unless otherwise specified during the

20   course of this hearing.

21             PRESIDING COMMISSIONER SHELTON:  I already

22   passed the Hearing Checklist to both Mr. Ruiz and

23   Ms. Fox and both have signed and indicated that they

24   have all the necessary materials to move forward.

25   Counsel, as there any additional documents to submit

26   other than, I know you submitted to us a parole

27   hearing -- parole plan package.  As well as a letter

6

1    with regards to housing at Anonymity Recovery House.

2    And you also a circumstances tending to show

3    unsuitability format.

4            ATTORNEY FOX:    That's the title of the first

5    page but it does include --

6            PRESIDING COMMISSIONER SHELTON:    Also --

7            ATTORNEY FOX:    -- factors tending to support

8    suitability.

9            PRESIDING COMMISSIONER SHELTON:    And

10   circumstances tending to show suitability.

11           ATTORNEY FOX:    So that's it for now.    In the

12   event --

13           PRESIDING COMMISSIONER SHELTON:    You are

14   welcome to submit anything all during the course of

15   the hearing.

16           ATTORNEY FOX:    Great.    Thank you, because

17   sometimes --

18           PRESIDING COMMISSIONER SHELTON:    Until we

19   recess.

20           ATTORNEY FOX:    -- chronos don't get into the

21   file.

22           PRESIDING COMMISSIONER SHELTON:    Right.    And

23   I appreciate it as we go through each section.    It

24   just makes it easier to review that.    And Mr. Linn,

25   we'll review this last suitability/unsuitability

26   package during that recess.

27           INMATE LINN:    All right.

7

1          PRESIDING COMMISSIONER SHELTON:  Okay?

2   Thank you.  And we will review the others during yours

3   and my discussion about parole plans.  Are there any

4   preliminary objections?

5          ATTORNEY FOX:  No, ma'am.

6          PRESIDING COMMISSIONER SHELTON:  And will

7   your client be speaking with us today?

8          ATTORNEY FOX:  Yes, he will, as to all

9   aspects.

10          INMATE LINN:  Yes.

11          PRESIDING COMMISSIONER SHELTON:  Okay.  Then

12   sir, please raise your right hand.  Do you solemnly

13   swear or affirm that the testimony you give at this

14   hearing will be the truth, the whole truth and nothing

15   but the truth?

16          INMATE LINN:  I do.

17          PRESIDING COMMISSIONER SHELTON:  Okay.  Then

18   let's do this, just to get things opened up since

19   you're going to speak with us about the offense, as

20   well.  Then what I would like to do is refer to the

21   September 2006 Board Report.  It's a brief summary and

22   an adequate one and I will go ahead and enter that

23   into the record as a way to jump into this, okay?

24          ATTORNEY FOX:  Normally, I object to using

25   the Probation Officer's Report because it's based on

26   hearsay.  And if any evidence would be reliable, it

27   would be testimony received under oath.  There was a

8

1    preliminary examination in this case.  However, having

2    said that, to use that as a jumping off point I think

3    would be all right.

4            PRESIDING COMMISSIONER SHELTON:  Thank you.

5            ATTORNEY FOX:  You're welcome.

6            PRESIDING COMMISSIONER SHELTON:  I like to

7    use Appellate Rulings but I have none in my file so,

8    all right.

9            "On December 28, 1980 at approximately

10                4:30 p.m., the Riverside County Sheriff's

11                Deputies responded to a report of robbery

12                and a homicide in an avocado grove on

13                Kamerlin (phonetic) Road near Rancho,

14                California.  Once at the scene, the officers

15                took statements from Jose and Abel Zelgado

16                (phonetic), victims of the robbery.  The

17                Zelgado brothers stated that they and their

18                brother, Guadalupe (phonetic) Zelgado, had

19                been working at the edge of the avocado

20                grove when two white men robbed them at

21                gunpoint.  Guadalupe attempted to run away

22                but was shot and killed by the two robbers.

23                A subsequent investigation revealed Linn's

24                crime partner, John Crawley (phonetic), had

25                left Linn's house armed with a rifle.

26                Investigators received a statement from

27                Ronald Crawley, indicating that John had a

9

```
 1              history of robbing illegal aliens and had
 2              left Linn's house armed with a rifle on the
 3              day of the homicide.  Linn was arrested for
 4              murder shortly afterwards."
 5   Mr. Linn, would you like to tell us in your own words
 6   what was going on then; what happened?
 7              INMATE LINN:  You want me to explain to you
 8   the day of the crime?
 9              PRESIDING COMMISSIONER SHELTON:  Sure, if
10   you're comfortable doing that.
11              INMATE LINN:  Yes, I can do that.
12              PRESIDING COMMISSIONER SHELTON:  Okay.
13              INMATE LINN:  I submitted a prisoner's
14   version of the crime and it's fairly brief but it's
15   pretty concise.  I'll go ahead and elaborate
16   (indiscernible).  What I've been saying all along to
17   the Board; we would do armed robberies and as we
18   pulled up to the three people that were working off to
19   the side of the road, just as we stepped from the
20   vehicle, one of the victims fled into the avocado
21   grove.  And as I stepped from the vehicle, I
22   approached Abel Zelgado and Jose Zelgado.  Jose and
23   Abel did not run.  Guadalupe ran and as we stepped
24   from the vehicle my co-Defendant, John Crawley, went
25   in running pursuit of him.  And at this -- at the
26   moment that John fired his shot, actually what he did,
27   he ran to the location where Guadalupe was standing
```

10

1   when he was -- before he took off running.  And John

2   basically got to that location and by doing that, he

3   was in line of sight of where Guadalupe was running.

4   Because it is an avocado grove and the aisle of the

5   trees was blocking peripheral view.  So at that time,

6   I had my -- I was approaching Abel and Jose.  Jose

7   took off running to Guadalupe's right -- I mean,

8   Abel's -- Jose took off from Abel's right, okay?  He

9   went to the right.  He ran to the right and Guadalupe

10  ran to the left but he was already to the left so he

11  more or less just ran straight up into the avocado

12  grove.  And Abel Zelgado yelled for his brothers to

13  stop running.  He was running for Jose to stop running

14  because Guadalupe was already long gone.  He was gone.

15  He was pretty much up in the grove when our feet hit

16  the ground out of the car.  So because Jose didn't run

17  right away, he didn't get very far.  He stopped

18  somewhere down the hill a little ways because his

19  brother yelled for him to stop running.  At that

20  point, he came back but I have a -- basically it was a

21  motion of approaching Abel Zelgado when I heard a shot

22  fired.  I was probably a distance of maybe ten feet

23  from him, maybe eight feet at the time that the shot

24  was fired.  And at -- back then when the crime took

25  place, I wasn't sure if there was two shots or one

26  shot.  I got -- I thought it over and through and I

27  know that the terrain was hilly.  It was like a

11

1    ravine.  There was avocado groves on both sides of the

2    road.  And the evidence that was found in court

3    actually more indicated there was one round, one shot

4    fired, okay?  But at the time, there was a lot of

5    statements saying two shots and I believe that that

6    was actually a echo of the terrain that made it sound

7    like two shots.  Because we really weren't paying

8    attention to that shot.  I know there was a shot fired

9    and at that point, that's when I looked at

10    John Crawley.  When I heard a shot, I looked for

11    John Crawley, which he was to my right and to Abel

12    Zelgado's left.  And like I said, I was pointing the

13    gun at him at this time.

14                PRESIDING COMMISSIONER SHELTON:  So you were

15    armed?

16                INMATE LINN:  I was armed with a .22 rifle

17    and it was loaded.  And at this point, like I say, I

18    looked towards John Crawley, my co-Defendant, and at

19    the same moment, Abel looked that direction.  We both

20    looked that direction.  Well, I knew I'm doing an

21    armed robbery so I didn't just -- you know, I kept --

22    I was still careful what I was doing.  I still had my

23    gun on Abel Zelgado.  And at this point, Abel -- Jose

24    was still coming back.  He did run oh, maybe 40 feet,

25    maybe 50 feet down a hill a little ways but he came

26    back.  He didn't come running back.  He walked back.

27    John took off up in the avocado grove.  At that point,

12

1    while John was gone up in the -- while he took off in

2    the avocado grove, I was doing a robbery.  I was

3    robbing Abel Zelgado and Jose Zelgado.  I robbed

4    Abel Zelgado first because Jose Zelgado was just still

5    coming back.  But I told Abel Zelgado to give me his

6    money, okay?  At that point, I told him to give me his

7    money and he did give me his money.  When Jose came

8    back, now I'm not real clear, I'm not real clear

9    exactly what I said to Jose about his money but I know

10   I was trying to get his money from him because there

11   was a robbery.  I was doing this robbery.  And at that

12   point, keep in mind I already did take the money from

13   Abel Zelgado and this is happening fairly quick, okay?

14   These people were running and I wasn't that far.  When

15   we pulled up to the crime scene, I was approximately

16   maybe 50 or 60 feet away from Abel Zelgado.  So when I

17   approached him, it wasn't too -- it was within seconds

18   that I was already on -- within range of where I told

19   you I was.  The location was eight to ten feet from

20   him.  Now, of course I moved in closer to get the

21   money and actually do the robbery.  I stepped right up

22   to him within maybe three or four feet to do that

23   robbery, okay?  But then after all that robbery taking

24   place, John came back before I took money from Jose.

25   Before I had a chance to take money from Jose, I

26   should say.  John came back from the avocado grove and

27   he came running out of the avocado grove and ran right

13

1   up to me and got to my left side.  He came around
2   behind me, got to my left side and then he told me in
3   my ear, he goes, "I think I killed this guy."  Well,
4   at that point, I didn't know what to think, you know.
5   Whether he knew what he was talking about.  I realized
6   right then and there that he did shoot someone.  There
7   was no doubt about that.  I can't sit here and say
8   well, I thought he was kidding or something like that.
9   I may have said something about that in the past, that
10  I was kidding or he was kidding, I thought he was
11  kidding.  I didn't even mean -- my interpretation was
12  misconstrued because the fact is, that's not what I
13  intended.  My intentions were of saying that I didn't
14  know if he actually knew he killed someone, you know.
15  He told me he thought he killed someone but I thought
16  maybe, it wasn't an actual killing.  But besides all
17  that, it's irrelevant, okay?  He did come back and
18  tell me that he shot this guy and possibly killed him.
19  And at that point, Jose was holding his money out and
20  John Crawley grabbed it out of his hand and at that
21  point, we told them to lay down on the ground.  We
22  told them to lay down on the ground because we didn't
23  know what we were doing.  We told them, "Get down, get
24  down, get down."  We both basically gestured for them
25  to get down.  I speak English, they speak Spanish and
26  I don't think they -- the only communication was
27  gesture and we knew how to say money and stop.  That's

14

1    all -- the only Spanish words I knew.  But the point

2    is, is that we got them to lay down on the ground and

3    no sooner than they laid down, I would say within

4    about three -- two or three seconds, we told them,

5    "Get up.  Go.  Run."  We started yelling at them, "Get

6    out of here.  Get out of here."  And then they jumped

7    up and ran at that point.  We got in the car and we

8    fled the scene of the crime and we went back downtown

9    and on the way home we stopped at a store.  And then

10   by the time we got home, there was already an

11   investigator at his house so we knew they were onto

12   us.  Basically, we knew we were suspects and the

13   reason why is because he had a green Pinto and there

14   was only a couple of green Pintos in that town.  And

15   the sheriff's kind of narrowed it down to who had

16   three Pintos and that led the investigation to us.

17   And me and John was basically -- we came up with an

18   alibi and it didn't fly and ten days later, we were

19   arrested and that's basically the crime.

20            PRESIDING COMMISSIONER SHELTON:  Question

21   for you, sir.  Were you under the influence of

22   anything during the commission of that crime?

23            INMATE LINN:  During the crime?  I was

24   drinking that day.  I drank -- I believe I drank about

25   six beers that day.  It may have been more because it

26   was the day of a football game and we -- I was at my

27   house and we were drinking beer.  And about three-

15

1    quarters of the way through the game, the game -- it

2    was the Super Bowl, as a matter of fact.  Three-

3    quarters of a way through that game, it was a blowout

4    in the game and we just decided we were going to go

5    out and do our deed, you know, what we did.

6              PRESIDING COMMISSIONER SHELTON:  Had you

7    committed robberies before with your partner?

8              INMATE LINN:  Yes, I did.

9              PRESIDING COMMISSIONER SHELTON:  Had you

10   been caught for them before?

11             INMATE LINN:  No.  The one that I did before

12   I did the crime, one robbery before that and we didn't

13   get arrested for it.

14             PRESIDING COMMISSIONER SHELTON:  How did you

15   know him?

16             INMATE LINN:  When I moved out to Elsinore

17   from Orange County -- actually, I was living in Orange

18   County in San Juan Capistrano and the company that I

19   used to work for moved out to Riverside County and

20   they were building -- breaking ground on a bunch of

21   new homes.  So I went ahead and moved out there and

22   went back to work for the same company that basically,

23   there were kind of -- they kind of let me down before.

24   So I went ahead and found a new job at the time but

25   I'll get to the point here.  I moved out to Riverside

26   County and because I didn't really -- I was young, you

27   know.  I was 20 years old at the time and I just

16

1    turned 20 and I was looking for, you know, friendship,

2    you know.  And that town, basically there wasn't a

3    whole lot going on.  It was -- you know, it was a

4    roll-up town.  It rolls up at 7:00 when the light --

5    when it gets dark.  The only thing in town is bars.

6    And I know I'm kind of making up excuses but I was

7    basically just looking for people to associate with

8    and I saw some people framing houses, you know.  While

9    I was on my day -- a day off, I saw some guys framing

10   a house and I went over and I started talking to them.

11   And that was John Crawley, his brother and they were

12   doing construction work.  So that's how I met them.

13   That's how I met John, basically and we started

14   hanging out together and we did a little bit of -- we

15   did some good things.  You know, we went out and we

16   did some -- just stuff that normal people would do,

17   like boating and fishing and stuff like that.  But

18   then there was the drinking and there was the drugs.

19   You know, some drugs; marijuana and maybe -- no, I

20   never -- I never shot up any kind of dope or anything

21   like that but I used -- I might snort some crank once

22   in a while or a little cocaine.  But it wasn't that

23   often that I would do that but you know, I was known

24   to.  You know, if it was there, I would get involved

25   it, you know.

26              PRESIDING COMMISSIONER SHELTON:  Where is

27   your crime partner today?

17

1          INMATE LINN:  I believe he's at Old Folsom.

2    That's the last I heard.

3          PRESIDING COMMISSIONER SHELTON:  Did he also

4    get a charge or a conviction of Murder One?

5          INMATE LINN:  Huh?

6          PRESIDING COMMISSIONER SHELTON:  Did he get

7    a conviction for Murder One?

8          INMATE LINN:  Yes, he did.  Excuse me.  He

9    took a plea bargain.  We both took plea bargains.

10          PRESIDING COMMISSIONER SHELTON:  All right.

11    Commissioner, do you have any questions with regards

12    to the offense right now?

13          DEPUTY COMMISSIONER KEENAN:  Nothing.  Thank

14    you.

15          PRESIDING COMMISSIONER SHELTON:  Okay.

16    Mr. Linn, we'll be returning to this most likely.  We

17    can ask questions during the course of the hearing.

18    And what I'd like to do is move forward into your

19    prior record and your social history.  According to

20    what I have here and I appreciate your honesty.  Here

21    is says -- according to your Board Report, it said

22    that you had no juvenile record.  But you indicate

23    that that is wrong because you were placed on

24    probation for a burglary when you were about 12 or so?

25          INMATE LINN:  That's right.

26          PRESIDING COMMISSIONER SHELTON:  A

27    commercial burglary?

18

1          INMATE LINN: Yes.

2          PRESIDING COMMISSIONER SHELTON: What did

3  you -- where did you go, into a department store or a

4  business or something?

5          INMATE LINN: The elementary school. I was

6  in junior high school at the time and me and three

7  other people broke into a cafeteria or an auditorium.

8  You know, where they keep stuff and we took the band

9  equipment.

10          PRESIDING COMMISSIONER SHELTON: Band

11  equipment?

12          INMATE LINN: Yes.

13          PRESIDING COMMISSIONER SHELTON: Did you

14  want to be a musician?

15          INMATE LINN: No. I don't know why I was

16  doing that. We'd play against them.

17          PRESIDING COMMISSIONER SHELTON: At 12 years

18  old, yeah, it probably just looked good.

19          INMATE LINN: We had gone back real soon

20  after and we got caught.

21          PRESIDING COMMISSIONER SHELTON: It also

22  indicates here that you have no prior record as an

23  adult?

24          INMATE LINN: No, I don't.

25          PRESIDING COMMISSIONER SHELTON: And I

26  couldn't -- I reviewed your CI&I file and it didn't

27  show anything there either. Well, that's good. All

19

1   right.  Let's talk about your social history a little

2   bit, okay?

3.          INMATE LINN:  Okay.

4          PRESIDING COMMISSIONER SHELTON:  I want to

5   verify that your birthday is January 5, 1958?

6          INMATE LINN:  Yes.

7          PRESIDING COMMISSIONER SHELTON:  And you

8   were born in West Covina.  Your dad's name was

9   Robert Linn and your mom was Betty Ayers (phonetic)?

10         INMATE LINN:  Yes.

11         PRESIDING COMMISSIONER SHELTON:  You're the

12   third of five children.  Tell me about where your four

13   brothers and sisters are, briefly.

14         INMATE LINN:  I have a younger brother and

15   younger sister in Orange County right now.  My older

16   -- two older sisters -- well, actually all three of my

17   older sisters.  Two of them live in Tennessee and the

18   other one is in Boondocks, Alabama and they all

19   recently just moved out there, oh, the last four

20   years.  They've all kind of started heading out that

21   way.

22         PRESIDING COMMISSIONER SHELTON:  You have

23   five siblings or six all together in your family?

24         INMATE LINN:  Actually, six.

25         PRESIDING COMMISSIONER SHELTON:  Okay.  So

26   that's wrong.

27         INMATE LINN:  My older brother, I don't know

20

1    where he's at.  That's the thing is he -- he's having

2    serious -- you know, some issues and -- but he's not

3    connected to the family real well.  And everybody's

4    still trying to --

5            PRESIDING COMMISSIONER SHELTON:  Do you have

6    contact?

7            INMATE LINN:  -- care -- you know, do what

8    they can for him but he just doesn't respond.  He

9    doesn't want to face the issues that he has and come

10   clean with the family.

11           PRESIDING COMMISSIONER SHELTON:  So he

12   doesn't want to be found right now?

13           INMATE LINN:  Evidently not.

14           PRESIDING COMMISSIONER SHELTON:  Okay.

15           INMATE LINN:  I really worry about him,

16   though, you know.  I'd like to be able to help him in

17   some way, you know, if I can.

18           PRESIDING COMMISSIONER SHELTON:  Well, I

19   know just briefly reviewing your parole plan that you

20   have contact with your siblings, most of them.

21           INMATE LINN:  Yes, I do.

22           PRESIDING COMMISSIONER SHELTON:  Mom and dad

23   are no longer alive?

24           INMATE LINN:  My mother is.  Yeah, she's in

25   Tennessee, too.

26           PRESIDING COMMISSIONER SHELTON:  Oh, is she?

27   Okay.  Growing up in school, it says you were a poor

21

1    student and dropped out of school in the ninth grade?

2              INMATE LINN:  Yes.

3              PRESIDING COMMISSIONER SHELTON: And got into

4    construction work?

5              INMATE LINN:  Yes, I did.

6              PRESIDING COMMISSIONER SHELTON:  And I'm

7    assuming that you went back to school and got a GED or

8    a high school diploma some time in prison?

9              INMATE LINN:  Yes, I have.

10             PRESIDING COMMISSIONER SHELTON:  Okay, good.

11   And Commissioner Keenan will be going over that with

12   you in just a moment.  You were employed as a

13   construction foreman at the time of this arrest;

14   correct?

15             INMATE LINN:  Um-hum.  Yes.

16             PRESIDING COMMISSIONER SHELTON:  I guess

17   that leads me to a quick question of why were you

18   robbing people when you had, it sounds to me, like a

19   fairly reasonable job?  And construction pays pretty

20   well.

21             INMATE LINN:  I was making -- I was taking

22   home $350, $400 a week for a full week's pay.  At that

23   time, I was -- I had a drug addiction of cocaine and

24   I'd say it was just three to four months prior to the

25   crime, I started intravenously using cocaine.  And the

26   habit eventually progressed to a point where I was

27   going to the guy that was supplying cocaine and he

22

1   would give me an "X" amount of cocaine up front.

2   Either between $500 or it would be close to $1,000

3   worth.  It depends, you know, what -- how much I would

4   owe him.  First it started off as just $500, I'd get

5   and I didn't have no problem paying it.  I had money,

6   my paycheck and every -- and like I say, the $500

7   worth of cocaine would last me -- I would -- I wasn't

8   so addicted to it at that point to where I had to go

9   running back to the dealer and say I need more.  I

10  want more.  So at that point, I would pay for that

11  cocaine out of my paycheck.  And then say a couple

12  weeks go by and I would have placed an order again to

13  where I could go to him again.  I would pay him his

14  money and then he would give me another issue, okay?

15  So it became to where I would get cocaine before I'd

16  pay the money.  But now --

17          PRESIDING COMMISSIONER SHELTON:  So you

18  always owed him.

19          INMATE LINN:  For me to go get the cocaine,

20  I had to come up with some money and I had my regular

21  bills.  I was buying a truck and I was living in a

22  home and I was paying some bills.  I had gasoline and

23  food bills and stuff like that.  So my $300 to $400

24  paycheck was working okay for a while.  But I started

25  getting behind on bills that I had to pay or else I'd

26  lose -- have no place to live and this and that.  So

27  my money was kind of split between bills and trying to

23

```
 1    support my habit.  And I tell you right now, that
 2    habit was -- it got the best of me because it was --
 3    every time that I was -- I'd find my pockets empty and
 4    no cocaine or down to my last little pile of cocaine,
 5    I'd be telling myself, what am I doing?  I kept
 6    questioning myself.  What am I doing here?  I gotta
 7    stop doing this.  I got -- this is it.  I'm not doing
 8    this no more.  I'm not gonna do it no more.  And you
 9    know what?  As soon as that was gone, the next day I
10    would be trying to conjure up a pile of money to get
11    some more cocaine.  I could not -- I could not control
12    that urge for cocaine.  Even as bad as I wanted to
13    stop, I could not control it.  So the point is, is I
14    had property, I had tools I had accumulated over the
15    years.  I bought tools and I had a motorcycle, fishing
16    boat.  I had fishing poles, I had guns.  I had a TV.
17    I had material things in my life that I had bought and
18    paid for from working before I had this problem.  I
19    began to sell those things off.  So it wasn't that I
20    had to go do a crime to support my habit.  It was more
21    of an issue of taking my paycheck, buying cocaine and
22    then start selling my personal possessions to keep up
23    with my bills and my cocaine habit.  And as I ran down
24    to zero property except for the truck and -- my very
25    truck and the clothes on my back and the few items
26    that I had, and I even was looking at my truck, to
27    sell my truck.  And I said no, I'm not touching my
```

24

1    truck.  You know, I had already convinced myself I'm

2    not going to sell my truck.  You know, that's where I

3    had to draw a line, not to sell my truck.  And I guess

4    maybe I'd have been better off selling my truck than

5    going and doing robberies but that -- I would have

6    continued right on the same path.  So that's what led

7    me to go do the robberies, is because of the fact that

8    I was out of control.  I lost control of my -- I lost

9    control of myself.

10           PRESIDING COMMISSIONER SHELTON:  I

11   appreciate your sharing that and being honest about

12   it.  And this also indicates that you're dyslexic.  Is

13   that true or not?

14           INMATE LINN:  I don't believe that's

15   actually the case.  You know, a lot of people --

16   growing up as a kid, I was told that a couple times by

17   grownup people, you know, and I -- so I took it for

18   face value that that must be my issue, you know?

19           PRESIDING COMMISSIONER SHELTON:  For

20   learning in school?

21           INMATE LINN:  Yeah.  And the thing is, is

22   the more I learned about what dyslexia was, I realized

23   that that really wasn't my problem.  My problem was I

24   didn't really pay attention in class, you know.  I

25   mean, I did well but I think somebody -- I'm not going

26   to -- I can't blame anyone for what happened to me in

27   school.  But I look back now and I just wish someone

25

1    would have said hey, kid, come here.  Pay attention,

2    you know.

3            PRESIDING COMMISSIONER SHELTON:  Put you up

4    (indiscernible), huh?

5            INMATE LINN:  Because I actually, I read

6    well and I like math and I like to learn and I didn't

7    feel good about being behind in class, behind in

8    school.  And the more I got behind, the harder it was

9    to keep up.  And the fact is, it seemed like there was

10   no catching up after a certain point and --

11           PRESIDING COMMISSIONER SHELTON:  Sure.  All

12   right.  So we've discussed so far in your social

13   history, we have discussed your family. We have

14   discussed your substance use.  We have discussed your

15   education.  It says here, you married a lady named

16   Marion Snyder after you got arrested?

17           INMATE LINN:  Yes.

18           PRESIDING COMMISSIONER SHELTON:  Did you

19   have any children?

20           INMATE LINN:  No.

21           PRESIDING COMMISSIONER SHELTON:  You're not

22   married to Marion anymore?  Or are you?  You're

23   legally married?

24           INMATE LINN:  We're married, yes.

25           PRESIDING COMMISSIONER SHELTON:  But no

26   relationship?

27           INMATE LINN:  No, separated.  I actually

26

1    talked to her about divorce and she told me that I

2    have to do it if I wanted to get it done.  So I went

3    ahead and I filed papers and I lost the -- I couldn't

4    find her.  She would disappear where I couldn't locate

5    her.

6              PRESIDING COMMISSIONER SHELTON:  Okay.

7              INMATE LINN:  So I said well, you know what?

8    The time will come.  I'll catch up with her eventually

9    and get it squared away.  And at this point, you know,

10    I've actually been in touch with her family for the

11    last five years or six years now and I just felt that,

12    you know, that that issue right there is probably

13    better left to deal with at another time.  I mean, I

14    don't want to -- you know, just because I got back in

15    contact with her family, hey, where's your sister, you

16    know?  I want to get this divorce and stuff.  I think

17    that's something that I'm going to have to get with

18    her at another time when it's more --

19              PRESIDING COMMISSIONER SHELTON:  Okay.  Who

20    comes and visits you here?

21              INMATE LINN:  Well, I actually get visits

22    from -- everyone in my family has visited me but they

23    don't get to get up here that frequent because of

24    distance.

25              PRESIDING COMMISSIONER SHELTON:  Besides

26    family, do you have any visitors?

27              INMATE LINN:  The friends that -- my sister-

27

1   in-law, she came up recently.  And she'd like to come

2   up more often but she's -- like I say, it's a thing of

3   it's real inconvenient and I don't -- I don't, you

4   know, ask them to come up.  Actually, I tell them, you

5   know, hold on because something might happen.  I --

6   maybe I'll get down south and then you don't have to

7   go through all this trouble.  But she's been up to

8   visit me and now she's married and she's a Christian

9   lady and she's real nice.  And you know, the funny

10  thing is she's -- there's something I need to explain

11  to her one day, too, you know, and actually in some --

12  in a certain way I have in letters, you know.  Kind of

13  let her know that everything's okay with me and that

14  she is not to blame for anything.  You know what I'm

15  saying?  Because she was going out with the guy --

16  actually, I think they were married.  She was married

17  to the guy that was giving me the cocaine.  So I think

18  she knew -- she saw what was going on.  I think she

19  got wind of what was going on because my wife, that's

20  her sister, they discussed my problem.  So maybe she

21  feels that, you know --

22          PRESIDING COMMISSIONER SHELTON:  A little

23  responsible.

24          INMATE LINN:  Yeah.  But I wrote her and let

25  her know that it was my choices that I made to do

26  things in my life that caused myself to go down that

27  lifestyle, you know.  The path of destruction.

28

1           PRESIDING COMMISSIONER SHELTON:  I

2  appreciate that, too.  We're going to go to

3  Commissioner Keenan now and review post-conviction

4  factors and I'll turn it over to him.

5           INMATE LINN:  All right.

6           DEPUTY COMMISSIONER KEENAN:  Okay, Mr. Linn.

7  Your last hearing was 9/30/05 and we recommended you

8  participate in self-help if available, you remain

9  disciplinary free, earn positive chronos.  You have a

10  placement score of 19.  Classification score was zero,

11  going back to 3/10/99.  The GED that was mentioned,

12  you got that in '98.  Does that sound right?

13           INMATE LINN:  Yes.

14           DEPUTY COMMISSIONER KEENAN:  You have a

15  total of three 115's.  The last one was 8/4/98 and I

16  think they were all for failure to report to work;

17  weren't they?

18           INMATE LINN:  Yes, they were.  I think one

19  was for being late and the other was for being late

20  and leaving my assignment.  And one was for not

21  showing up or something like that.

22           DEPUTY COMMISSIONER KEENAN:  Um-hum.

23           INMATE LINN:  They were basically all work-

24  related, attendance.

25           DEPUTY COMMISSIONER KEENAN:  Yeah.  I see

26  them listed as failure to report.  Oh, I think I -- oh

27  yeah.  Here it is, okay.  Yeah, 8/4/98, reporting

29

1    late, leaving work assignment without authorization.

2    5/8/98, reporting late for work.  12/22/84, home brew

3    found in cell.  And then you had three 128-A's;

4    6/22/00 was the last one, failure to report.  Also

5    7/19/99 and 3/7/98, both failure to report.

6              INMATE LINN:  Yes.

7              DEPUTY COMMISSIONER KEENAN:  All right.  And

8    you've been working as a kitchen sanitation worker

9    since your last hearing?

10             INMATE LINN:  Yes, I am.

11             DEPUTY COMMISSIONER KEENAN:  Okay.

12   Satisfactory to above average reports?

13             INMATE LINN:  Yes.  I have a chrono from my

14   boss, if you --

15             DEPUTY COMMISSIONER KEENAN:  Sure.  I'd like

16   to see that.

17             INMATE LINN:  It's the most recent one.

18   That's it right there.  Yeah, I'm -- they put me in

19   that position, you know.  They assign you to a job and

20   I take it upon myself -- you know, I'm not a quitter,

21   you know.  So I went in there, I did a good job and I

22   stuck to it and I've been -- I work hard and I try to

23   do everything the way it's supposed to be done, you

24   know.

25             DEPUTY COMMISSIONER KEENAN:  All right.  The

26   chrono's 10/19/06 from C. Sylvania, Correctional

27   Sergeant.

30

1    "Inmate Linn was initially assigned to CTF

2    north culinary A.M. sanitation crew on

3    8/24/04.  He is currently assigned to a

4    position from (indiscernible) and was

5    promoted to lead man position on 1/7/06.

6    Since being assigned to A.M. sanitation

7    crew, Linn has done an exemplary job

8    handling all duties assigned to him and

9    requires minimal supervision to perform.

10    Linn has served the position exceptionally

11    well and has been integral in the operation

12    of culinary sanitation.  He is a motivation

13    to the inmates following his leadership and

14    is very cooperative with assisting during

15    institutional lockdowns when he was at times

16    called upon to work during his regular days

17    off.  Linn has also volunteered to work for

18    other crews within the culinary when inmate

19    workers were needed.  Linn consistently

20    displays a mature attitude, gets along well

21    with staff and inmates alike and performs

22    his assignments with exceptional quality.

23    Inmate Linn is an asset to the north

24    culinary and can always be depended upon to

25    perform well."

26    INMATE LINN:  Yeah.  You know, if you

27    noticed it mentioned I worked on my days off?

31

1          DEPUTY COMMISSIONER KEENAN:  Right.

2          INMATE LINN:  Okay.  I'm not making any

3     excuses.  I did miss those days of work.  You know,

4     what, here and there my attendance was kind of

5     sporadic for a minute there.  But I do put a lot of

6     extra time in, volunteer time for work and I've been

7     doing that throughout my prison sentence.  And my --

8     before in the county jail, you know.  I'm just always

9     following upgrade to work.  You know what I'm saying?

10    I don't sit back and play cards or lay around and let

11    something be undone.  I see something that needs to be

12    taken care of and I take care of it, regardless where

13    it is, where the position is at.  It could be

14    something that needs done on the yard.  It could be

15    something that needs done in a building.  If a staff

16    member or a guard asks me, hey, I need a sign and they

17    realize that I -- I'm an artist.  I paint.  I'll paint

18    that sign.  I'll do that sign.  You know what I'm

19    saying?  I'm constantly contributing to help out.

20         DEPUTY COMMISSIONER KEENAN:  Then how do you

21    explain the failure to report?

22         INMATE LINN:  The what?

23         DEPUTY COMMISSIONER KEENAN:  Failure to

24    report.

25         INMATE LINN:  Those failures to report; the

26    one that was in 2000, I believe 2000, that one there I

27    actually had a class that day.  I missed both days of

32

1    ducket and the -- and my instructor gave me an "A" day

2    for it.  So I'm not going to sit here and tell you

3    that, you know, you know, I -- that it's his fault.

4    It's basically the way it happened was I had a

5    substitute teacher at the time.  So he told me to come

6    back with a ducket the next day and I did have the

7    ducket showing that I went to a group that day.  And

8    there wasn't a class after that.  There wasn't a class

9    for a good long period of time and that instructor

10   never came back.  So at that point, I never had a

11   chance to clear that one up.  But the ones prior to

12   that, I basically failed to get to work.  Some of them

13   just plain feeling I didn't want to go.  I just didn't

14   want to go on those days, okay?  And there was a

15   couple times where when I went to work, that one where

16   I appeared -- I showed up late and then left without

17   authorization, that one was because my instructor told

18   me -- well, actually, it was my boss.  He told me that

19   I was going to get an "A" day.  When I came in late,

20   he told me I was going to get an "A" day.  That means

21   absent.  And without thinking about it, I turned right

22   around and left work because the fact of if I'm

23   getting an "A" day, that means I'm absent.  So if I'm

24   getting a day of absence, why should I be at work so I

25   went ahead and left, which was the wrong thing to do.

26   That's what gave me the 115 for leaving my assignment

27   without authorization.  I should have said, hey, you

33

1    know, you're giving me an "A" day.  What's -- do I

2    have to be here and I should have handled it

3    correctly.  And I look back at that now and I realize

4    that I've made a bad decision on just taking off.  I

5    should have let him know what I had -- my intentions

6    were to just go ahead and you give me an "A" day.

7    I'll leave.  I can't make up any excuses why I didn't

8    get there, get to work on time or report.  There is no

9    excuse for that.  I just failed to get out of the cell

10   and go to work.

11              DEPUTY COMMISSIONER KEENAN:  Okay.  All

12   right.  I also see you worked in culinary also as a

13   maintenance carpenter -- maintenance carpentry shop.

14              INMATE LINN:  Yes (indiscernible).

15              DEPUTY COMMISSIONER KEENAN:  Support

16   services, maintenance paint, food server, janitorial,

17   porter, dining room server, sanitation.  Think you

18   picked up any marketable skills in any of those

19   fields?

20              INMATE LINN:  Yes, I have.  (indiscernible)

21   I would say in the carpenter shop, I was already a

22   journeyman carpenter so I was actually a big asset to

23   that shop.

24              DEPUTY COMMISSIONER KEENAN:  How long were

25   you in that?

26              INMATE LINN:  About a year and a half.

27              DEPUTY COMMISSIONER KEENAN:  Okay.  And at

34

```
 1   that point, I went to a vocational trade so I moved
 2   on.
 3              DEPUTY COMMISSIONER KEENAN:  Okay.
 4              INMATE LINN:  The culinary services, as I
 5   mentioned earlier, they assigned me to these
 6   positions, okay?  I know that I can say well, I want
 7   to move on and go to another position in this
 8   institution.  It's not undoable but it's not -- at the
 9   same time, you have to go through the proper channels
10   and get the assignment lieutenant to do the paperwork
11   for you.  Usually, if I'm working in a position like
12   that I get on a vocational waiting list and then I
13   just wait it out.
14              DEPUTY COMMISSIONER KEENAN:  Okay.
15              INMATE LINN:  And then when those vocational
16   waiting lists are four years long, without me
17   realizing it's going to be a four-year wait, here I
18   am.  I'm still working in this position.  I continue
19   working but at the same time, I take my position
20   seriously, you know?  It's not a matter of me being in
21   prison.  I do an honest day's work.  I don't -- the
22   pay doesn't mean nothing.  It's my principle that, you
23   know, is the way I was brought up.  Working in
24   construction, I do a good job at what I do.
25              DEPUTY COMMISSIONER KEENAN:  All right.
26              INMATE LINN:  As far as marketable skills,
27   yes, there were some.  There was gardening because of
```

35

1    the fact that yard crew jobs --

2              DEPUTY COMMISSIONER KEENAN:  Is that the

3    landscaping?

4              INMATE LINN:  Landscaping.

5              DEPUTY COMMISSIONER KEENAN:  I saw that

6    mentioned.  I wasn't sure if that was vocational

7    landscaping or that was an assignment.

8              INMATE LINN:  That was basically a job in

9    the -- it was a program.  Basically, it's sort of a

10   program that -- where they were growing vegetables for

11   the community and I was involved in that.

12             DEPUTY COMMISSIONER KEENAN:  For how long.

13             INMATE LINN:  That was about two years.

14             DEPUTY COMMISSIONER KEENAN:  Okay.

15             INMATE LINN:  And during that time, I'd say

16   I became a bit of a farmer.

17             DEPUTY COMMISSIONER KEENAN:  Okay.

18             INMATE LINN:  You know, as far as growing

19   vegetables and I learned from --

20             PRESIDING COMMISSIONER SHELTON:  I'm

21   confused.  Let me interrupt.  Did you ever get a

22   vocation in particular?

23             INMATE LINN:  Yes.

24             DEPUTY COMMISSIONER KEENAN:  He did.

25             INMATE LINN:  I've had two.

26             DEPUTY COMMISSIONER KEENAN:  I haven't

27   gotten to the vocations yet.  We'll get there.

36

1          PRESIDING COMMISSIONER SHELTON:  All right.

2          INMATE LINN:  Yeah, this program anyway, as

3  far as the -- like I say, the marketable skills --

4          DEPUTY COMMISSIONER KEENAN:  You're not

5  talking about vocations yet; right?

6          INMATE LINN:  No.  No.

7          DEPUTY COMMISSIONER KEENAN:  Landscaping was

8  something else?

9          INMATE LINN:  Yes.

10         DEPUTY COMMISSIONER KEENAN:  Okay.

11         INMATE LINN:  I'm basically (indiscernible)

12  regular jobs, institutional jobs.

13         DEPUTY COMMISSIONER KEENAN:  Right.

14         INMATE LINN:  And like I say, as far as

15  marketable skills go, the only thing I could tell you

16  on that is, there's jobs --

17         DEPUTY COMMISSIONER KEENAN:

18  (indiscernible).

19         PRESIDING COMMISSIONER SHELTON:  No.  I just

20  wanted to clarify that we're still talking about work

21  experiences.

22         DEPUTY COMMISSIONER KEENAN:  Oh, okay.

23         PRESIDING COMMISSIONER SHELTON:  And not

24  certified vocations.

25         INMATE LINN:  What I can tell you about

26  these jobs, okay, is that I know that if I'm capable

27  of doing all these odds and ends jobs and putting

37

1  pride into what I do and doing a good job at each one

2  of them and going beyond what most people usually do.

3  I'll tell you right now, there's been a lot of times

4  where they don't require me to do certain parts of

5  those jobs and I do it because I now it needs to be

6  done.  And they're like, wow, that looks really good,

7  Mr. Linn.  And in other words, I carry on like that.

8          DEPUTY COMMISSIONER KEENAN:  I think you

9  answered my question.

10         INMATE LINN:  Okay.

11         DEPUTY COMMISSIONER KEENAN:  Let me move

12  forward to the vocations.  Drafting, you completed?

13         INMATE LINN:  Yes.

14         DEPUTY COMMISSIONER KEENAN:  Computer aided

15  drafting and design, completed?

16         INMATE LINN:  Yes.

17         DEPUTY COMMISSIONER KEENAN:  They're both

18  basically part of the same course; are they?  One

19  builds on the other?

20         INMATE LINN:  They're the same class.  They

21  are the same.  You have to complete the drafting

22  before you get into the computer aspect of it.  So

23  without completing the drafting, they don't allow you

24  to get on Auto-Cad or Versa-Cad.  Some people made it

25  that far and some people didn't.  There was some

26  people that went through just the drafting and then

27  they completed them.

38

1          DEPUTY COMMISSIONER KEENAN:  So you consider

2     that to be a completion of one vocation?

3          INMATE LINN:  Yes.

4          DEPUTY COMMISSIONER KEENAN:  Okay.  All

5     right.  Two components, though.

6          INMATE LINN:  Yes.

7          DEPUTY COMMISSIONER KEENAN:  Okay.  And also

8     you completed major appliance repair in '99.

9          INMATE LINN:  Yes, I have.

10          DEPUTY COMMISSIONER KEENAN:  Okay.  Oh, I'm

11     sorry.  You know, I saw two listings.  I saw

12     vocational appliance repair and major appliance

13     repair.  You had one in 03, as well.  Are these just

14     the same thing and you got back into it a little bit

15     later on?

16          INMATE LINN:  No.  What happened was they --

17     that was at the time where I was telling you about the

18     instructor not being there.  They -- what happened is,

19     he retired and they put a substitute in there.  The

20     substitute stuck around for a little while and then

21     they assigned somebody.  It took a year before they

22     got a new instructor for that class so there was a

23     break in between that time.  And during that time, I

24     volunteered on the yard crew with my time.

25          DEPUTY COMMISSIONER KEENAN:  Okay.

26          INMATE LINN:  I didn't just go out and sit

27     around.  I went to work every day.

39

1          DEPUTY COMMISSIONER KEENAN:  So in '03, you

2    completed the appliance repair, then?

3          INMATE LINN:  Huh?

4          DEPUTY COMMISSIONER KEENAN:  In '03, was it,

5    that you completed the appliance repair?

6          INMATE LINN:  Yes.  Yes.

7          DEPUTY COMMISSIONER KEENAN:  Okay.  It also

8    notes here that you -- something you do in your spare

9    time is read tech manuals?

10          INMATE LINN:  Yes.

11          DEPUTY COMMISSIONER KEENAN:  In what areas?

12          INMATE LINN:  Well, because I was in

13    drafting and my background is construction doing

14    homes, I went through a lot of drafting books.  I

15    did --

16          DEPUTY COMMISSIONER KEENAN:  So drafting

17    would be the area?

18          INMATE LINN:  Yes.  And I also would read --

19    man.  Oh, yeah, sailing.  I just studied sailing,

20    navigation; books that actually had some meaning.

21    They would teach me things about things that were

22    going on out there, you know.  I did a little -- a lot

23    of reading on camping and outdoor life type stuff, you

24    know.  Basically, what's going on with it and what

25    people are doing.  Backpacking, those types of skills

26    and stuff like that.  I did study in my spare time --

27    of course, I was in refrigeration, air conditioning

40

1    and appliance repair.

2            DEPUTY COMMISSIONER KEENAN:   I saw mention

3    of that in the last transcript.  The transcript of the

4    last hearing.

5            INMATE LINN:   Yeah.

6            DEPUTY COMMISSIONER KEENAN:   And I thought

7    that the conclusion was that you picked up a

8    certificate but you did not complete an entire course.

9    is that accurate?  That you had some certificate of

10   achievement but you never completed the entire course.

11           INMATE LINN:   No.  The two trainings that

12   I've actually been able to get into, I completed them.

13   What I have is, in the drafting I had a few extra

14   things involved where I did a -- I entered into a

15   drawing contest on computer and --

16           DEPUTY COMMISSIONER KEENAN:   I saw that.

17           INMATE LINN:   Okay.  So I got honorable

18   mention.

19           DEPUTY COMMISSIONER KEENAN:   Correct.

20           INMATE LINN:   And the refrigeration, I went

21   ahead and -- there's only several people in this

22   institution that have actually achieved it and I got

23   the certification for refrigeration and air

24   conditioning.

25           DEPUTY COMMISSIONER KEENAN:   Well, let me

26   read from the last transcript.

27               "Deputy Commissioner Mejia; Is that a

41

1          completion -- completion of refrigeration?

2          I don't see it.  Inmate Linn; Right here.

3          Deputy Commissioner Mejia; That's an

4          achievement.  All right.  This is one aspect

5          of refrigeration; right?  Inmate Linn;

6          Yeah.  Commissioner Mejia; Okay.  I'm

7          talking about the complete -- completion of

8          the whole.  Inmate Linn; Sorry about that.

9          Commissioner (indiscernible); That's okay."

10  And then I don't know that it was resolved beyond

11  that.

12       ATTORNEY FOX:  Okay.  What I'm looking at is

13  a goldenrod colored Education Progress Report, which

14  I'll pass over.  What was that, Mr. Linn?

15       INMATE LINN:  Oh, this is a completion of

16  the refrigeration and appliance.

17       ATTORNEY FOX:  It's a vocational evaluation

18  of employability.

19       INMATE LINN:  That's a completion right

20  there of the appliance repair trade.  That right there

21  is the completion of the refrigeration and the

22  appliance repair completely.

23       DEPUTY COMMISSIONER KEENAN:  Okay.  This is

24  refrigeration unit repair under the hearing appliance

25  repair.

26       INMATE LINN:  Right.

27       DEPUTY COMMISSIONER KEENAN:  So as part of

42

1   your completion of appliance repair, you learned how
2   to repair refrigeration units?
3           INMATE LINN:  Yes.  And I think what he was
4   referring to was the fact that it was just a part of
5   refrigeration and air conditioning is that there
6   wasn't no heating involved in that, although I did
7   learn some heating units, about certain parts of
8   heating units.  But it was basically based on those
9   appliances and at that point, they cut it off, as I
10  said.  That's all they teach there.  They don't teach
11  the heating.
12          DEPUTY COMMISSIONER KEENAN:  Well, this is
13  in '99.  That was back when you had the original
14  teacher.  It's an Education Progress Report.
15          "Inmate Linn has completed this course.  He
16          has employable skills in many areas of
17          repair and refrigeration.  He's also EPA
18          certified in refrigeration.  He will excel
19          in this trade."
20  So somewhere while learning about appliance repair,
21  you sort of picked this up, as well.
22          INMATE LINN:  Yes.  Yeah, the EPA, which is
23  there, is basically a separate test that not
24  everyone --
25          DEPUTY COMMISSIONER KEENAN:  Yeah.  What
26  that does actually is it -- I'm not going to say
27  guarantees me a position in air conditioning and

43

1   refrigeration companies.  But an employer would be

2   impressed with that and there's probably a good chance

3   they would want to hire me, just for the fact that I

4   can do -- work on sealed systems, which is the

5   refrigerants themselves.

6          ATTORNEY FOX:  And it should be in the C-

7   file.  It's an ESCO Institute.  It's an EPA

8   certification and it states that Robert Linn has been

9   certified as a universal technician, as required by

10  the applicable Federal code.  And his scores were 100,

11  100, 100 and 96.

12         DEPUTY COMMISSIONER KEENAN:  Okay.

13         ATTORNEY FOX:  Thank you.

14         INMATE LINN:  All right.  Can I show you one

15  more thing with that?  There's -- I have this right

16  here, this chrono right here.  It was also during that

17  time that that shop was closed, during the time the

18  shop was closed, I did -- I went over to the -- and

19  helped reconstruct the shop itself to get it ready for

20  open -- reopening of the class again.

21         DEPUTY COMMISSIONER KEENAN:  Okay.  This is

22  11/23/01 from J. Kane (phonetic), supervisor of

23  vocational instructions and R. Lietzel (phonetic),

24  vocational residential electronics repair instructor.

25         "Inmate Linn was assigned February 20, '99

26         to position number" -- there's a code --

27         "with the vocational residential electronics

44

1          repair program.  He is a diligent and

2          talented student.  He works hard to

3          understand all facets of trade, including

4          quality control.  During the shop closure he

5          helped with the reorganization of the shop

6          and was a value asset and did an excellent

7          job.  He worked well with others and shared

8          his knowledge with them.  He is prompt and

9          always courteous to staff and other inmates.

10         Linn will be a valuable employee to a

11         residential electronics repair business."

12         **ATTORNEY FOX:**  Okay, thank you.

13         **INMATE LINN:**  Like I'm saying, you know,

14  that was during the shop closure, closing and I didn't

15  have to go over there and do that.  I volunteered to

16  help out.

17         **DEPUTY COMMISSIONER KEENAN:**  Okay.

18         **INMATE LINN:**  They -- I could have been out

19  on the yard and --

20         **DEPUTY COMMISSIONER KEENAN:**  Or playing

21  cards.

22         **INMATE LINN:**  -- doing nothing, you know.

23         **DEPUTY COMMISSIONER KEENAN:**  I understand.

24         **INMATE LINN:**  But I found that between that

25  and the gardening, I kept myself busy.

26         **DEPUTY COMMISSIONER KEENAN:**  Okay.  Let me

27  move onto the self-help programs.  Since your last

45

1    hearing, participated in NA from 7/05 to 12/05 and

2    there was a mention of a laudatory chrono from a

3    kitchen supervisor, COR. Rentoria (phonetic).

4                INMATE LINN:  Oh, yeah.

5                DEPUTY COMMISSIONER KEENAN:  And that's in

6    your C-file.

7                ATTORNEY FOX:  We have it right here.

8                DEPUTY COMMISSIONER KEENAN:  Okay.

9                ATTORNEY FOX:  If you want it?

10               DEPUTY COMMISSIONER KEENAN:  I have it,

11   also.

12               ATTORNEY FOX:  Oh, okay.

13               DEPUTY COMMISSIONER KEENAN:  9/28/05;

14               "Inmate Linn was initially assigned to CTF

15               north culinary sanitation crew.  He's

16               currently assigned to a position and since

17               being assigned to A.M. sanitation crew, Linn

18               has done an exemplary job of handling all

19               duties assigned to him.  In doing so, Linn

20               was recommended next to take over the lead

21               position in his crew.  He's been very

22               cooperative with assisting during

23               institutional lockdowns when he was at times

24               called upon to work regular days off.  Linn

25               also volunteered to work with other crews in

26               the kitchen when inmate workers were needed.

27               Linn consistently displays a mature attitude

46

1           and gets along with staff and inmates alike.
2           Performs his assignment with very little
3           supervisor.  Inmate Linn is an asset to
4           culinary and can be depended upon to perform
5           any duty assigned to him."
6    Also, I saw there was a -- something from Dave
7    Rodriguez, a sponsor.
8           "Inmate Linn has been an active member in NA
9           the third and fourth quarters of '05.  His
10          enthusiastic participation and support -- in
11          his enthusiastic participation and support,
12          he has achieved tremendous personal success
13          towards recovery and self-improvement.  He
14          should be commended for his sincerity and
15          commitment in dealing with his ongoing
16          challenge."
17   And going back in time, I see you participated in AA
18   from '95 to '97 and also from July 2000 to December
19   2000.  In NA, the Square One NA.  This was back in
20   '90.  Involved in NA from 2/90 to 6/91 and from 10/01
21   to 12/04.  You were in the Impact Program in '01.
22   That was a 14-week workshop focusing on victim
23   awareness.  Project Change, voluntary participation in
24   that 44-week course in '03.  You've been in beginning
25   stress management and relaxation training in '91.
26   That was a four-week group.  Substance abuse therapy
27   in '92.  Completed the eight-week program.  Also a

47

1   mention of several psychotherapy programs at CMC east.

2   What kind of programs at CMC East; psychotherapy

3   programs?

4          INMATE LINN:  They had several programs

5   there.  They had one-on-one and they had group

6   therapy.  I participated in substance abuse and stress

7   management.  I got -- I was on the waiting list for a

8   group therapy.  At the time I was on the waiting list

9   for that group and I fell right into one group after

10   another.  I'd complete a group and I'd try to get back

11   into another one.  If I wasn't going to one, I'd be on

12   the waiting list for another.  And at that point, I

13   was on the waiting list for group therapy and I was

14   transferred from CMC to here due to the points.  That

15   was a level III institution.  I had a level II in

16   points and they were transferring all level II inmates

17   out of that institution so I ended up at CTF at the

18   time.  I arrived here.  I'm not going to say there

19   wasn't any type of group therapy or one-on-one group.

20          DEPUTY COMMISSIONER KEENAN:  When did you

21   get here?

22          INMATE LINN:  I got here I think, I believe,

23   it was April of '93.

24          DEPUTY COMMISSIONER KEENAN:  Okay.  All

25   right.

26          INMATE LINN:  I -- at that institution at

27   CMC, all the -- they did have quite a bit of

48

1    programming there for inmates.  I came from a level IV

2    institution.  I was at two different IV's and counting

3    the county jail, that was like nine years of

4    institution, of maximum-security housing.  So I didn't

5    have an opportunity to get to an AA group or an NA

6    group.  There wasn't -- they weren't available at all.

7              DEPUTY COMMISSIONER KEENAN:  From when to

8    when?

9              INMATE LINN:  From the time I was arrested

10   to the time that I left -- it was -- the first

11   available AA or NA or any kind of self-help was

12   available to me at CMC east and I arrived at CMC east

13   in 1990 -- I think it was 1989.  Or 19 -- yeah, it was

14   the end of 1989.  And then at that point, that's when

15   I signed up for Narcotics Anonymous and I started

16   attending that Narcotics Anonymous.  That was the

17   first --

18             DEPUTY COMMISSIONER KEENAN:  Well, there's a

19   blank space on the Narcotics Anonymous from '91 to

20   '01.

21             INMATE LINN:  '91 to '01, right?

22             DEPUTY COMMISSIONER KEENAN:  I believe so.

23             INMATE LINN:  Yes.

24             DEPUTY COMMISSIONER KEENAN:  Why is that?  I

25   saw there was some AA in the interim, though; '95 to

26   '97 and in 2000.

27             INMATE LINN:  Yeah.  I went to a -- the NA

49

1    when I got -- I did the NA at CMC and then I went to a

2    substance abuse program also and stress management.

3    And from that point, like I mentioned earlier, I did

4    get on the waiting list for group therapy.  And the

5    NA, when I got here I didn't go to NA.  I did sign up

6    for -- let me see if I got that right.  Yeah, I signed

7    up for AA in '96.  No, I got here in '93, April of '93

8    and I didn't start attending AA -- I didn't start

9    attending AA until September of '95, okay.  But --

10            ATTORNEY FOX:  The quarter ending September

11    of '05.  That was September.

12            INMATE LINN:  Actually, to answer your

13    question on the NA, I did not go to NA from the time

14    that I left CMC East until 2000, which would be

15    (indiscernible).  Excuse me one second.  Yeah, it

16    would be 2001.  Is that what you have?

17            DEPUTY COMMISSIONER KEENAN:  I see starting

18    up in 2001.

19            INMATE LINN:  Yes.  Okay, so I just -- I

20    didn't get to an NA program.  In between that time, I

21    did attend some AA, several years here and I missed a

22    couple years.  And then I went back to AA.  I have a

23    outside sponsor that I have been corresponding with

24    since 1997 so it's -- I have been in touch and

25    participating in some parts of AA and NA.  Not running

26    together but it's like I go from one to the other.  I

27    try to stay within a group if I can.  There was two

50

1    years that I didn't go and like I said, that was when

2    I first arrived here, from '93 to '95.  I didn't

3    attend any AA or NA.

4            DEPUTY COMMISSIONER KEENAN:  Back to my

5    original question; why?

6            INMATE LINN:  Okay.  That's a perfectly good

7    question because I do have an answer to that.  I --

8    the first nine years of my sentence, you know, my

9    county time and my level IV time, AA and NA wasn't

10   available to me.  And during that time, I did not use

11   drugs or alcohol, okay?  So at this point in my life,

12   at the point where -- when it was available to me in

13   1989 or -- let's see.  Yeah, 1989.  Actually, I went

14   to AA at Tehachipi when it first opened up.  It was --

15   finally they got a group going in level IV.  But

16   besides that, I was going it alone and I was staying

17   clean.  So for me to go to an NA group or an AA group

18   at this point, it would be like asking for heart

19   surgery when I don't need it.  I mean, here I am.  I'm

20   not using drugs.  I'm refraining from even wanting to

21   use drugs.  I'm staying away from alcohol.  And now I

22   have this -- a Parole Board hearing and they're

23   expecting me to go to -- get to groups, okay?  So I

24   realized that I have to do my part, so I'm going to go

25   ahead and go to these groups and every time I went to

26   these groups, I came away with something.  It was --

27   even though I wasn't using drugs or alcohol and out of

51

1    my own self-will, I refrained from using or being a

2    part or participating in that, I was still

3    participating in those groups and had walked away with

4    a group atmosphere feeling. Hey, you know, that was a

5    really nice speech that guy gave or that conversation

6    I had with this guy was really good. So the group

7    actually was helping me along but all at the same

8    time, all I'm saying is I didn't have the -- I didn't

9    have NA and AA available to me the first nine years I

10   was in prison. And I didn't go participate in those

11   guys smoking marijuana or those guys drinking alcohol

12   or doing drugs. I stayed away from that. I liked

13   staying away from it and I was staying away from it.

14   So I knew that I - as far as the group goes, it was

15   like learning to admit defeat, where I was not

16   defeated. I actually overcame alcoholism and drug

17   addiction on my own. I did that.

18           DEPUTY COMMISSIONER KEENAN: Do you feel

19   like when you get out you're gonna need some kind of

20   ongoing drug program, like NA or whatever else?

21           INMATE LINN: What I feel today is, I don't

22   have to have -- I don't have to go it alone on my own.

23   I can be open with other people about my past and my

24   weaknesses and my qualities. So it's like today and

25   starting back quite a few years ago, I finally came to

26   understand what a group is all about. It wasn't me

27   going in and saying hey, I'm powerless over an

52

1    addiction and this and that because I wasn't powerless

2    over my addiction.  What I'm powerless over is when I

3    have a -- when I'm doing drugs and if I'm doing

4    alcohol, then I'm powerless over that substance and

5    that's why I'll stay away from it.  I understand that

6    part.  But like you say, what -- do I feel like I want

7    to participate in self-help beyond prison and from

8    this point on?  Yes, I will and I look forward to

9    doing that because --

10              DEPUTY COMMISSIONER KEENAN:  Well, I don't

11    know if I asked you is that something you want to

12    participate in.  I'm saying is it something that you

13    feel in your case that you need?

14              INMATE LINN:  Yes, I do.

15              DEPUTY COMMISSIONER KEENAN:  All right.

16              INMATE LINN:  Because the fact is that my

17    addition, it goes beyond drugs and alcohol.

18              DEPUTY COMMISSIONER KEENAN:  But you haven't

19    participated in NA this last year, have you?

20              INMATE LINN:  Yes.  I -- the yard was locked

21    down for -- from the first of the year until the third

22    quarter and they reopened the NA and the AA program so

23    I'm back into the program now.  But there was a

24    lockdown because of a major riot on the yard.  And

25    prior to that, there was a -- the --

26              DEPUTY COMMISSIONER KEENAN:  Back in as of

27    when?

53

1       **INMATE LINN:**  This is a chrono for my last -
2   - this is the last participation, the most current,
3   okay, for it.
4       **DEPUTY COMMISSIONER KEENAN:**  Okay.  Let me
5   read it.  10/11/06 from David Rodriguez.
6           "Inmate Linn has been an active member of AA
7           at CTF north facility during the third
8           quarter of '06.  Through his enthusiastic
9           participation and support, he has achieved
10          tremendous personal success in his efforts
11          towards recovery and self-improvement.  He
12          should be commended for his sincerity and
13          commitment in dealing with this ongoing
14          challenge."
15   Okay.
16      **INMATE LINN:**  Okay.  I have something else
17   that would explain why I haven't gone to -- that
18   chrono is just by itself.  This right here gives you
19   the north facility.
20          **ATTORNEY FOX:**  It speaks to the lockdown.
21      **DEPUTY COMMISSIONER KEENAN:**  Okay.  7/19/06.
22          "Inmate Linn has been an active member in
23          Narcotics Anonymous north facility during
24          the first and second quarters of '06.  Due
25          to north facility being on full facility
26          suspended program and partial facility
27          lockdown, there's been no meetings conducted

54

1           for the first and second quarters.  He

2           should be commended for his sincerity and

3           commitment in dealing with this ongoing

4           challenge."

5   Okay.  Thank you.

6           INMATE LINN:  Okay.  But up to that point, I

7   have been attending Narcotics Anonymous.

8           DEPUTY COMMISSIONER KEENAN:  All through

9   '05?  Or well, from July '05 to 12/05.  I saw that

10  already.

11          INMATE LINN:  Well --

12          DEPUTY COMMISSIONER KEENAN:  We've already

13  covered it.  Okay.

14          INMATE LINN:  I've been doing that ever

15  since like 2001; right?  I had to be about 2001, some

16  time in 2001 when I started attending that NA.

17          DEPUTY COMMISSIONER KEENAN:  I believe

18  that's accurate.  Okay.  Let me focus on the

19  Psychological Evaluation at this point, from

20  M. Macomber, M-A-C-O-M-B-E-R, Clinical Psychologist,

21  dated 9/6/05.  In evaluating you, he goes over basic

22  identifying information, sources of information.

23  Under current mental status/treatment needs, I didn't

24  notice any problems noted here.  He notes in part that

25  you discussed significant life changes that you

26  experienced, particular since '98.  Because actively

27  involved in Christian Bible studies.

55

1          "He has a deep and serious relationship with
2          the Lord.  He stated that since his life has
3          been committed to serving God, his creator,
4          he has no interest in drug or alcohol use.
5          He understands that life is short, whereas
6          his existence in heaven is forever.  He is
7          determined to live a life worthy of his
8          biblical commitments.  He follows biblical
9          instructions in his life.  This includes
10          total abstinence from any destructive
11          behaviors, including drugs and alcohol.
12          Also notes prior to the commitment offense
13          24 years ago, he met the requirement for a
14          diagnosis of polysubstance abuse.  He's been
15          clean and sober throughout his prison
16          experience of 24 years.  He foolishly
17          allowed a cellie to make pruno in their cell
18          together when he first arrived, not
19          realizing the serious consequences of this.
20          He knows is now and he stated he definitely
21          would not allow this to happen anymore,
22          although cellies do try to make pruno or use
23          drugs.  He is totally intolerant of this
24          behavior.  He has shown significant growth
25          and change over the years.  At this point,
26          there's no diagnosable mental disorder."
27    Axis I and Axis II, the doctor notes no contributory

56

1   clinical disorder, no contributory personality

2   disorder.  Current GAF, global assessment of

3   functioning of 90.  That's on a scale of 1 to 100.

4   Review of life crime, he covers and notes in part:

5             "Inmate Linn does have deep feelings of

6             sorry and remorse for the victim's death and

7             I agree with prior evaluators, who also note

8             his sense of sorry and remorse is sincere

9             and genuine."

10  He notes that your potential for violence in the

11  institutional environment is definitely below average

12  in comparison with other inmates.  He states:

13            "In considering his potential for dangerous

14           behavior if released to the community at

15           this point, I agree with prior evaluators,

16           who stated that his violence potential in

17           the community would be no greater than the

18           average citizen in the community.  There are

19           several facts that support this conclusion.

20           Inmate Linn is not a criminally oriented

21           person.  He does not have antisocial

22           thinking or values.  He does not have a

23           personality disorder that would contribute

24           toward violence.  He definitely knows the

25           difference between right and wrong and he

26           has a well-developed conscience and a strong

27           abhorrence against wrong activities.  As a

57

```
 1    Christian, he has strong values against
 2    injuring others.  He has developed a
 3    sensitivity and awareness of the disastrous
 4    effects of illegal behavior.  He has changed
 5    considerably since he was 21 years of age
 6    and was involved in the commitment offense.
 7    Other evaluators have noted that a risk
 8    factor for Inmate Linn for potential
 9    violence would be if he were to return to
10    the abuse or alcohol or drugs.  The fact
11    that this raises the issue about potential
12    future drug use is what has concerned the
13    Board of Prison Terms in the past.  In this
14    writer's opinion, this is no longer an issue
15    in this man's life.  I have been working
16    with criminals now for four years, both as a
17    parole agent and a psychologist.  If there
18    was any danger that he would revert to drugs
19    or alcohol, I would be able to discern this.
20    In my opinion, this is no longer a factor in
21    his life and therefore, is no longer a risk
22    factor."
23 His final comments here; clinical observations,
24 comments, recommendations.  The doctor says:
25    "There is no indication of any mental or
26    emotional problems that would interfere with
27    this inmate being granted parole.  The
```

58

1             prognosis for his successful adjustment in

2             the community in this case is excellent.

3             There are many factors that would support

4             this conclusion.  This inmate has a very

5             strong work ethic.  He has a strong work

6             history prior to the commitment offense and

7             a strong work history in the institution.

8             He's an outstanding worker who enjoys

9             working and will not have any trouble

10            securing employment.  He does have numerous

11            job offers in the community.  He has

12            accumulated several trades; vocational

13            drafting and computer drafting, vocational

14            refrigeration and air conditioning,

15            vocational appliance repair and working four

16            years as a glazier."

17 What is that?

18            INMATE LINN:  What's that?

19            DEPUTY COMMISSIONER KEENAN:  A glazier?

20            INMATE LINN:  Oh, that's a -- that was a

21 window repairer.  I did -- I worked for the paint

22 shop --

23            DEPUTY COMMISSIONER KEENAN:  Oh, in the

24 construction field?

25            INMATE LINN:  -- for about four years, three

26 and a half years and I was the lead man over there and

27 basically took care of a lot of things like that.  But

59

1   I was actually the window man, which is the glazier

2   and I fixed windows throughout the institution.

3          DEPUTY COMMISSIONER KEENAN:  Okay.  It says:

4          "In addition, he's a professional carpenter.

5          Compared to other inmates and even compared

6          to other lifers, his work skills and work

7          history are above average.  These factors

8          support the conclusion he'll do very well in

9          the community.  In addition, he does have

10        strong family support in the community.  His

11        sisters and brothers are doing well.  They

12        have good paying jobs.  They are anxious for

13        his release.  They will provide financial

14        assistance, employment and residence for

15        him.  This factor is also a strong indicator

16        of successful adjustment in the community.

17        His prognosis for success is excellent."

18  Anything you want to say about that report?

19          INMATE LINN:  Well, actually all I've got to

20  add to that is, you know, as you were asking me

21  earlier about my work ethic, I have -- there's not a

22  job out there that I won't do.

23          DEPUTY COMMISSIONER KEENAN:  Actually, I

24  think I know everything I want to know about your

25  work, your work abilities, your work history.

26          INMATE LINN:  All right.

27          DEPUTY COMMISSIONER KEENAN:  How about the

60

1    doctor's comment about remorse?

2            **INMATE LINN:**  Oh.  See, I understand that

3    more as my life -- as I live life.  I understand more

4    and more how -- what a tragedy, the crime it was that

5    I committed, you know.  I -- as I put more and more

6    value on my own life because I appreciate life more

7    and more as I experience it.  So I know what I did by

8    taking a person's life away from them, you know.  I

9    know what I stole away from them.  And they were

10   living out there and I intruded into their lives.  I

11   had no business -- or what I had no business doing

12   that way, intruding in their life that way.  So I

13   found that in my life, I take that crime that I

14   committed and I have to -- I've looked back at my --

15   in my past and moved forward from this point on.  I

16   look back and use every one of the things that I've

17   done wrong and what led up to the point of committing

18   that crime.  I will always keep that close to heart.

19   So those are my -- those lessons will never be

20   forgotten, you know, and what caused this to happen.

21   My life was actually a big mess at the time that I

22   committed the crime and then from there got worse,

23   because here I was responsible for someone losing

24   their life.  And I had to evolve into the

25   understanding of the real meaning of this guy losing

26   his life and the effects it had on his family and my

27   family and the community.  So as I go on, I kind of --

61

```
 1   well, all I'm saying is, I realize that everything
 2   that I've been through, I put them through.  I mean,
 3   all of the sorrow that I caused in my own life, but I
 4   did them -- they -- they were living their own life
 5   and I put such a tragedy on their lives.  And to where
 6   they had to deal with all these issues in their lives;
 7   the sorrows, the griefs, their hate.  I mean,
 8   everything that they didn't have to really go through,
 9   I put them through.  And I know those experiences
10   because those human emotions, I experienced myself so
11   I understand those well.  I came to terms with all of
12   that and I just -- today, it's like one of the hardest
13   things is to understand, if they ever came around or
14   at what point in their life are they going to be able
15   to come to terms with this.  You know what I'm saying?
16   For what I did.  I know that it's a long-lasting
17   offense.  It'll never go away, this crime that I
18   committed.  The family will always have remembrance of
19   Guadalupe.  And I can't change that and nothing will
20   change that but at the same time, like I say, I
21   concern -- I'm concerned with how they dealt with
22   that, you know, what I did.  Or you know, I just hope
23   that they came back to what you -- more of a peaceful
24   state in life, you know.  I really hope that.  And I
25   hope that I didn't cause the brothers that I robbed
26   to, you know, act in a different way in their life
27   because of what I redirected their lives by committing
```

62

1   that crime, you know.  Because I know if somebody did

2   that to me, maybe I might be bitter or I might be mad

3   and then it may change the course of my life.  But I

4   think because they're human beings, you know, we all

5   come to conclusions and there's -- it's usually the

6   goodness in people.  They probably -- I'm hoping that

7   they worked it out for themselves to where they're

8   living a good life, you know.  And what I know about

9   religion is, you know, it doesn't change nothing.  But

10  you know, Guadalupe, you know, is in heaven.  So it's

11  not like, you know, I'm making up excuses that we're

12  all going to see him again, but that's a fact, okay?

13  That's going to happen.  But we have to -- I have to

14  live in this lifetime and I have to do my part and I

15  know what I caused.  I know what I did.  So I kind of

16  live my life today and I appreciate what I got out of

17  all this.  So far as, you know, I have to stay -- for

18  me to do anything wrong from this point on, is taking

19  this man's life and on top of what I've done, you

20  know, is just making things worse.  What kind of a

21  monster do I have to be to commit a crime now at this

22  point in my life?  I don't want to be that person and

23  I won't be that person.  I have to live with myself so

24  I'm not going to -- I keep Guadalupe and I keep those

25  lessons in my life close to my heart, to move on to

26  each day and create my values and principles.  So I --

27  all I can say is, that --

63

1           PRESIDING COMMISSIONER SHELTON:  We're going

2    to move on, sir.

3           INMATE LINN:  Okay.  All I want to say is --

4           PRESIDING COMMISSIONER SHELTON:  Two

5    seconds.

6           INMATE LINN:  All right.

7           PRESIDING COMMISSIONER SHELTON:  You like to

8    talk and I appreciate what you have to say but we need

9    to move forward.

10          INMATE LINN:  As far as about remorse goes,

11   you know, I don't want to try to overstate it or -- I

12   just basically want you to know I have a real good

13   understanding of my crime.  I have more of an

14   understanding than anybody.  That's -- I'll keep it at

15   that.

16          PRESIDING COMMISSIONER SHELTON:  And that

17   makes sense.

18          INMATE LINN:  And I am responsible for this

19   whole crime.  I am responsible for my co-Defendant

20   being in prison because I didn't have to say yeah,

21   let's go and then have to agree with him.  We had a

22   discussion to go do this crime and I agreed to go.  If

23   I would have said no, let's not go and do this, we

24   wouldn't have went and done that.  John did not say

25   I'm going to hold a gun to your head and make you go.

26   I could have said, no, that's not a good idea.  Let's

27   not go do this and we would not have done it.  We

64

1    would have not have done that.  So I am responsible

2    for John's life, my life and the worst thing is, I'm

3    responsible for Guadalupe's life being stolen away the

4    way it was.  And I'll leave it at that as far as --

5              PRESIDING COMMISSIONER SHELTON:  Okay.  The

6    next step in this process is to talk about your parole

7    plans and I'm going to refer to the packet you gave me

8    today, which I already had in the file.

9              ATTORNEY FOX:  I had -- just to be sure.

10             PRESIDING COMMISSIONER SHELTON:  No, I know.

11   Because lots of times, it's not.  So anyway, according

12   to your Board Report, it says here that you want to

13   live with your sister, Tricia, in Orange County?  Yes

14   or no?

15             INMATE LINN:  No.

16             PRESIDING COMMISSIONER SHELTON:  Okay.

17             INMATE LINN:  I have a --

18             PRESIDING COMMISSIONER SHELTON: Just let me

19   go through this.

20             INMATE LINN:  Okay.

21             PRESIDING COMMISSIONER SHELTON:  Then you

22   have your second choice, according to this Board

23   Report, was your sister-in-law, Laura.  Yes or no?

24             INMATE LINN:  No.

25             PRESIDING COMMISSIONER SHELTON:  I know that

26   you're looking for something that you probably gave me

27   that has to do with the Anonymity Recovery House but

65

1    we're going to go through what the Board Report is so

2    we can make sure it's updated for future reference.

3    Let's talk about this, Mr. Linn.  You have a letter

4    here dated December 4, 2006, indicating there -- it

5    says:

6                "This letter is to confirm that you would

7                reside at the Anonymity House Recovery Sober

8                Living upon release from prison."

9    And that this house is located in Riverside.  It's

10   signed by Gary Pearson (phonetic), the Director.  What

11   I have a problem with this letter is, is number one

12   it's not signed.  Number two, it's not on letterhead.

13   It could have come from anywhere to anybody so -- and

14   I know that it went to --

15              ATTORNEY FOX:  And I do have a follow-up

16   phone number if that's something you would like.

17              PRESIDING COMMISSIONER SHELTON:  It's

18   actually something that somebody --

19              ATTORNEY FOX:  To reach Gary Pearson at the

20   Anonymity House.  Because of anonymity, anonymous --

21              PRESIDING COMMISSIONER SHELTON:  Yeah.  But

22   it still should have a letterhead and a signature on

23   this letter to verify it.  But there's no reason to

24   dispute it at this point, okay, because all of this

25   will be checked out.

26              ATTORNEY FOX:  Thank you.

27              PRESIDING COMMISSIONER SHELTON:  Okay.  So

66

1  that is your first choice, sir?  That's where you want

2  to live first choice?

3      INMATE LINN:  Yeah.  Because it is the county

4  of commitment and I thought it would probably be

5  easier to go back to that county than --

6      PRESIDING COMMISSIONER SHELTON:  Your family

7  -- your support system, your family and your AA

8  person, do they all live in that same area?

9      INMATE LINN:  They're in Orange County,

10  right next door.  The county next door.

11      PRESIDING COMMISSIONER SHELTON:  Okay.

12  According to your parole plan, we have here that you

13  want to have your residence be at Anonymity House.

14  You have a couple offers of employment and I noted

15  three of them; one at Storyland Foam Works.  Let me

16  find that letter.  It says here that they would offer

17  you a job as a laborer at $8 an hour.  You were

18  recommended by a friend.  Would that be your brother-

19  in-law?

20      INMATE LINN:  Yes.

21      PRESIDING COMMISSIONER SHELTON:  You also

22  received an offer of employment from Sterling

23  Meridian.  That is a maintenance position and you

24  would be paid $10.75 an hour.  And this is your

25  brother?

26      INMATE LINN:  Yes.

27      PRESIDING COMMISSIONER SHELTON:  Then you

67

1    were offered employment by a Mr. Carlson,

2    Gary Carlson, who as I understand it, is an old friend

3    of yours and also your AA sponsor.

4            INMATE LINN:  Yes.

5            PRESIDING COMMISSIONER SHELTON:  Not only

6    did he offer you employment through his construction

7    company.  He offered you a place to live with him and

8    he wrote a very nice letter about you, by the way,

9    too.  Also with regards to financial support, it says

10   your sister, Tricia, and your brother, Ron, have

11   agreed to pay the $425 per month that it costs to stay

12   at Anonymity House so that was very nice.  You also

13   have been in contact with -- your family's been in

14   contact with NA in Riverside County?

15           INMATE LINN:  Yes.

16           PRESIDING COMMISSIONER SHELTON:  You're

17   going to go back to Riverside County, then that would

18   be a good place to go for the follow-up, as we talked

19   previously.  Your brother's also helped to -- has

20   agreed to help you obtain a car and auto insurance and

21   your sister said she's held you get your driver's

22   license.  Did you put this package together?

23           INMATE LINN:  My sister, she -- I wrote

24   letters to all these people.

25           PRESIDING COMMISSIONER SHELTON:  Uh-huh.

26           INMATE LINN:  And they sent her copies.

27           PRESIDING COMMISSIONER SHELTON:  Very nice.

68

1   Very nice package.

2           INMATE LINN:  She put it together.

3           PRESIDING COMMISSIONER SHELTON:  It says

4   your family all supports you.  Everybody is involved

5   in the Calvary Church.  You have a good support

6   system.  But what I'm especially surprised at and

7   somewhat impressed is that your sentencing judge wrote

8   you a letter of recommendation.  That's Robert Timlin

9   (phonetic).  He wrote this letter June 28 of 2006.

10          ATTORNEY FOX:  Judge Timlin typically

11  writes.  He's very interested in follow Robert's case.

12          PRESIDING COMMISSIONER SHELTON:  I noticed

13  that he has written before on several occasions.

14  Primarily, he's writing a support letter.  I'm not

15  going to read it because it's lengthy but I -- he

16  feels that you have everything it takes to be

17  successful on parole.  He -- there was one sentence in

18  here.  He felt you had a -- I thought this was

19  interesting -- a malleable personality.  Which, do you

20  know what malleable means?

21          INMATE LINN:  Yes.

22          PRESIDING COMMISSIONER SHELTON:  Okay.  And

23  felt that you were influenced by your use of your --

24  well, your addiction, as we've talked about.  He said

25  of all the Defendants who had previously appeared

26  before him, you were particularly rehabilitateable and

27  feels that you would not be a possible risk of danger

69

1    to society.  That was a very nice letter.  We also

2    have -- let's see what else we have in here.  We also

3    have a letter from a Ronald Lordon (phonetic), who

4    evidently was your defense attorney for a couple of

5    years.

6              DEPUTY DISTRICT ATTORNEY RUIZ:  Is that the

7    letter dated 1996?

8              PRESIDING COMMISSIONER SHELTON:  No.  This

9    is a July 5, 2006.  Do you have that one, sir?

10             DEPUTY DISTRICT ATTORNEY RUIZ:  I had one

11   dated in '96.  Go ahead.

12             PRESIDING COMMISSIONER SHELTON:  Okay.  This

13   was at the very -- they had them filed not under

14   letters this time in the Board Report.  It was filed

15   under miscellaneous.

16             DEPUTY DISTRICT ATTORNEY RUIZ:  Okay, go

17   ahead.

18             PRESIDING COMMISSIONER SHELTON:  Okay.  And

19   basically, this letter indicates that he represented

20   you for a couple of years.  The judge was interested

21   in this case and evidently, at that time it was

22   unusual for you to be sent for a diagnostic evaluation

23   but we did find that in the file earlier today.

24   Realize what you did was serous.  Basically, this is a

25   letter of support from him, as well.  I have a letter

26   from Laura Snyder (phonetic), dated July 1, 2006 and

27   that's a support letter, as well.  November 2006 from

70

1  your sister; she said she's willing to provide you

2  with emotional and financial support as long as

3  necessary.  And again, verifies her willingness to

4  help pay for your room and board, help you secure a

5  driver's license and work with your other -- your

6  brother to do the car and all that.  This is your

7  youngest brother, Ron.  Talks about being very sorry

8  about the crime that you were involved in and it says:

9       "We think about the Zelgado family often."

10 He thinks you will not commit any more crimes and he's

11 verifying assistance to help pay for rent, utilities,

12 groceries and all that.  Driver's license and he has a

13 used truck for you, as well as a construction job.

14 And then finally, a letter dated August 14, 2006 from

15 Susan and David Long, who are your sister and brother-

16 in-law.  This is a support letter.

17       "Our entire family realizes that Bob is not

18       the victim here.  We realize that a terrible

19       crime was committed."

20 I appreciate her saying that.  And that's a support

21 letter, financially and emotionally, as well.  That's

22 a nice parole package.  Anything that you would like

23 to add with regards to your parole plans?

24       INMATE LINN:  Yes.

25       PRESIDING COMMISSIONER SHELTON:  Parole

26 plans, nothing else.

27       INMATE LINN:  Okay.  As far as the parole

71

1  plans so, you know I thought it through, definitely.

2  I have several different parole plans because of the

3  fact that I have to reach out and make sure I have

4  something available.  So I know that it's the Board's

5  -- it kind of has been the Board's policy in the past

6  to get parole plans for the county of commitment so I

7  did reach out and found something in Riverside.  Like

8  I told you earlier, I had just moved to Riverside

9  recently before my arrest so I didn't have family out

10  there.  I didn't have -- I do have a few acquaintances

11  out there, which is a sister-in-law.  A guy that used

12  to work under me as a foreman, he's out there.  He has

13  a business now.  Those are the people that I got in

14  contact with.  Everyone else --

15                    --oOo--

16  [TAPE 1 SIDE 2]

17                    --oOo--

18          DEPUTY COMMISSIONER KEENAN:  We're back on

19  record on side two.  You might want to repeat the last

20  couple sentences.

21          INMATE LINN:  Okay.  Anyways, I reached out

22  to Riverside, the people that I was able to get in

23  contact with.  And I acquired parole plans a couple

24  different times here through the years, okay?  I may

25  have feel short the last hearing and the hearing

26  before that.  But as far as the parole plans go, I

27  guess I gave it a lot of -- considerable thought.  I

72

1  feel that I'm probably better off going into an

2  environment where there's some people that have the

3  same interests as me, which is the halfway house.  And

4  I spoke with the person that owns the house, the

5  chairperson and he -- we had a discussion about 20

6  minutes on the phone and he's more than happy to have

7  me in there.  He explained the rules to me, what the

8  rules -- house rules were and he'll give me more

9  details later.  But as far as moving in with a friend

10  in say Orange County or working for my brother or

11  anything like that.  You know, I'm kind of -- I don't

12  want to be that burden to those -- my family any more

13  than I have to.  So I think for me to go into an

14  atmosphere with people with the same interests and

15  strive in life with these people here; they're clean

16  and they're sober living people and that's the way

17  they want to stay.  They do -- have nothing to do with

18  anything that has to do with alcohol or drugs.  That

19  gets me into more a independent situation.  Although I

20  have their support and they'll have -- support me to a

21  certain point, I will be independent of my family

22  members, which will actually make me grow out there

23  faster and be more responsible for myself.  Rather

24  than put the burden on sister, brother, friend and

25  live at their house.  I mean, you know, they're

26  willing to help me and everything and that's -- I love

27  that.  That's great.  And they will be there if all

73

1    else fails.  They would be there for me but I have to

2    stand on my own two feet and that's I think a great

3    part of getting that stuff for Riverside.  And the

4    Board was right about that, you know.  I think they

5    kind of pushed me into that because --

6              PRESIDING COMMISSIONER SHELTON:  We have --

7    we need to move on, sir, but I think that we

8    understand your parole plans very well and

9    (indiscernible).

10             INMATE LINN:  Okay.  And as far as the jobs

11   go, I'm not planning on stopping at one employment.  I

12   am going to seek other employment because out there,

13   the opportunity is open.  The market is open.

14             PRESIDING COMMISSIONER SHELTON:  You've got

15   a --

16             INMATE LINN:  And I'm a refrigeration

17   technician and a carpenter.

18             PRESIDING COMMISSIONER SHELTON:  You've got

19   a decent --

20             INMATE LINN:  I will make it.

21             PRESIDING COMMISSIONER SHELTON:  You have

22   some decent skills for yourself.  All right.  We're

23   going to move forward.  This is the portion of the

24   hearing where we can ask questions.  That would mean

25   the Commissioner and myself, as well as both

26   attorneys.  All questions will be asked, at least

27   through the -- by the District Attorney's Office,

74

1    through the Board.  And at this present time I think I

2    don't have any questions so I'm going to go ahead and

3    defer to the Commissioner.

4            DEPUTY COMMISSIONER KEENAN:  No questions.

5            PRESIDING COMMISSIONER SHELTON:  Okay.

6    Mr. Ruiz, do you have any questions at this time?

7            DEPUTY DISTRICT ATTORNEY RUIZ:  Yes.  Yes,

8    please.  I'd like the Panel to ask the inmate, since

9    the inmate blames drugs for the commitment offense,

10   how long was --

11           ATTORNEY FOX:  I'm going to object to that.

12   That mischaracterizes the testimony.  He doesn't blame

13   the commitment offense on drugs.

14           DEPUTY DISTRICT ATTORNEY RUIZ:  I'll

15   rephrase.

16           ATTORNEY FOX:  He's accepted responsibility.

17           DEPUTY DISTRICT ATTORNEY RUIZ:  I'll

18   rephrase.

19           PRESIDING COMMISSIONER SHELTON:  Go ahead.

20           DEPUTY DISTRICT ATTORNEY RUIZ:  Since the

21   inmate claims that he was addicted to cocaine at the

22   time of the offense, how long does the inmate claim

23   that he had been using cocaine?

24           PRESIDING COMMISSIONER SHELTON:  Prior to

25   the offense or --

26           DEPUTY DISTRICT ATTORNEY RUIZ:  Yes.

27           PRESIDING COMMISSIONER SHELTON:  Okay.  Do

75

1    you understand the question?

2              INMATE LINN:  Yes, I do.

3              PRESIDING COMMISSIONER SHELTON:  Okay.  How

4    long?

5              INMATE LINN:  I started using cocaine

6    approximately five and a half months before the

7    commitment offense.  I'd been in -- I wasn't shooting

8    up cocaine until like three months before the

9    commitment offense.  I just was snorting it and then I

10   progressed into using a needle.

11             DEPUTY DISTRICT ATTORNEY RUIZ:  Isn't it

12   true that this inmate has lied to prison staff,

13   specifically psychologists, and exaggerated the number

14   of years to which he was abusing cocaine?

15             PRESIDING COMMISSIONER SHELTON:  Do you

16   understand the question?

17             INMATE LINN:  I never told anyone other than

18   what I've just stated now.  That I started using

19   cocaine five, six months before the commitment

20   offense.

21             DEPUTY DISTRICT ATTORNEY RUIZ:  Does the

22   inmate think it might help refresh his memory about

23   that statement he just made if he were to review page

24   two of the report that was prepared for the Parole

25   Board in 1998, specifically October 13, 1998?  Wherein

26   he represented to Dr. Tureen (phonetic) that he began

27   abusing cocaine four years prior to the -- well, for

76

1  the last -- to quote the doctor, "the last four years

2  of his freedom."

3              PRESIDING COMMISSIONER SHELTON:  Do you

4  remember telling Dr. Tureen that, that you used

5  cocaine for four years, sir?

6              ATTORNEY FOX:  Well, if I may read the

7  entire paragraph?

8              DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

9  I'm doing the questioning at this point.

10             INMATE LINN:  Excuse me.  Is that the Psyche

11  Evaluation Report?

12             DEPUTY DISTRICT ATTORNEY RUIZ:  This is the

13  Psychological Evaluation dated 10/13/98, page two,

14  paragraph nine and I'm doing the questioning here.

15             ATTORNEY FOX:  And what was the question?

16  Did he remember why he said it?

17             DEPUTY DISTRICT ATTORNEY RUIZ:  I've asked

18  the question.  I'd ask that the inmate answer the

19  question.

20             PRESIDING COMMISSIONER SHELTON:  I'm going

21  to take over this.  Page two.

22             INMATE LINN:  Oh, that's incorrect.  This is

23  an incorrect statement on this Psyche Evaluation

24  Report.  I never said that and I see where you found

25  that.  That is not correct.

26             PRESIDING COMMISSIONER SHELTON:  All right.

27             DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

77

1          INMATE LINN:  They included -- what they did

2    is they included the marijuana and the alcohol abuse

3    prior to my conviction and somehow incorporated the

4    cocaine into that.  And that's not even -- that's not

5    a fact.

6          PRESIDING COMMISSIONER SHELTON:  All right.

7          DEPUTY DISTRICT ATTORNEY RUIZ:  So in other

8    words, if any Board has previously relied on a history

9    of cocaine abuse for four years in finding him

10   previously suitable for parole because his abuse of

11   cocaine appeared to be for four years, that would have

12   been an incorrect assumption on that prior Board's

13   part.  Is that correct?

14         ATTORNEY FOX:  Objection.  Calls for

15   speculation.

16         DEPUTY DISTRICT ATTORNEY RUIZ:  No.  That is

17   a hypothetical question.

18         PRESIDING COMMISSIONER SHELTON:  It's a

19   sustained objection.

20         DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

21         PRESIDING COMMISSIONER SHELTON:  All right?

22   And I would like to remove both counsels that this is

23   supposed to a congenial type hearing.  I don't want

24   either one of you to get defensive.  Let's move

25   forward and ask questions so we can determine

26   suitability.

27         DEPUTY DISTRICT ATTORNEY RUIZ:  Thank you.

78

1    I'm trying to get to the truth here.

2              PRESIDING COMMISSIONER SHELTON:  Sure.

3              DEPUTY DISTRICT ATTORNEY RUIZ:  Did the

4    inmate represent to the Panel at this hearing that he

5    would consume $500 to $1,000 worth of cocaine over a

6    several day period?

7              INMATE LINN:  I didn't understand the

8    question.

9              PRESIDING COMMISSIONER SHELTON:  Let me

10   rephrase it.  Did you indicate to us that you would

11   use $500 to $1,000 worth of cocaine over a several day

12   period?

13             INMATE LINN:  My statement that I made --

14             ATTORNEY FOX:  I think (indiscernible).

15             INMATE LINN:  Was I was going through $500

16   to $1,000 of cocaine in -- per week.  It was a weekly.

17   I went from paycheck to paycheck and that's where I

18   went in debt.  Because the -- it was more $500 than

19   $1,000 but occasionally, yes, the guy would give me

20   $1,000 worth.

21             DEPUTY DISTRICT ATTORNEY RUIZ:  So then am

22   in correct in my assumption then that Dr. Tureen is

23   wrong when he writes that the inmate told him that he

24   was doing $500 to $1,000 a day of cocaine?

25             INMATE LINN:  $500 to $1,000 worth of

26   cocaine a day I think would probably kill me.  Even

27   though I was (indiscernible).

79

1          DEPUTY DISTRICT ATTORNEY RUIZ:  Excuse me.

2   The question calls for a yes or no answer.  Was

3   Dr. Tureen wrong when he says the inmate told him he

4   was doing $500 to $1,000 a day, as stated in that same

5   paragraph I've already identified?

6          INMATE LINN:  Yes, he's wrong.

7          DEPUTY DISTRICT ATTORNEY RUIZ:  Isn't it

8   true that the inmate only started using cocaine -- I'm

9   sorry.  Isn't it true that the inmate only used

10  cocaine for a three-month period?

11         INMATE LINN:  I used intravenously for three

12  months.  That's how long I was intravenously using

13  cocaine, for three months prior -- just prior to the

14  conviction.

15         DEPUTY DISTRICT ATTORNEY RUIZ:  Isn't it

16  true that Ron Lordon, his lawyer, hired an expert to

17  prepare a pre-sentencing report for Judge Timlin?

18         INMATE LINN:  Yes.

19         DEPUTY DISTRICT ATTORNEY RUIZ:  And didn't

20  this inmate talk to that expert in preparation of that

21  report?

22         INMATE LINN:  Yes.

23         DEPUTY DISTRICT ATTORNEY RUIZ:  And didn't

24  this inmate talk about, among other things, his

25  history of drug abuse?

26         INMATE LINN:  Yes.

27         DEPUTY DISTRICT ATTORNEY RUIZ:  And didn't

80

1   he specifically tell that individual that he started

2   using cocaine and he didn't -- when he first started

3   using cocaine, he didn't immediately start slamming or

4   injecting cocaine at the very beginning of using

5   cocaine?

6           ATTORNEY FOX:  Objection.  It's a compound

7   question, I think.  It's a inappropriate question.

8           PRESIDING COMMISSIONER SHELTON:  Would you

9   please rephrase that?

10          DEPUTY DISTRICT ATTORNEY RUIZ:  Yes.  Did

11  the inmate start injecting cocaine from the very

12  beginning of his use of cocaine?

13          INMATE LINN:  No.

14          DEPUTY DISTRICT ATTORNEY RUIZ:  I'm confused

15  here, Mr. Ruiz, because he's answered this question a

16  couple of different times and he talked about it

17  earlier today.

18          DEPUTY DISTRICT ATTORNEY RUIZ:  Right.

19  These questions are foundational to see if he's lying

20  about his length of use of cocaine.  He has said that

21  he slammed it for -- I'm sorry -- used it

22  intravenously for three months.  This report says he

23  used it for a total of three months.  He's drawing a

24  distinction.  In this report, he says he did not start

25  -- when he first started using cocaine, it wasn't by

26  injection.  He's exaggerating the length of his use of

27  cocaine.  That's why I'm asking.

81

1        ATTORNEY FOX:  I'd object to --

2        DEPUTY DISTRICT ATTORNEY RUIZ:  I'm --

3        ATTORNEY FOX:  I'd object to the entire line

4   of questioning.  I believe this goes more towards

5   argument rather than suitability.

6        DEPUTY DISTRICT ATTORNEY RUIZ:  I am trying

7   to establish that this inmate is malingering and

8   exaggerating the length of his cocaine abuse as an

9   excuse for his conduct, which shows his unsuitability,

10  which is the key question at this hearing.

11       PRESIDING COMMISSIONER SHELTON:  You know, I

12  can read this paragraph and I will read this paragraph

13  into the record.  And it says:

14            "Together with Mr. Crawley, Robert started

15            using cocaine.  He explains that Crawley and

16            another friend were going to slam it or

17            inject it and initially refused, yet later

18            decided to go along.  Continued to use

19            cocaine for three months, terminating abuse

20            approximately one month prior to his

21            arrest."

22  I guess it's a matter of interpretation as to how you

23  want to read the paragraph but I would like to move

24  on.  I'm not sure where you're going with this.  I

25  know what you're saying with setting a foundation but

26  I'm not sure it's going to make a big difference.

27       DEPUTY DISTRICT ATTORNEY RUIZ:  Very well.

82

1  I just want to draw your attention to the last

2  sentence on page three where he specifically says a

3  few months prior to his arrest, he did start using

4  cocaine.

5       PRESIDING COMMISSIONER SHELTON:  I

6  appreciate that.  Any other questions, sir?

7       DEPUTY DISTRICT ATTORNEY RUIZ:  Yeah.  Oh,

8  is it true that the inmate stopped using cocaine on

9  his own one month prior to his arrest?

10      INMATE LINN:  It's true that I stopped using

11 cocaine but it wasn't a month prior to my arrest.

12      DEPUTY DISTRICT ATTORNEY RUIZ:  Would it

13 help refresh the inmate's memory about what he told

14 that expert hired by his lawyer, if he were to look at

15 page four of that Pre-sentencing Report, second full

16 paragraph, last sentence?

17      ATTORNEY FOX:  He's reading that now.

18      INMATE LINN:  No, that's not true.  I used

19 the cocaine more like up to a few days, maybe a week

20 before I committed that last -- that crime.  That

21 crime was probably committed five days -- the last

22 time I used cocaine was probably about four -- three,

23 four or five days before that time.  And I didn't use

24 any cocaine up to that -- from then on.

25      PRESIDING COMMISSIONER SHELTON:  I know I

26 recall you told me you were under the influence of

27 about six beers that day.

83

1          INMATE LINN:  I drank alcohol that day.

2          DEPUTY DISTRICT ATTORNEY RUIZ:  Well, on

3   that issue, isn't it true though that this inmate has

4   told -- has made several statements about that,

5   including he only felt a slight buzz because that was

6   an everyday thing for him, consuming six beers?  Isn't

7   that true?

8          INMATE LINN:  I referred to like that -- I

9   referred to it as a slight buzz as compared to being

10  straight drunk.  I was still under the influence and I

11  wasn't -- I'm not going to sit here and blame the

12  alcohol.  But the fact is that I drank at least six

13  beers that day and I felt intoxicated on that day.

14         DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  Now

15  getting back to this statement then about stopping its

16  use, the cocaine use one month prior, isn't it true

17  that his memory about when he stopped using cocaine

18  was more fresh back in 1982 than it is now, 26 years

19  later?

20         ATTORNEY FOX:  Objection.  Argumentative and

21  I think it's time to move on.  We're here to discuss

22  suitability.  We're not here to retry the case.

23         PRESIDING COMMISSIONER SHELTON:  And I would

24  sustain that objection.  Come on, Mr. Ruiz.  Let's

25  move this forward.

26         DEPUTY DISTRICT ATTORNEY RUIZ:  In this

27  typewritten statement that has been presented to the

84

1    Board by the inmate --

2            ATTORNEY FOX:  By the inmate's attorney.

3            DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

4    Did the inmate prepare the document entitled

5    circumstances tending to show suitability?

6            ATTORNEY FOX:  Objection.  Relevance.

7            DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

8    Has the Board been asked to consider this document or

9    not?

10            ATTORNEY FOX:  Objection.  Relevance.  It's

11   attorney/client privilege, work product.

12            PRESIDING COMMISSIONER SHELTON:  Wait a

13   second.  I'm going to overrule your objection and I'm

14   going to ask you -- we have not yet reviewed his yet.

15   We're going to review it during recess.

16            DEPUTY DISTRICT ATTORNEY RUIZ:  Exactly.  If

17   you're going to consider it --

18            PRESIDING COMMISSIONER SHELTON:  And yes, it

19   was given -- this was given to us by the inmate's

20   attorney.  The inmate prepared this himself.

21            DEPUTY DISTRICT ATTORNEY RUIZ:  Right.

22            PRESIDING COMMISSIONER SHELTON:  So what is

23   your question?

24            DEPUTY DISTRICT ATTORNEY RUIZ:  I want to

25   ask him questions about what he prepared, to test the

26   truth and voracity of the representations this inmate

27   is making to this Board.  Whether he says it to your

85

1    face or he hands it in a document to you, I have the

2    right to ask questions about it to test its voracity.

3                PRESIDING COMMISSIONER SHELTON:  Does it go

4    to his issue of suitability for parole?

5                DEPUTY DISTRICT ATTORNEY RUIZ:  Absolutely.

6    It goes to the --

7                PRESIDING COMMISSIONER SHELTON:  Ask a

8    question, Mr. Ruiz.

9                DEPUTY DISTRICT ATTORNEY RUIZ:  I'm sorry.

10   There was an objection.  I'm simply responding.  You

11   haven't ruled.

12               PRESIDING COMMISSIONER SHELTON:  I overruled

13   it.

14               DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  With

15   respect -- well, the first thing I want to know is did

16   he prepare this?

17               ATTORNEY FOX:  Objection again.  Work

18   product, attorney/client privilege.

19               DEPUTY DISTRICT ATTORNEY RUIZ: If it is work

20   product then is this attorney saying she prepared it?

21   Because if she prepared it then he did not and you

22   need to know this.

23               ATTORNEY FOX:  Objection.  Work product and

24   attorney/client privilege.  It is what it is.

25               DEPUTY DISTRICT ATTORNEY RUIZ:  That is

26   not --

27               PRESIDING COMMISSIONER SHELTON:  Actually --

86

1      DEPUTY DISTRICT ATTORNEY RUIZ:  If it is a

2  statement made by a Defendant, who is acting as a

3  witness and that is what he is doing, he making

4  averments to you, statements to you.  Whether they are

5  statements made orally or in writing, they are

6  statements.  He is therefore a witness.

7      PRESIDING COMMISSIONER SHELTON:  Ms. Fox,

8  when you handed this to me you told me that your

9  client prepared this.  Is that not true?

10      ATTORNEY FOX:  I told you that, yes.

11      DEPUTY DISTRICT ATTORNEY RUIZ:

12  Attorney/client privilege is waived by that

13  representation.  Did this -- well actually, I don't

14  need to ask a question now.

15      ATTORNEY FOX:  Ask the question.

16      DEPUTY DISTRICT ATTORNEY RUIZ:  With respect

17  to paragraph two, previous record of violence and your

18  represent -- and sorry, the inmate's representation

19  that he does not have any history of previously

20  inflicting or attempting to inflict serious injury on

21  another person.  What happened at that prior robbery

22  of the other, as the inmate likes to call them, wet

23  backs?

24      ATTORNEY FOX:  Once again, objection.  We're

25  not here to retry the case.

26      DEPUTY DISTRICT ATTORNEY RUIZ:  No.  The

27  entire question is his suitability and one of the

87

1   things that all of these --

2              PRESIDING COMMISSIONER SHELTON:    I would

3   over -- I mean, I would sustain your objection based

4   on the fact that it's not on the record.    It was on a

5   statement.    There is nothing, there's no legal record

6   of him committing prior robberies.

7              DEPUTY DISTRICT ATTORNEY RUIZ:    Oh, yes

8   there is.

9              PRESIDING COMMISSIONER SHELTON:    Where?

10             DEPUTY DISTRICT ATTORNEY RUIZ:    It is in his

11  statement submitted to the Court for consideration at

12  sentencing; his statement by his sentencing report

13  that was submitted to the Court.    That is part of the

14  record in this case, just like the Probation Officer's

15  Report.    Judge Timlin took that into consideration

16  when he referred it for the 1203.03 diagnostic.    That

17  is part of the record in this case.

18             PRESIDING COMMISSIONER SHELTON:    All right.

19  So what's your point?    The fact that --

20             DEPUTY DISTRICT ATTORNEY RUIZ:    One of the --

21             PRESIDING COMMISSIONER SHELTON:    -- he said he

22  didn't have any prior record?

23             DEPUTY DISTRICT ATTORNEY RUIZ:    The question

24  on suitability takes into consideration, as you must,

25  whether or not he committed -- whether or not he has

26  an escalating history of violence.    And where he

27  admits to you and where he admitted to the judge that

88

1    he has, in fact, engaged in conduct exactly like this

2    on a prior occasion.  And that the psychologists, when

3    they say he's not a danger to the community because

4    he's never engaged in any conduct like this before

5    except the commitment offense.  Then I get to get up

6    here and argue to you that the psychologist's opinion

7    is based on a faulty foundation because they didn't do

8    their homework.  And they don't realize that he did

9    the exact same thing a month and a half before.  Just

10   like Dr. Macomber writes and just like Dr. Zeka

11   (phonetic) wrote in the report before that.  And he's

12   -- I'm going to have him admit it.  I'm going to get

13   it out of his own mouth and that's going to give me

14   the argument that these psychologists got their

15   opinion wrong.  And the prior opinion of suitability

16   by a prior Board was based on those faulty opinions.

17            PRESIDING COMMISSIONER SHELTON:  All right.

18   Let's go with this, since I get to be the one in

19   charge in this room.  First of all, I already heard

20   Mr. Linn admit to the fact that he did commit a prior

21   robbery, okay?  If it was not acknowledged in the

22   psychologist's report, then they did not do their

23   homework, as you said.  Point being, all right, I will

24   accept the fact, based on your definition, that

25   Mr. Linn has a prior record of violence.

26            DEPUTY DISTRICT ATTORNEY RUIZ:  There is one

27   other thing, however, that I would ask your indulgence

89

1    on.  In that prior incident, according to this inmate,

2    John Crawley shot the victim in that case, another wet

3    back, in the hand because he made the poor victim --

4    and this inmate will acknowledge this.  Hold a can up

5    for kicks and he tried to shoot that can out of the

6    hand of that poor victim and he shot him through the

7    hand on November 2, 1980.  And he and his lawyer

8    presented that in the Pre-Sentencing Report and

9    John Crawley thought it was hysterical.

10           ATTORNEY FOX:  Objection (indiscernible).

11           DEPUTY DISTRICT ATTORNEY RUIZ:  Hey, no.

12   Let me offer push to this Commissioner.  And so --

13           PRESIDING COMMISSIONER SHELTON:  You're

14   pushing your luck with me, sir.

15           DEPUTY DISTRICT ATTORNEY RUIZ:  And so don't

16   you want to know that if he was there and present and

17   saw this and he willingly goes on another robbery,

18   doesn't that evince a callous disregard for the human

19   suffering of other people?  I think that's --

20           ATTORNEY FOX:  (indiscernible).

21           PRESIDING COMMISSIONER SHELTON:  Are you

22   making a closing statement, sir, or are you asking

23   questions (indiscernible)?

24           DEPUTY DISTRICT ATTORNEY RUIZ:  I'm asking

25   for evidence to base my argument on.  I can't make

26   that argument if I don't have evidence to base it on

27   now, can I?

90

1          PRESIDING COMMISSIONER SHELTON:  We're here

2  to discuss suitability.

3          DEPUTY DISTRICT ATTORNEY RUIZ:  And a record

4  of violence is the very essence of suitability.

5          PRESIDING COMMISSIONER SHELTON:  Okay.  We

6  discussed the fact that Mr. Linn has a prior record of

7  violence.  Your discussion of his previous robbery is

8  pushing your limit when it comes to you telling me

9  that his co-partner laughed at the poor victim and

10  you're supposing what Mr. Linn did.  So I would like

11  you to close your questioning, take what's important

12  for you and let's move forward on this.  Your points

13  have been thoroughly taken and understood by this

14  Panel.  I appreciate that.

15          DEPUTY DISTRICT ATTORNEY RUIZ:  It -- then

16  can I ask this?  Is what I just described about the

17  prior shooting a fair characterization of what

18  happened?

19          ATTORNEY FOX:  Objection.

20          DEPUTY DISTRICT ATTORNEY RUIZ:  Is that

21  fair?

22          ATTORNEY FOX:  Objection.  We're not here

23  for fair characterizations based on impressions.  This

24  is a speech.  It's not a question to the inmate.  And

25  my understanding is, the District Attorney's

26  questioning is to be towards suitability.  The file is

27  what the file is.  Consistent statements, inconsistent

91

1    statements; that all goes towards argument.

2            PRESIDING COMMISSIONER SHELTON:  I sustain

3    your objection.  You want to put that into a question,

4    sir, that's easier to answer?

5            DEPUTY DISTRICT ATTORNEY RUIZ:  Is the --

6    yes.  Is the description of what happened at that

7    prior robbery on November 2, 1980 a fair

8    characterization of what happened out there in that

9    prior robbery?

10           PRESIDING COMMISSIONER SHELTON:  Maybe an

11   accurate description.

12           DEPUTY DISTRICT ATTORNEY RUIZ:  An accurate

13   description of what happened out there on that prior

14   robbery?

15           ATTORNEY FOX:  Do you understand that,

16   Robert?

17           INMATE LINN:  I'd like to have that question

18   rephrased.

19           PRESIDING COMMISSIONER SHELTON:  Let me

20   rephrase it.

21           INMATE LINN:  Or just -- I'd like to hear

22   the question again so I'm clear on this.

23           PRESIDING COMMISSIONER SHELTON:  I will

24   rephrase it.

25           ATTORNEY FOX:  Thank you.

26           PRESIDING COMMISSIONER SHELTON:  You

27   admitted to us that you were involved in a robbery

92

1    that you were not held accountable for, in and of

2    itself.  And you admitted that you and your partner

3    did another robbery.  Is it true that your partner

4    shot the victim in the hand and he made him hold up a

5    can and your partner laughed at him?

6         INMATE LINN:  Yes.  The crime happened but

7    that's not how it happened.  That's not what happened.

8    He didn't have his hold his hand up so he could shoot

9    the beer out of his hand.  We had him -- I guess I'm

10   going to have to admit to everything if you want me to

11   talk about a crime --

12        ATTORNEY FOX:  I'm going to object.

13        PRESIDING COMMISSIONER SHELTON:  Yeah.  I

14   mean --

15        INMATE LINN:  I'll go ahead and tell you.

16   No, he had his hand up in the air with a beer can in

17   his hand already.  John kept telling him but the beer

18   down and he still held it up and John shot him in the

19   hand.  But he was shooting -- excuse me -- he was

20   shooting the beer can to shoot -- I don't know what he

21   was thinking.  He was shooting at the beer, not

22   realizing that it was going to go through the guy's

23   hand or whether he realized it was going to go to the

24   hand.  I can't speak for John.  All I know is I saw

25   John pointing the gun towards him, telling him to put

26   the beer down and then he fired a shot at the beer

27   can.

93

1          PRESIDING COMMISSIONER SHELTON:  I guess

2    what -- where we're going here and tell me if I'm

3    wrong, Mr. Ruiz.  But I have a feeling that where

4    we're going is, you did this one robbery with this guy

5    and you used a gun and you hurt somebody.  Why would

6    you go do another one?

7          INMATE LINN:  That's exactly my point.  I

8    saw what John did and I know that he didn't shoot --

9    at that point, it was my belief that John was shooting

10    the beer can out of the guy's hand and not shooting

11    him in the hand.  It's just --

12          PRESIDING COMMISSIONER SHELTON:  So that's

13    what happened.

14          INMATE LINN:  It happened that way.  So for

15    me to think that he was going to -- you know what?  It

16    was bad judgment on my part to believe that he wasn't

17    going to shoot again, okay, at the time.  I did go do

18    another robbery with him.

19          DEPUTY DISTRICT ATTORNEY RUIZ:  That's fine.

20    That's fine.  I'm done with that.  The inmate had been

21    asked about a prior school burglary where some band

22    equipment was taken.  Isn't it true that the inmate

23    was placed on probation for stealing a bicycle as a

24    juvenile, as well?

25          INMATE LINN:  No.

26          DEPUTY DISTRICT ATTORNEY RUIZ:  I'll just

27    expedite this.  I know you want to move on.

94

1          PRESIDING COMMISSIONER SHELTON:   Thank you.

2          DEPUTY DISTRICT ATTORNEY RUIZ:   I'll just

3    draw the Panel's attention then to page five of that

4    report, the same report prepared for the judge at

5    sentencing and part of the record in this case and

6    part of the inmate's C-file.  Mr. Linn reported that

7    he was placed on probation at the age of 12 for

8    burglary in the elementary school and stealing a

9    bicycle.  He finished probation without incident.  In

10   this statement -- again, going back to the typewritten

11   statement presented to the Panel.  The inmate writes:

12          "Mr. Linn does not have any history of

13           mental problems."

14   Does the inmate remember being interviewed by a doctor

15   hired by his lawyer by the name of Dr. Sherry Skidmore

16   (phonetic)?

17          INMATE LINN:   Yes.

18          DEPUTY DISTRICT ATTORNEY RUIZ:   And does the

19   inmate remember Dr. Skidmore telling the judge that

20   the Defendant's personality is borderline and

21   unstable?

22          "He decompensates into periodic breaks on

23           reality.  Outbursts of aggression, strange

24           behavior, impulsiveness and other acting out

25           behavior would be characteristic of Mr. Linn

26           during these episodes.  During these times,

27           Mr. Linn's perceptions, thoughts and

95

1               behaviors are likely to be distorted to an
2               extreme that is psychotic."
3      Does the inmate remember his lawyer presenting that
4      information to the court?
5               ATTORNEY FOX:  Once again, I'd object based
6      on relevance and -- based on relevance.  We're not
7      here to retry the case.
8               DEPUTY DISTRICT ATTORNEY RUIZ:  Well, then
9      I'll offer this.  Does the inmate and his attorney
10     then wish to withdraw number five, psychological
11     figures, from consideration by this Panel?
12              ATTORNEY FOX:  No.
13              DEPUTY DISTRICT ATTORNEY RUIZ:  Well, then I
14     think it is relevant if she wants you to consider it.
15              PRESIDING COMMISSIONER SHELTON:  And this
16     point then, Mr. Ruiz, we're going to -- the Panel will
17     consider all -- everything presented to us.  And we --
18     I think that we're in a position to be able to sort
19     out what we feel is viable for suitability, as well.
20              DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.
21              PRESIDING COMMISSIONER SHELTON:  So let's
22     move along.
23              DEPUTY DISTRICT ATTORNEY RUIZ:  All right.
24     We have presented this then at a prior hearing.  This
25     is in the inmate's file, documented in our letter of
26     April 1, 2004.  Is it true that at the 2001 hearing,
27     the inmate experienced an emotional collapse?

96

1        **INMATE LINN:** No.

2        **ATTORNEY FOX:** Objection -- okay.

3        **DEPUTY DISTRICT ATTORNEY RUIZ:** Okay. Okay.

4        **INMATE LINN:** I can (indiscernible) on that

5 if you like.

6        **PRESIDING COMMISSIONER SHELTON:** No.

7        **ATTORNEY FOX:** I don't know what an

8 emotional collapse is.

9        **PRESIDING COMMISSIONER SHELTON:** I'm not

10 sure where this is all leading but you know, I'm

11 getting a little bit frustrated. So if you would

12 finish your questioning, please.

13        **DEPUTY DISTRICT ATTORNEY RUIZ:** I'm sorry.

14 I'm just reading from Commissioner Steven's note that

15 present -- and I'm sorry. I'm quoting from note to

16 CDC staff, parole denied, recommendations and request.

17        "Presentation not focused. Close to

18        emotional collapse during portions of

19        presentation."

20 I'm just going by what the Panel said.

21        **PRESIDING COMMISSIONER SHELTON:** I read that

22 already, thank you.

23        **DEPUTY DISTRICT ATTORNEY RUIZ:** Okay. Since

24 he put it in issue, I'm just asking him about this.

25        **PRESIDING COMMISSIONER SHELTON:** I think

26 your point is made.

27        **DEPUTY DISTRICT ATTORNEY RUIZ:** Okay.

97

```
1              PRESIDING COMMISSIONER SHELTON:  So are we
2    ready?  Are you done?  Not to rush you or anything,
3    sir, but I'm -- I -- I'm following your line of
4    questioning.
5              DEPUTY DISTRICT ATTORNEY RUIZ:  As you can
6    see, I'm moving onto different questions when you ask
7    me to.  Okay.  The inmate has stated that immediately
8    upon exiting the vehicle, John Crawley went rushing
9    after or pursuing the fleeing murder victim.  Isn't it
10   true that John Crawley was standing just a few feet
11   away from the inmate when he fired that shot at the
12   victim?
13             ATTORNEY FOX:  Objection.  Relevance.  We're
14   not here to retry the case.
15             DEPUTY DISTRICT ATTORNEY RUIZ:  Oh, I'll
16   make an offer of proof or --
17             ATTORNEY FOX:  It'll be the same objection.
18             DEPUTY DISTRICT ATTORNEY RUIZ:  I'll make an
19   offer of proof.
20             ATTORNEY FOX:  That's argument.
21             DEPUTY DISTRICT ATTORNEY RUIZ:  Then I'll --
22             ATTORNEY FOX:  I think it's an argument.
23   Objection to relevance again.
24             PRESIDING COMMISSIONER SHELTON:  Mr. Ruiz,
25   what does that have to do with suitability?
26             DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.  Okay.
27             PRESIDING COMMISSIONER SHELTON:  Like I
```

98

1    said, I'm going to be cutting you off here real quick

2    if we don't wrap this up.

3            DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

4            PRESIDING COMMISSIONER SHELTON:  You need to

5    bring your points to the point.

6            DEPUTY DISTRICT ATTORNEY RUIZ:  Okay.

7            PRESIDING COMMISSIONER SHELTON:  And I've

8    not ever had to do that to a Deputy District Attorney

9    before but we're hearing this out.

10           DEPUTY DISTRICT ATTORNEY RUIZ:  In the '02

11   Psychological Report, his version of the offense was

12   they arrive on scene and one of them, one of the

13   victims take off running.  And he says that he

14   remained back to guard the other two workers and the

15   co-Defendant runs off after the victim.  He guards the

16   two other victims and after that, he hears two shots.

17   It creates the impression that he doesn't even see

18   Crawley shoot.  My offer of proof is no wonder these

19   psychologists find him so blameless.  And what I'm

20   going to do -- no, I'll go ahead and save it for

21   argument at this point.  That's fine.  Since I've

22   tried the patience of the Panel, I'll go ahead and

23   save it for argument.

24           PRESIDING COMMISSIONER SHELTON:  Yes, you

25   have tried our patience.

26           ATTORNEY FOX:  Then I'd move to strike the

27   last part of that speech.

99

1          DEPUTY DISTRICT ATTORNEY RUIZ:  Oh, no.  Or

2    fine.

3          PRESIDING COMMISSIONER SHELTON:  So done.

4          ATTORNEY FOX:   There was no question

5    pending.

6          PRESIDING COMMISSIONER SHELTON:  All right.

7          ATTORNEY FOX:  And I have no questions.

8          PRESIDING COMMISSIONER SHELTON:  Thank you.

9          ATTORNEY FOX:  You're welcome.

10         PRESIDING COMMISSIONER SHELTON:  Before we

11   move into closing statements, I do want to let you

12   know that we send out what are called 3042 Notices to

13   agencies or people that might have an interest in your

14   case.  And we did receive, obviously, a response from

15   the Riverside County District Attorney's Office and

16   none other.  So we're going to go into closing

17   statements now.  And Mr. Ruiz, I would read a

18   statement to you to remind you what your parameters

19   are.

20              "The Hearing Panel accepts as true the

21              findings of the Court.  You are allowed to

22              comment on the facts of the case and present

23              an opinion about the appropriate

24              disposition."

25   And if you start going sideways on me, sir, I will

26   interrupt you.  So feel free to make a brief closing

27   statement, as I know the inmate's counsel will be

100

1    brief at this point in time.

2              **DEPUTY DISTRICT ATTORNEY RUIZ:**   Being

3    intimately familiar with In Re: Elkins and Rosenburg

4    -- I'm sorry Rosencrans and Danenburg, I'm perfectly

5    familiar what my parameters are.   The question before

6    this is suitability and the question of the

7    reasonableness of the risk to public safety is

8    measured by certain factors.   One of those factors is

9    the degree to which the Defendant has engaged in a

10   pattern of criminality.   If this were the only crime

11   that the inmate had engaged in, then given the time

12   that he has served, it tends to inure to the benefit

13   of the inmate on the question of suitability.   That he

14   has enjoyed a relatively free disciplinary free --

15   excuse me -- pattern of behavior and good programming

16   history in this institution.   To the extent that that

17   is not true, he is unsuitable.   If you review each one

18   of my questions under that standard, you will find

19   that each one is germane and highly relevant.   I know

20   what I am doing.   I did my first parole hearing in

21   1991.   Every one of my questions is relevant because

22   each one, having spent six hours going over each one

23   of my questions, they were all designed to elicit

24   answers relative to the question of his willingness to

25   be honest about his substance abuse.   Because as we

26   all know, the more that drugs played a role in this,

27   the less blameworthy he is if he has a handle on it